## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

CARMEN BLANCO.

CASE NO   00-6006-CIV-ZLOCH

Plaintiff,

MAGISTRATE JUDGE SELTZER

v.

MICHAEL W. MOORE, Secretary
of the FLORIDA DEPARTMENT
OF CORRECTIONS, in his Official
Capacity, and FLORIDA DEPT. OF
CORRECTIONS,



Defendants

_____/

## DEFENDANT DOC'S MOTION FOR SUMMARY JUDGMENT

Defendant, FLORIDA DEPARTMENT   OF CORRECTIONS, by and through its undersigned counsel, and pursuant to Rule 56(c), Federal Rules of Civil Procedure, moves for summary judgment on all remaining claims against it, and in support states as follows.

### A.    PLAINTIFF'S CLAIMS:

1.    Plaintiff, Carmen Blanco, commenced this action against Defendants, Michael W. Moore, Secretary of the Florida Department of Corrections, in his official capacity ("Moore"), and the Florida Department of Corrections ("DOC") by filing a Complaint on January 4, 2000. (Dkt 1).

2.    Plaintiff's four count Complaint (Dkt 1) contained the following causes of action. (i) Count I alleges nation origin discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991. 42 U.S.C  §2000e, et seq ("Title VII") against Moore and the DOC; (ii) Count II alleges age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §621, et seq against Moore and the DOC; (iii) Count III alleges national origin discrimination pursuant to the Florida Civil Rights Act of 1992, Florida Statutes §760.01 et seq. ("FCRA") against Moore and the DOC, and (iv) Count IV alleges age discrimination pursuant to the FCRA against Moore and the DOC.

## B.    PROCEDURAL HISTORY:

3.    On or about February 22, 2000, Defendants filed a Motion to Dismiss and Supporting Memorandum of Law. (Dkt. 7) Following compliance with Local Rule 7.1(A)(4), Defendants filed a Motion to Reconsider the Motion to Dismiss. (Dkt. 9).

4    The Motion to Dismiss set forth the following grounds for dismissal of the Complaint.

   a.    Count II, ADEA claim, is barred by the Eleventh Amendment;

   b.    Moore is immune to all claims in the Complaint under the doctrine of sovereign immunity;

   c.    Count I, Title VII claim, is barred by Plaintiff's failure to file suit within 90 days of receipt of the EEOC right-to-sue letter;

   d    Any claims under Count I that arose prior to September 21, 1997 are time-barred,

   e.    Count III, FCRA claim for national origin discrimination, is barred by sovereign immunity and the statute of limitations;

   f    Defendants are not liable for punitive damages under the FCRA; and

   g.    Plaintiff failed to state a claim for age or national origin discrimination.

5.    Upon consideration of the Motion to Reconsider, this Court issued an order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. 15) The May 11, 2000 Order of Court: (i) dismissed Count II pursuant to the Eleventh Amendment to the United States Constitution; (ii) dismissed Count III for failure to comply with Fla. Stat §768.28; and (iii) dismissed all Coun·; against Moore on the grounds of sovereign immunity. (Dkt. 15) The Court did not reach Defendants' FCRA statute of limitations or punitive damages arguments because it dismissed Count III for failure to comply with Fla. Stat §768 28 (Dkt. 15).

6    The May 11, 2000 Order of Court denied Defendant DOC's Motion to Dismiss Count I, but it granted it as to Moore on the grounds of sovereign immunity Therefore, the only remaining Defendant is the DOC (Dkt. 15)

7    Following the Court's May 11, 2000 ruling, the only viable claim is Count I for Title VII national origin discrimination against DOC

8.    On or about July 24, 2000, Defendant DOC filed an Answer and Affirmative Defenses responding to Count I.

9.    Due to a scrivener's error, Count IV was excluded from Defendant's Motion to Dismiss as well as the Answer and Affirmative Defenses. However, the same basis for dismissal of Count III applies to Count IV. See May 11, 2000 Court Order at 5-7 and 6n.1 (Dkt. 15) and Motion to Dismiss at ¶6 and Argument §V (pg. 8-10) (Dkt. 7). Specifically, Plaintiff is prohibited from proceeding on an FCRA claim if she has failed to provide the administrative notice necessary to invoke a waiver of the sovereign immunity embodied in Fla. Stat. §768.28. Accordingly, based on the law of the case, Defendant will move below to dismiss Count IV for the same reasons this Court dismissed Count III.

10.    In the alternative, if this Court denies this Motion for Summary Judgment as to Count IV, Defendant DOC requests leave to file an Amended Answer responding to Count IV.

## C.    STATEMENT PURSUANT TO S.D. FLA. LOCAL RULE 7.5 OF UNDISPUTED MATERIAL FACTS ENTITLING DEFENDANT TO SUMMARY JUDGMENT

The following undisputed facts as stated are taken from the pleadings, depositions and exhibits in the record:

### Relevant Dates

11.    On March 13, 1992, Plaintiff was hired by the DOC as a Word Processor Systems Operator. (Ex. "A"[1]; Complaint at ¶10 (Dkt. 1)).

12.    On June 29, 1998, Plaintiff abandoned her position at DOC by resigning. (Ex. "B").

13.    On July 16, 1998, Plaintiff filed a charge of discrimination against the DOC alleging discrimination in failing to promote and retaliation on the basis of national origin in violation of Title VII and the FCRA. (Ex. "C").

14.    Three hundred (300) days before the filing of the July 16, 1998 EEOC Charge was

_____

[1]In response to a request for production of documents, Defendant DOC produced the EEOC file and the Plaintiff's personnel file. With the exclusion of depositions and interrogatory answers, the attached exhibits are excerpts from the document production.

September 19, 1997.

15.    On Tuesday, October 5, 1999, the EEOC issued its Dismissal and Notice of Rights, EEOC Form 161 (10/96). (Ex. "D").

16.    Monday, January 3, 2000 was the 90th day from October 5, 1999.

17.    Plaintiff's Complaint was filed on January 4, 2000. (Dkt. 1).

### Background Information On Plaintiff

18.    Plaintiff was born on July 9, 1950. (Ex. "E". Deposition of Carmen Blanco taken on March 16, 2001 ("Blanco Depo.") at 6).

19.    Plaintiff was born in Puerto Rico, and she moved to the United States when she was three (3) years old.    (Blanco Depo. at 6).

20.    Plaintiff's educational background consists of high school and three and half (3 1/2) years of post-high school education at Broward Community College and Florida International University (FIU). Plaintiff does not have any degrees or professional licenses. (Blanco Depo. at 8-9).

### The Complaint

21.    Without admitting or conceding the veracity of Plaintiff's factual allegations, which Defendant vehemently disputes, Defendant DOC notes that Plaintiff asserts two types of adverse employment actions. Plaintiff alleges that she was not promoted 11 times between 1992 and 1998, and she claims she was denied training. Plaintiff also alludes to, but does not explicitly state, that she was constructively discharged. (Dkt. 1 at ¶¶ 10-19).

### Undisputed Facts Relevant To Plaintiff's Promotion Claims

22.    Of the 11 promotions Plaintiff claims she did not receive (Blanco Depo. at 41), Plaintiff received one of them (Blanco Depo. at 63-64).

23.    Of the remaining ten positions, Plaintiff was only eligible and qualified for seven of the promotions during her employment. (Ex. "F", Defendant DOC's Answers to Plaintiff's First Set of Interrogatories, at No. 9) (Ex. "G" Applicant Information for Carmen Blanco -- excerpt from the EEOC investigation file which was produced in response to Plaintiff's First Request for Production of Documents).

24.    Of the seven promotions, Plaintiff was eligible and qualified to be considered as an

applicant, only one occurred within 300 days of the filing of Plaintiff's EEOC charge. Specifically, it was for Position #27756 - Fiscal Assistant II, which closed on October 25, 1997. (Ex. "F" at No. 9; Ex. "G"). Carolyn Baker received this promotion. (Id.)

25.    Plaintiff admits to receiving letters at the close of each job search indicating that a more qualified candidate was chosen. (Blanco Depo. at 108).

26.    Plaintiff admits that she does not even know if she had the requisite qualifications for each promotion she sought. She estimates that she was eighty (80%) percent qualified for the positions she sought. (Blanco Depo. at 111).

27.    Plaintiff has no knowledge of Ms. Baker's qualifications or whether Plaintiff is more or less qualified for the positions of Fiscal Assistant II. (Blanco Depo. at 104-105).

28.    Plaintiff's only reason for believing she was more qualified was her six years experience as a word processor with good performance reviews. Plaintiff claims that if an employee had good performance reviews in one job, the person was automatically qualified for a promotion (Blanco Depo. at 109). Plaintiff cannot cite to any DOC policies that incorporate this view.

29.    Ms. Baker was selected for the position of Fiscal Assistant II because she was more qualified than Plaintiff. (Ex. "H". Employee Histories of Baker and Plaintiff).

30.    As a comparison of Plaintiff's and Ms. Baker's employee histories show, Ms. Baker had more experience and was better qualified for the position of Fiscal Assistant II because she had been performing the position since May 1994. Plaintiff's experience, on the other hand, was as a word processor. (Ex. "H").

31.    The record is devoid of any evidence to show that Plaintiff was equally or more qualified for the position of Fiscal Assistant II. (Blanco Depo., Ex. "I", McDonald Depo.; Ex. "F"; Ex. "G", and Ex. "H").

### Undisputed Facts Relevant To Plaintiff's Failure To Train Claims

32.    Plaintiff's supervisor at the time of her resignation, Karen McDonald, is Jamaican. (McDonald Depo. at 6).

33.    Ms. McDonald supervised Plaintiff for approximately two years prior to Plaintiff's resignation. (McDonald Depo. at 11).

34    The record is devoid of any evidence that Plaintiff was denied training opportunities. Non-Hispanic employees were not chosen for select training to increase their chances of promotion. Rather, DOC clerical employees, as a group, do not receive training to enable them to apply for promotions. (McDonald Depo. at 34-36).

35.    The employees could, however, volunteer to serve as back-up for a position that could open up in the future. This would provide an employee with hands on experience. (McDonald Depo. at 34-36, 54).

36.    While under Ms. McDonald's supervision, Plaintiff did not volunteer to serve as a back up to a higher level person, which would provide on the job training in the event a position became open. (McDonald Depo. at 36, 54).

## *Undisputed Facts Relevant To Plaintiff's Resignation*

37.    Plaintiff's only reprimand -- for which she can complain -- occurred on June 16, 1998. It was a written reprimand concerning her unprofessional conduct, which included loud vocal insubordination. (Ex. "J"). Plaintiff could not have suffered any adverse employment actions from this reprimand because she resigned a few days later on June 29, 1998 (Ex. "B").

38    In response, Plaintiff filed two grievances. The first was a union grievance dated June 23, 1998. (Ex. "K"). Plaintiff also filed a Career Service Grievance. (Ex. "L").

39.    The union grievance complained that Plaintiff was not permitted to see her personnel file by Grace Fishter, Ms. McDonald's supervisor. It did not complain in any fashion about national origin discrimination or retaliation. (Ex. "K").

40    The Career Service Grievance complained that Plaintiff was "discriminated against, harassed and retaliated against indirectly." (Ex. "L") It does not, however, refer to or complain in any way about national origin discrimination. (Id.). The remaining 26 lines of Plaintiff's Complaint deal with Ms. Fishter's alleged unprofessional behavior towards Plaintiff. The Grievance provides examples of this unprofessional behavior including negative memorandums in

Plaintiff's personnel file[2] and refusal to permit Plaintiff to inspect the file, but it does not concern Plaintiff's national origin. (Id.). Plaintiff concludes by threatening as follows:

> Until there is an investigation on Ms. Fishter's behavior towards me regarding her unprofessional behavior by an independent agency, or someone from Tellahasee [sic], I Carmen Blanco refuse to come to work until this problem is solved.

(Id.). Importantly, the threat to not return to work concerned Ms. Fishter's alleged unprofessional behavior and not any allegations of discrimination or retaliation on the basis of national origin. (Id.).

41    On June 29, 1998, Plaintiff resigned from her position at the DOC. (Ex. "B"; Blanco Depo. at 96-97).

42    Plaintiff gave the DOC an ultimatum through her resignation. She threatened that until the memorandums Ms. Fishter put in her personnel file were investigated, she would not return. (Blanco Depo. at 96-97).

43    Plaintiff's resignation letter stated in relevant part as follows:

> Ms. McDonald...Until there is an investigation from an independent agency regarding the unethical and unprofessional behavior towards me, I Carmen Blanco resign.. as of June 29, 1998.

(Ex. "B"). Although Ms. Fishter's unethical and unprofessional behavior is referenced in the resignation letter, there is no complaint about discrimination or retaliation on the basis of national origin. (Ex. "B"). It, therefore, is undisputed that Plaintiff voluntarily resigned on June 29, 1998. (Exs. "B", "K", and "L")

44    It also is undisputed that Plaintiff did not complain that she was being discriminated or retaliated against on the basis of her national origin until she filed the EEOC Charge after her resignation. (Ex. "C").

45    It also is undisputed that Plaintiff's reason for voluntarily resigning concerned

[2]It should be noted for the record that Plaintiff's personnel file does not contain any negative memorandums from Ms. Fishter except for the written reprimand (Ex "J"). (See, e.g., Ex. "M" Report of Investigation Office of the Inspector General Department of Corrections dated 12/28/98 excluding attachments [containing a synopsis of the contents of Plaintiff's voluminous personnel file]).

personal matters between her and Ms. Fishter over Ms. Fishter's alleged unprofessional and unethical treatment of Plaintiff -- not over discrimination. (Exs. "B", "K", and "L").

46   In any event, it is also undisputed that the circumstances as described in Plaintiff's own words do not rise to the level of intolerable working conditions. (Exs. "B", "K", and "L").

## D.   MOTION FOR FINAL SUMMARY JUDGMENT

47   The pleadings, depositions and discovery demonstrate the lack of any issue of material fact raised by Plaintiff.

48   Count I fails as a matter of law because the Complaint appears to be filed more than 90 days from the date of the EEOC right to sue letter. E.g., Norris v. Florida Dept. of Health & Rehabilitative Services, 730 F. 2d 682 (11th Cir. 1984).

49   Any claims raised by Plaintiff in Count I that arose before September 19, 1997 -- 300 days before the filing of the EEOC Charge -- also are time-barred. Specifically, there is no evidence of failure to train after September 19, 1997 and ten of the eleven promotions at issue occurred before September 19, 1997. Accordingly, Defendant DOC is entitled to judgment as a matter of law on any time barred claims. See 42 U.S.C. §2000e-5(e)(1), Forehand v. Florida State Hosp., 89 F.3d 1562, 1567 (11th Cir. 1996), Samedi v. Miami-Dade County, 134 F. Supp. 2d 1320, 1342 (S.D. Fla. 2001).

50   Defendant is entitled to judgment as a matter of law on Plaintiff's only non-time barred claim under Count I because the undisputed facts of this case establish that Plaintiff cannot establish a prima facie case of failure to promote because of her national origin. Specifically, Plaintiff cannot show she was qualified for the position of Fiscal Assistant II, and Plaintiff cannot show that Carolyn Baker was equally or less qualified for that position. E.g., Walker v. Mortham, 158 F. 3d 1177, 1192-93 (11th Cir. 1998); Wu v. Thomas, 847 F. 2d 1480, 1483 (11th Cir. 1988).

51   Defendant is entitled to judgment as a matter of law on Plaintiff's constructive discharge charge claim in Count I because it is outside the scope of the EEOC charge. E.g., Evans v. U.S. Pipe & Foundry Co., 696 F. 2d 925, 928-29 (11th Cir. 1983).

52   Further, Defendant is entitled to judgment as a matter of law on Plaintiff's constructive discharge charge claim in Count I because the undisputed facts of this case establish

that Plaintiff voluntarily resigned. Moreover, the undisputed facts do not support a claim that the work conditions are objectively intolerable so as to require Plaintiff to resign. E.g., Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 n.2 (11th Cir. 1997).

53      Under the law of the case doctrine, Plaintiff is entitled to judgment as a matter of law on Count IV because it should be dismissed for the same reasons this Court dismissed Count III -- failure to comply with Fla. Stat. §768.28. E.g., Winck v. Danzig, Civil Action No. 01-A-216-N, 2001 U.S. Dist. LEXIS 7950 at *5 (N.D.Ala., June 11, 2001).

54      Defendant also is entitled to judgment as a matter of law on Plaintiff's FCRA age discrimination claim in Count IV because it is outside the scope of the EEOC charge. E.g., Evans v. U.S. Pipe & Foundry Co., 696 F.2d at 928-29.

55.      Defendant also is entitled to judgment as a matter of law on the punitive damages claims in Counts I and IV because state agencies cannot be liable for punitive damages. See 42 U.S.C. § 1981a(b)(1); Erickson v. Hunter, 932 F. Supp 1380 (M.D. Fla. 1996) aff'd without op 176 F.3d 493 (11th Cir. 1999).

56.      Finally, Defendant is entitled to judgment as a matter of law on any damages claims beyond June 29, 1998 because Plaintiff voluntarily resigned. E.g., Morrison v. Genuine Parts Co., 828 F.2d 708, 709 (11th Cir 1987).

57      In further support of this Motion for Summary Judgment, Defendant DOC incorporates by reference as if fully set forth herein its Memorandum in Support.

WHEREFORE, Defendant respectfully requests that this Court grant summary judgment on Counts I and IV because the undisputed facts of record establish that Plaintiff cannot establish liability on Counts I and IV.

In the alternative, Defendant requests that this Court grant summary judgment on Plaintiff's claims for punitive damages and damages arising after June 29, 1998, and grant it leave to file an Amended Answer to respond to Count IV.

-06006-WJZ    Document 36    Entered on FLSD Docket 07/18/2001    Pa

Blanco v. Moore, etc., et al.
CASE NO. 00-6006-CIV-ZLOCH
Page 10

## MEMORANDUM IN SUPPORT

### I.    STANDARD FOR SUMMARY JUDGMENT

Summary Judgment is proper, as it is here, when the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and Defendants, as the moving party, show they are entitled to judgment as a matter of law. Hill v. Clifton, 74 F.3d 11150, 1152 (11th Cir 1996), citing Celotex Corporation v. Catrett, 477 U.S. 317, 322 (1986). The evidence must be viewed in the light most favorable to the non-moving party. Hill at 1152. Pursuant to Federal Rule of Civil Procedure 56(c), this action should be dismissed in its entirety. Even construing all the evidence in favor of the non-moving party, Plaintiff cannot establish that Defendant is liable to Plaintiff on the claims presented in Counts I and IV.

### II.    DOC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNT I

#### A.    Plaintiff Must Comply With The Jurisdictional Prerequisites Of Title VII.

Title VII requires that plaintiffs seeking to bring civil actions under Title VII must do so within 90 days of receiving notice of their right-to-sue from the EEOC. See Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980); Goldsmith v. Atmore, 996 F.2d 1155, 1160 (11th Cir. 1993); Norris v. Florida Dept. of Health & Rehabilitative Services, 730 F. 2d 682 (11th Cir.1984), 42 U.S.C. § 2000e-5(f)(1). Compliance with the 90 day requirement is a prerequisite or condition precedent to the bringing of a Title VII action. If a claimant does not file suit within the time allotted, her claim is time-barred. 42 U.S.C. §2000e-5(f)(1); 29 U.S.C. §626(3); see generally, Norris, 730 F. 2d at 682; Chapman v. Travalco, U.S.A., Inc., 973 F. Supp. 1045 (S. D. Fla. 1997). In fact, this ninety-day limit is strictly enforced in the Eleventh Circuit. See Norris v. Florida Department of Health and Rehabilitative Services, 730 F.2d at 682 (ninety-one days); Law v. Hercules, Inc., 713 F. 2d 691, 692 (11th Cir 1983) (Title VII complaint, filed ninety-one days after the EEOC's right-to-sue letter was signed by plaintiff's seventeen year-old son, was time-barred. The dismissing suit filed ninety-one days after right to sue letter received at their shared place of residence), Bell v. Eagle Motor Lines, Inc., 693 F. 2d 1086 (11th Cir 1982) (affirming the dismissal of suit for failure to meet the 90-day filing deadline where the EEOC notification letter was delivered to plaintiff's home and was received by Plaintiff's wife who resided in the

home).

The 90 day period begins to run from the date the EEOC right to sue letter is delivered to formally designated counsel or to claimant. Thus, the date that the ninety days begins to run is from the date that the Plaintiff receives the notice. E.g., Goldsmith; Ringgold v. National Maintenance Corp., 796 F. 2d 769, 770 (5th Cir. 1986). In this case, the EEOC issued the right to sue letter on October 5, 1999. (Ex. "D"). Plaintiff filed the complaint 91 days later on January 4, 2000. Unless Plaintiff can show that she received the letter prior to October 6, 1999, Count I must fail as a matter of law because it is time-barred.

**B. Plaintiff's Claims Arising Prior To September 19, 1997 Are Time-Barred.**

Title VII requires that a charge of discrimination with EEOC be filed within 300 days of the alleged unlawful employment practice. See 42 USC §2000e-5(e)(1) (requiring charges to be filed "within three hundred days after the alleged unlawful employment practice occurred"); Forehand v. Florida State Hosp., 89 F.3d 1562, 1567 (11th Cir. 1996). Any claims for relief concerning alleged unlawful employment practices that occurred prior to 300 days before the filing of the EEOC charge are time-barred as a matter of law.

In this case, Plaintiff filed her charges with the FCHR and the EEOC on July 16, 1998 (Ex. "C"). Any claims arising from actions taken prior to September 19, 1997, therefore, are time-barred. As noted in the undisputed facts, Plaintiff asserts two claims in her Complaint -- denials of 11 promotions and failure to train. It is undisputed that only one of the eleven promotions at issue occurred within the 300 day time period. Specifically, it was Position #27756 - Fiscal Assistant II, which closed on October 25, 1997. (Ex. "F" at No. 9; Ex. "G"). With respect to the failure to train, Ms. McDonald, Plaintiff's supervisor during this 300 day time period, unequivocally testified that Plaintiff was not denied any training opportunities during this period. (McDonald Depo. at 34-36, 54). Moreover, Plaintiff's deposition is devoid of any denials of training during the relevant time period. (See, generally, Blanco Depo.). Plaintiff, as a matter of law, only can assert one timely claim for failure to promote, and she cannot assert any timely claims of failure to train. Accordingly, this Court should grant summary judgment to Defendant DOC with respect to any claims arising prior to September 19, 1997. See Samedi v. Miami-Dade

County, 134 F. Supp. 2d 1320, 1342 (S.D. Fla. 2001) (granting summary judgment on all claims arising more than 300 days before the filing of the EEOC charge). Specifically, this Court should rule that the only timely claim the Plaintiff has is for the failure to promote to Position #27756.

## C.    Plaintiff's Only Non-Time Barred Claim Fails As A Matter Of Law.

A plaintiff may establish a prima facie of discrimination in a promotional decision by showing: (1) that she is a member of a protected class [national origin]; (2) that she was qualified for and applied for a promotion; (3) that she was considered for and denied the promotion, and (4) other equally or less qualified employees who are not members of the protected minority were promoted. See Walker v. Mortham, 158 F. 3d 1177, 1192-93 (11th Cir. 1998), Wu v. Thomas,847 F. 2d 1480, 1483 (11th Cir. 1988), see also Bundy v. Jackson, 641 F. 2d 934, 951 (D.C.Cir.1981) (modifying formula approved in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 & n. 13 (1973) for cases involving discriminatory refusal to hire). For purposes of summary judgment only, DOC can concede that Plaintiff can establish the first and third elements. Plaintiff is of Puerto Rican national origin, and she was considered and denied the promotion (Blanco Depo. at 6 and Ex "H"). Plaintiff has no evidence that she was qualified for the position (the second element) or that an equal or less qualified non-minority person received the promotion (the fourth element). Therefore, as a matter of law, Plaintiff's failure to promote claim fails.

The only non-time-barred promotion concerns Position #27756 - Fiscal Assistant II, which closed on October 25, 1997. (Ex. "F" at No. 9; Ex. "G"). Carolyn Baker received the promotion. (Id.). In this case, Plaintiff has no evidence to show that Plaintiff was qualified to be the Fiscal Assistant II, or that Carolyn Baker was equally or less qualified than Plaintiff. As the undisputed facts show, Plaintiff admits to receiving letters at the close of each job search -- presumably including this position -- indicating that a more qualified candidate was chosen. (Blanco Depo. at 108) Plaintiff also admits that she does not even know if she had the requisite qualifications for each promotion she sought. She estimates that she was eighty (80%) percent qualified for the positions she sought. (Blanco Depo. at 111).

Plaintiff has no knowledge of Ms. Baker's qualifications or whether Plaintiff is more or

less qualified for the position of Fiscal Assistant II. (Blanco Depo. at 104-105). Plaintiff's only reason for believing she was more qualified was her six years experience as a word processor with good performance reviews. Plaintiff claims that if an employee had good performance reviews in one job the person was automatically qualified for a promotion. (Blanco Depo. at 109). This, however, is unsupported by any DOC policy.

The undisputed evidence does establish that Ms. Baker was selected for the position of Fiscal Assistant II because she was more qualified than Plaintiff. (Ex. "H": Employee Histories of Baker and Plaintiff). As a comparison of the Plaintiff's and Baker's employee histories show, Ms. Baker had more experience and was better qualified for the position of Fiscal Assistant II because she had been performing the position since May 1994. Plaintiff's experience, on the other hand, was as a word processor. (Ex. "H", Blanco Depo. at 109). Accordingly, Plaintiff lacks any evidence to show that Plaintiff was equally or more qualified for the position of Fiscal Assistant II. (Blanco Depo., Ex. "I", McDonald Depo.; Ex. "F"; Ex. "G", and Ex. "H").

Although Defendant DOC acknowledges that it has the initial burden in a summary judgment motion to establish the absence of a genuine issue as to any material fact, the Plaintiff has the burden of presenting evidence to support her claims. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) ("the focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). At the summary judgment stage, Plaintiff's burden is to set forth specific facts showing the existence of a genuine issue of a material fact by producing affirmative evidence sufficient for a reasonable jury to return a verdict in her favor. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). A mere "scintilla" of evidence, or evidence that is only "colorable" or is "not significantly probative" is insufficient. Anderson, 477 U.S. at 248-50. Issues of fact are genuine only if a reasonable jury, considering the evidence presented, could find for Plaintiff. Anderson, 477 U.S. at 247-51.

In this case, Plaintiff the record is insufficient and unsupported by admissible evidence. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (where

factual context of claim is implausible, the nonmoving party must come forward with more persuasive evidence than would otherwise be necessary). The record does not provide Plaintiff with any evidence sufficient to met her burden in this summary judgment. Specifically, the Plaintiff show the existence of a genuine issue of a material fact by producing affirmative evidence sufficient for a reasonable jury to return a verdict in her favor because no such facts exist. Accord, Earley, 907 F 2d at 1080. In this case, Plaintiff cannot establish that she was not promoted because of her national origin Nor can Plaintiff demonstrate that she was equally or more qualified than Carolyn Baker, the individual selected for the promotion. Accordingly, Defendant is entitled to judgment as a matter of law on Count I because Plaintiff's only non-time barred claim lacks any evidentiary support

## D.   Plaintiff's Constructive Discharge Claim Fails As A Matter Of Law.

Although it is not clear from the Complaint, Plaintiff may also be asserting a constructive discharge claim under Count I. Defendant is entitled to summary judgment on this claim for two reasons First, it is beyond the scope of the EEOC charge, and it is unsupported by the record.

### 1.   Plaintiff Is Prohibited From Raising Claims Not Raised In Charge.

Plaintiff's EEOC charge, which was cross-filed with the FCHR (Ex. "C"), does not raise any claims of constructive discharge. It only raises a claim of national origin discrimination in failing to promote and retaliation in violation of Title VII The charge indicates that the first and last date of discrimination was April 18, 1998 -- several months before her resignation (Ex. "C"). The charge does not reference or complain that Plaintiff was constructively discharged. Therefore, any claims of constructive discharge are beyond the scope of the original charge. Unless the lawsuit claim is "like or related" to the claims raised in the EEOC charge, lawsuit counts raising claims outside the scope of the EEOC charge of discrimination fail as a matter of law. E.g., Evans v U.S. Pipe & Foundry Co., 696 F.2d 925, 928-29 (11th Cir 1983), EEOC v. Jacksonville Shipyards, Inc., 696 F Supp 1438 (M D. Fla 1988). Wallace v Alabama By-Products Corp., Civil Action No. 85-AR-0110-S, 1985 U.S. Dist. LEXIS 15590, *4-*5 (N.D.Ala. Sept. 25, 1985). Plaintiff's constructive discharge claim, therefore, fails as a matter of law because it is beyond the scope of the EEOC charge in that it is not "like or related" to a

-06006-WJZ    Document 36    Entered on FLSD Docket 07/18/2001    Pa

Blanco v. Moore, etc., et al.
CASE NO. 00-6006-CIV-ZLOCH
Page 15

failure to promote claim. (Ex. "C").

## 2.    Plaintiff Was Not Constructively Discharged.

Moreover, the evidence is insufficient to support a claim of constructive discharge. In order to be eligible for any damages after the date of Plaintiff's resignation, she must prove that she was "constructively discharged." Morrison v. Genuine Parts Co., 828 F.2d 708, 709 (11th Cir 1987). The standard for proving constructive discharge is extremely high. In fact, it is higher tha · the standard for proving a hostile work environment. Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment "), aff'd, 511 U.S. 244 (1994); see also Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316-18 (11th Cir. 1989) (affirming district court's conclusion that Title VII plaintiffs were subjected to hostile work environment, but were not constructively discharged); Huddleston v. Roger Dean Chevrolet, Inc., 845 F.2d 900, 905-06 (11th Cir 1988) (same).

In evaluating constructive discharge claims, this Court cannot consider Plaintiff's subjective feelings. Instead, this Court is to employ an objective standard. Doe v. DeKalb County Sch. Dist., 145 F.3d 1441, 1450 (11th Cir. 1998). Specifically, a plaintiff must demonstrate that working conditions were "so intolerable that a reasonable person in her position would have been compelled to resign." Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 n.2 (11th Cir 1997). See also Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991) (citation omitted) (the Eleventh Circuit Court of Appeals has "traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable'"). The Eleventh Circuit has made clear that a failure to promote, as Plaintiff claims here, is insufficient to establish grounds for being constructively discharged. See Wardwell v. School Bd. of Palm Beach County, 786 F.2d 1554 (11th Cir 1986). Likewise, there is no legal support for the theory that a Plaintiff is permitted to use her resignation as an ultimatum to obtain an investigation of alleged unprofessional behavior by a supervisor that is unrelated to violations of the ADEA, Title VII and/or the FCRA. This is especially true, where as in this case, the Defendant DOC had options for Plaintiff to pursue two different types of internal grievances. (Exs. "K" and "L").

The evidence in this case is devoid of objective support for how Plaintiff could have been constructively discharged. It is undisputed that Plaintiff voluntarily resigned from her position at the DOC on June 29, 1998. (Ex. "B", Blanco Depo. at 96-97). It also is undisputed that the circumstances as described in Plaintiff's own words do not rise to the level of intolerable working conditions. (Ex. "B"). Plaintiff's reason for leaving concerned personal matters between her and Ms. Fishter over Ms. Fishter's alleged unprofessional and unethical treatment of Plaintiff -- not over discrimination. Plaintiff gave the DOC an ultimatum through her resignation. She threatened that until the memorandums Ms. Fishter allegedly placed in her personnel file were investigated, she would not return. (Blanco Depo. at 96-97; Exs. "K," "L" and "B"). In fact, Plaintiff never complained of discrimination on the basis of national origin or age prior to her resignation, and she resigned before fully pursuing her grievances. (Exs. "K," "L" and "B").

There are no genuine issues of material fact in dispute as to the determination of whether Plaintiff was constructively discharged. Plaintiff's deposition testimony coupled with here two grievances and her resignation letter make it perfectly clear that Plaintiff was not working in intolerable working conditions. Rather, Plaintiff was in a dispute with her supervisor over personnel matters wholly unrelated to discrimination or retaliation on the basis of national origin or age discrimination. This is not "intolerable" as required by the Eleventh Circuit. Cf. Poole v. Country Club of Columbus, Inc., 129 F.3d at 553.

Defendant DOC is entitled to a judgment as a matter of law on Plaintiff's constructive discharge charge claim because it is beyond the scope of the EEOC charge (Ex. "C") and is wholly unsupported by the evidence. (Blanco Depo. at 96-97; Exs. "K," "L" and "B").

## III.   DOC IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNT IV

In the May 11, 2000 Order of Court, this Court found as a matter of law that Count III should be dismissed for failure to comply with §768.28(6)(a), Florida Statutes. (Dkt. 15 at 6). As noted above, due to a scrivener's error, Count IV was excluded from the Motion to Dismiss as well as the Answer and Affirmative Defenses. Accordingly, this is Defendant DOC's first response to Count IV.

## A.    The Law Of The Case Doctrine Requires Dismissal Of Count IV.

Count IV sets forth the same claim as Count III -- violation of the FCRA -- except that
Count IV concerns age instead of national origin discrimination. (Dkt. 1 at ¶¶31-40). In any
event, both Counts III and IV are based on the same administrative proceeding of filing a charge
of discrimination (Ex. "C") with the EEOC. (Dkt. 1 at ¶¶8-9).

On May 11, 2000, Count III was dismissed pursuant to the argument set forth in
Defendants' Motion to Dismiss. Defendant DOC incorporates by reference the arguments in
favor of dismissal of Count III of the Complaint in support of why summary judgment should be
granted on Count IV. In short, Plaintiff's Complaint does not state that Plaintiff has provided the
administrative notice necessary to invoke waiver of sovereign immunity embodied in section
768.28, Florida Statutes, in order to pursue Counts III or IV.

Under the law of the case doctrine, this Court should dismiss Count IV for the same
reasons it dismissed Count III. The law of the case doctrine "posits that when a court decides
upon a rule of law, that decision should continue to govern the same issues in subsequent stages
in the same case." Winck v. Danzig, Civil Action No. 01-A-216-N, 2001 U.S. Dist. LEXIS 7950
at *5 (N.D.Ala., June 11, 2001), quoting Arizona v. California, 460 U.S. 605, 618 (1983). In this
case, the same reasons for dismissing Count III support why Defendant is entitled to judgment as
a matter of law on Count IV. As this Court found as a matter of law on May 11, 2000:

> The Defendants next assert that they are entitled to dismissal of Count III of
> Plaintiff's Complaint because the Plaintiff has failed to allege that she provided the
> administrative notice necessary to invoke a waiver of sovereign immunity as
> required by Fla. Stat. § 768.28. Fla. Stat. §768.28 provides in relevant part:
>> An action may not be instituted on a claim against the state or one
>> of its agencies or subdivisions unless the claimant presents the claim
>> in writing to the appropriate agency, and also, except as to any
>> claim against a municipality or the Spaceport Florida Authority,
>> presents such claim in writing to the Department of Insurance,
>> within 3 years after such claim accrues and the Department of
>> Insurance or the appropriate agency denies the claim in writing.
> This section is part of the statutory waiver of sovereign immunity and by its terms
> requires written notice of the Department of Insurance within three years of the
> accrual of the claim before suit may be filed against any state agency. Levine v.

-06006-WJZ    Document 36    Entered on FLSD Docket 07/18/2001    Pa

Blanco v. Moore, etc., et al.
CASE NO. 00-6006-CIV-ZLOCH
Page 19

Dade County Sch. Bd., 442 So.2d 210, 212 (Fla. 1983)
Here, the Plaintiff's Complaint fails to allege that she has provided the
administrative notice necessary to invoke a waiver of sovereign immunity
embodied in Fla. Stat. §768 28. The Plaintiff also has failed to allege the dates on
which she was allegedly denied promotions. Absent evidence of waiver of
statutory notice or estoppel by the state or other entity involved, where the time
for notice of claim against the state has expired so that it is apparent that the
Plaintiff cannot fulfill the requirement, the Court has not alternative but to dismiss
Count II of the Plaintiff's Complaint  See Brown v. State Dep't of Corrections,
701 So.2d 1211 (Fla. 1st DCA 1997).

(Dkt 15 at pp. 5-6). Due to Plaintiff's failure to comply with §768 28, Fla Stat., Defendant

DOC is entitled to judgment as a matter of law on Count IV.

## B. Plaintiff Is Prohibited From Raising Claims Not Raised In Charge.

Plaintiff's EEOC charge, which was cross-filed with the FCHR (Ex. "C"), does not raise

any claims of discrimination on the basis of age. It only raises a claim of national origin

discrimination and retaliation. Therefore, Count IV, age discrimination in violation of the FCRA,

is beyond the scope of the original charge  As explained above with respect to the constructive

discharge claim, unless the lawsuit count is "like or related" to the claims raised in the EEOC

charge, lawsuit counts raising claims outside the scope of the EEOC charge of discrimination fail

as a matter of law. E.g., Evans, 696 F 2d at 928-29; Wallace v. Alabama By-Products Corp.,

1985 U.S. Dist. LEXIS 15590 at *4-*5. Plaintiff's age discrimination claim, as with the

constructive discharge claim, fails as a matter of law because it is beyond the scope of the EEOC

charge. (Ex. "C").

## IV. THE DOC CANNOT BE LIABLE FOR PUNITIVE DAMAGES.

Plaintiff asserts that she is entitled to an award of punitive damages against the DOC on

Counts I and IV.[3] Plaintiff's claim for punitive damages fails as matter of law because she cannot

recover punitive damages from a state agency on either Count I or Count IV.

_____

[3]Plaintiff also claimed she was entitled to punitive damages on Counts II and III, but these
claims were dismissed so this Court did not reach the punitive damages issue in the May 11, 2000
Order of Court concerning Defendants' Motion to Dismiss. (Dkt. 15).

With respect to Count I, Title VII explicitly exempts Defendant DOC from punitive damages. See 42 U.S.C. § 1981a(b)(1) ("Determination of punitive damages. A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) ...."). See also Erickson v. Hunter, 932 F. Supp 1380 (M.D. Fla. 1996) aff'd without op 176 F.3d 493 (11th Cir. 1999).

With respect to Count IV, section 768.28(5), Florida Statutes provides that "the state and its agencies and subdivisions shall be liable for tort claims in the same manner and to the same extent as a private individual under like circumstances, but liability shall not include punitive damages or interest for the period before judgment." See also §760.11(5), Florida Statutes (cross-referencing §768.28(5) in the FCRA).

As a matter of law, Plaintiff cannot recover punitive damages from Defendant DOC in Counts I and IV. Therefore, this Court should grant summary judgment as to Plaintiff's claims for punitive damages to the extent this Court does not dismiss Counts I and IV in their entirety.

## V. PLAINTIFF IS BARRED FROM RECOVERING ANY DAMAGES FROM JUNE 29, 1998 INTO THE FUTURE.

To the extent this Court is inclined to deny Defendant's Motion to Dismiss Counts I and/or IV in their entirety, Plaintiff is barred from recovering any damages beyond June 29, 1998 -- the date she resigned. In a claim under Title VII[1], damages can include back pay and front pay. The back pay period extends until the date of judgment. Nord v. United States Steel Corp., 758 F.2d 1462, 1473 (11th Cir. 1985) (citation omitted). Therefore, back pay begins at the time of the discriminatory employment action and runs through the date judgment is entered in a plaintiff's favor. Front pay and/or reinstatement, on the other hand, are discretionary and cover the time period from the judgment through a date in the future where the jury or the court believes Plaintiff will be restored to the same status as before the alleged discriminatory acts occurred. Id.

___

[1]Courts apply federal case law dealing with Title VII claims to the FCRA because the FCRA is patterned after Title VII. See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 (11th Cir. 1998). Therefore, if this Court limits recovery for Count I by Plaintiff's resignation date, it must also do so for Count IV.

When an employee voluntarily quits her job, the employer's liability for back pay, and likewise front pay, ends at the date of the resignation. See Morrison, 828 F.2d at 709; Key v. Bender Shipbuilding & Repair Co., Civil Action No. 1:98-1123-RV-C, 2000 U.S. Dist. LEXIS 10122, *3-*4 (S.D. Ala. July 10, 2000). In Morrison, the plaintiff brought a failure to promote case when the plaintiff had voluntarily quit. The jury returned a verdict in favor of Plaintiff on the failure to promote claim but the court directed a verdict on the constructive discharge claim. The court then limited the damages to back pay from the date the promotion would have taken place until the date of Plaintiff's resignation. Morrison, 828 F.2d at 710 n.1.

In this case, it is undisputed that Plaintiff resigned on June 29, 1998. (Ex. "B"). To the extent Plaintiff succeeds in this matter, Defendant DOC's responsibilities for damages ends on June 29, 1998. Plaintiff's damages -- including back pay, front pay and/or reinstatement -- are barred after June 29, 1998 because she voluntarily resigned. See Morrison, 828 F.2d at 709, see also Nance v. Maxwell Federal Credit Union, 186 F.3d 1338 (11th Cir. 1999) (holding that Plaintiff is not entitled to front pay if she voluntarily resigned and was not constructively discharged). As described above in Section II-D, Defendant is entitled to summary judgment as a matter of law on Plaintiff's constructive discharge claim. This Court also should enter a partial summary judgment as to any damages that occurred after June 29, 1998 because Plaintiff cannot state a claim for these damages as a matter of law.

## VI.    CONCLUSION

For the foregoing reasons, Counts I and IV must be dismissed as a matter of law because there are no genuine issues of material facts in dispute, and Defendant DOC is entitled to judgment as a matter of law. In the alternative, Defendant DOC is entitled to a partial motion for summary judgment on Plaintiff's claims for punitive damages and damages arising after June 29, 1998.

Blanco v. Moore, etc., et al.
CASE NO. 00-6006-CIV-ZLOCH
Page 21

Respectfully submitted,

KUBICKI DRAPER
Attorneys for Defendants
City National Bank Building
25 West Flagler Street, PH
Miami, Florida    33130
Tel. (305) 982-6612
Fax. (305) 374-7846

By: _____
ELIZABETH M. RODRIGUEZ
Florida Bar No. 821690

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Defendant DOC's Motion for

Summary Judgment was sent by and by U.S. Mail this 16th day of July, 2001, to: ANDREW S.

HENSCHEL, ESQ., Henschel and Henschel, P.A., 951 NE 167 Street, Suite 205, North Miami

Beach, FL 33162

_____
ELIZABETH M. RODRIGUEZ

# STATE OF FLORIDA
# REPORT OF PERSONNEL ACTION

OFFICE OF ASSISTANT SECRETARY FOR OPERAT
TION IV- REGIONAL DIRECTOR'S OFFICE
BATION & PAROLE SERVICES

DATE PRINTED 03.26/92

EMPLOYEE    BLANCO, CARMEN D

| FROM | TO |
|---|---|

## EMPLOYEE

| SOCIAL SECURITY # | POS # | POS F.T.E. | SVC | EFFECTIVE DATE | SOCIAL SECURITY # | POS # | POS F.T.E. | SVC | EFFECTIVE DATE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 21210 | 1.00 | 1 | 03/13/92 |

EMPLOYEE NAME

EMPLOYEE NAME
BLANCO, CARMEN D

COPES ORGANIZATION

COPES ORGANIZATION
T03040901704 ANDREWS OFFICE

| APPOINTMENT TYPE | APPOINTMENT STATUS | STATUS EXPIRE | APPOINTMENT TYPE | APPOINTMENT STATUS | STATUS EXPIRE |
|---|---|---|---|---|---|
| | | | ORIGINAL | PROBATIONARY | 09/13/92 |

| PAY PLAN | CLASS | CBU | INCL | ANNIV DATE | PAY PLAN | CLASS | CBU | INCL | ANNIV DATE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | CAREER SERVICE | 0090 | 01 | INC | 03/13 |

OFFICIAL CLASS TITLE

OFFICIAL CLASS TITLE
WORD PROCESSING SYSTEMS OPERATOR

## ACTION

| | | ACTION |
|---|---|---|
| | 01 | ORIGINAL |

## PAY

| BASE RATE | RATE | HR BASE | HR RATE | FTE | TYPE | BASE RATE | RATE | HR BASE | HR RATE | FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | B | 498.98 | 547.78 | 6.24 | 6.95 | 1.00 |

| CAD | LEADWORKER | SHIFT | ON CALL | CONTACT | OTHER | CAD | LEADWORKER | SHIFT | ON CALL | CONTACT | OTHER |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 45.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| EXMPT | ADD WTH | RET | INSURANCE | LAST PERF APPRAISAL | W4 | EXMPT | ADD WTH | RET | INSURANCE | LAST PERF APPRAISAL |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | M | 01 | 0.00 | HA | 0000 | |

DISBURSEMENT CODE              INTER DEPT

DISBURSEMENT CODE              INTER DEPT
T01010003657030030000401000000    000000000

SAMAS ORGANIZATION

SAMAS ORGANIZATION
T03040017400 ANDREWS OFFICE PROBATION & C

## LEAVE WITHOUT PAY

| HOURS | FROM | TO | HOURS | FROM | TO |
|---|---|---|---|---|---|

## LOCATION

| LOCATION | HEADQUARTER COUNTY | LOCATION | HEADQUARTER COUNTY |
|---|---|---|---|
| | | | 06 BROWARD |

| PHYSICAL COUNTY | PHYSICAL COUNTY |
|---|---|
| | 06 BROWARD |

## SEPARATIONS AND TERMINAL LEAVE

| REASON FOR SEPARATION | ANNUAL | SICK PRE 73 | POST 73 | SPC COMP |
|---|---|---|---|---|

| ANNUAL PAID | SICK PAID | SPECIAL COMP PAID | |
|---|---|---|---|

## COMMENTS

REQUESTED BY _____    DATE 03/16/92

APPROVAL _____    DATE 3-30-92

LOCATION _____ *17 -4* _____    EFFECTIVE DATE *3/13/92*

*BLANCO      CARMEN      DELIA*      ▆▆▆▆▆▆▆▆▆▆
(LAST NAME)    (FIRST NAME)    (MIDDLE INITIAL)    (SOCIAL SECURITY NUMBER)

TYPE OF EMPLOYMENT: CS ✓   OPS _____   SMS _____   SES _____

TYPE OF ACTION:

_✓___ ORIGINAL
_____ PROMOTION
_____ DEMOTION
_____ REASSIGNMENT
_____ TERMINATION

_____ LEAVE WITHOUT PAY
_____ RETURN FROM LEAVE OF
        ABSENCE W/0 PAY
_____ OTHER

| FROM | | TO |
|------|------------------|----------|
|  | CLASS TITLE | *WPSO* |
|  | CLASS CODE | *0090* |
|  | POSITION NUMBER | *21210* |
|  | *RATE OF PAY | *547·78* |
|  | STATUS | *PROB.* |

REMARKS:_____
_____
_____
_____
INSTRUCTIONS ON BACK

TO BE COMPLETED BY PERSONNEL
RECRUITMENT _____
COPES _____
CHANGE ORDERS _____
DATE _____

RECOMMENDED BY:_____
            SUPERVISOR                DATE

_____  _____    _____  _____
APPOINTING AUTHORITY   DATE       PERSONNEL              DATE

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**
**PROBATION AND PAROLE SERVICES CIRCUIT 17-0**

**MEMO TO:** GRACE FISHTER, CPSS

  **FROM:** KAREN MCDONALD, WPSO SUP

  **DATE:** JULY 1, 1998

**SUBJECT:** **EMPLOYEE RESIGNATION EFFECTIVE 6/29/98**
          **MS. CARMEN BLANCO #09312**

---

Please be advised that on the above date, this writer received a faxed
copy of Ms. Carmen Blanco's resignation effective June 29, 1998. Please
see attached.

*Karen McDonald*
Karen McDonald, WPSO SUP

cc: Barry Groves, CPDA
    Gary Rogatz, CPSCA
    Personnel File

QUALITY IS CONTAGIOUS

MEMO TO:  KAREN MCDONALD
          WPSS

FROM:     CARMEN BLANCO
          WPSO

DATE:     June 29, 1998

SUBJECT:  CAREER GRIEVANCE REGARDING- INDIRECT RETALIATION,
          HARASSMENT AND DISCRIMINATION.

---

Ms. McDonald, We all have choices to make. We can stand up for what is right or we
can join others in doing what is wrong. I believe in doing the "Right Thing". All those
memos that Ms. Fishter put in my file while I was out on sick leave must be addressed
with higher authorities.

Until there is an investigation from an independent agency, regarding the unethical
and unprofessional behavior towards me. I Carmen Blanco resign from the
Department of Corrections as of June 29, 1998.

I am confident, that in a Court of Law the " Right Thing" will be done .
Sincerely,

Carmen Blanco

Carmen Blanco
WPSO


cc:   E. E. O. C.
      Attorney

# CHARGE OF DISCRIMINATION

This ... is affected by the Privacy Act 1974; see Privacy Act statement be...
completing this form.

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| | FEPA | |
| | X EEOC | 15A980402 |

Broward County Human Rights Division _____ and EEOC
*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Ms. Carmen D. Blanco | (954) 979-4689 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1740 S. W. 70 Avenue, Pompano Beach, FL 33068-4358 | | 07/09/50 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE,
STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Department Of Corrections | 15 - 100 Employees | (954) 467-4645 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| Ten West Las Olas Boulevard, Fort Lauderdale, FL 33301 | | 011 |

| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 04/18/98 | 04/18/98 |
| ☒ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

1. I have been employed by the Respondent since 3/12/92 as a Word
   Processor. I filed a complaint with the Respondent about being
   discriminated against in July, 1993 and 1996. In retaliation, I
   have been further discriminated against and treated differently
   because of my National Origin by denying me equal wages and
   failure to promote. I have been harassed continually since
   July, 1993 to the present by exposing me to a hostile, continuous
   and pervasive environment. I am Puerto Rican.

2. The Respondent has informed me that they do not have to give a
   reason for exposing me to differential treatment.

3. I believe that I have been discriminated against in violation of
   Title VII of the Civil Rights Act of 1964, as amended, Section
   704a, and the Florida Civil Rights Act (Chapter 760).

MICHAEL O. BURNEY
CC ... 9 CC 201259
... 19 04, 1995
... 1999
ATLANTIC ELECTRONIC CO., INC

Fla. D... R-452-7104-90-749-C

☐ I want this charge filed with both the EEOC and the State or
local Agency, if any. I will advise the agencies if I change my
address or telephone number and cooperate fully with them in the
processing of my charge in accordance with their procedures.

NOTARY *(When necessary for State and Local Requirements)*

I swear or affirm that I have read the above charge and that
it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true
and correct.

X *Carmen D. Blanco*

Date  1/6/98   Charging Party *(Signature)*

SIGNATURE OF COMPLAINANT

X *Carmen D. Blanco*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(Day, month, and year)*
16- July -1998

EEOC FORM 5 (Rev. 06/92)

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Ms. Marian Deadwiley
Supervisor For Civil Rights
State Of Fl/Depart. Of Corrections
2601 Blairstone Road
Tallahassee, FL 32399

| Blanco, Carmen D |
|---|
| THIS PERSON (check one) |
| [X] CLAIMS TO BE AGGRIEVED |
| [ ] IS FILING ON BEHALF OF ANOTHER |

| DATE OF ALLEGED VIOLATION | |
|---|---|
| *Earliest* | *Most Recent* |
| 04/18/98 | 04/18/98 |

PLACE OF ALLEGED VIOLATION

Fort Lauderdale, FL

CHARGE NUMBER

15A980402

## NOTICE OF CHARGE OF DISCRIMINATION
*(See EEOC "Rules and Regulations" before completing this form)*

You are hereby notified that a charge of employment discrimination has been filed against your organization under:

[X] **TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

[ ] **THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967**

[ ] **THE AMERICANS WITH DISABILITIES ACT**

[ ] **THE EQUAL PAY ACT (29 U.S.C. SECT. 206(d))** investigation will be conducted concurrently with our investigation of this charge.

The boxes checked below apply to your organization:

1. [ ] No action is required on your part at this time.

2. [X] Please submit by 10/30/98 a statement of your position with respect to the allegation(s) contained in this charge, with copies of any supporting documentation. This material will be made a part of the file and will be considered at the time that we investigate this charge. Your prompt response to this request will make it easier to conduct and conclude our investigation of this charge.

3. [ ] Please respond fully by _____ to the attached request for information which pertains to the allegations contained in this charge. Such information will be made a part of the file and will be considered by the Commission during the course of its investigation of the charge.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

MIAMI DISTRICT OFFICE
One Biscayne Tower, Suite 2700
2 South Biscayne Blvd.
MIAMI, FLORIDA 33131

Nelson Benedico, Supervisor
*(Commission Representative)*

(305) 536-4776
*(Telephone Number)*

[X] Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

[ ] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [X] NAT. ORIGIN   [ ] AGE   [ ] DISABILITY   [X] RETALIATION   [ ] OTHER

CIRCUMSTANCES OF ALLEGED VIOLATION

See enclosed Form 5, Charge of Discrimination.

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 09/22/98 | Federico Costales<br>Director | |

EEOC FORM 131 (Rev. 06/92)

RESPONDENT'S COPY

| To: | From: |
|---|---|
| **Ms Carmen D. Blanco**<br>**1740 SW 70 Ave.**<br>**Pompano Beach, FL 33068-4358** | **Miami District Office**<br>Equal Employment Opportunity Commission<br>One Biscayne Tower, Suite 2700<br>2 South Biscayne Boulevard<br>Miami, Florida 33131-1805 |

☐ *On behalf of a person aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge Number<br>15A 98 0402 | EEOC Representative<br>Frank J. Burke | Telephone No.<br>305 530 6047 |
|---|---|---|

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ We cannot investigate your charge because it was not filed within the time limit required by law.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You had 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

-- NOTICE OF SUIT RIGHTS --
*(See the additional information attached to this form.)*

Title VII, the Americans with Disabilities Act, and/or Age Discrimination in Employment Act: This will be the only notice of dismissal and of your right to sue that we will send you. You may pursue this matter further by bringing suit in federal or state court against the respondent(s) named in the charge. If you decide to sue, you must sue WITHIN 90 DAYS from your receipt of this Notice. Otherwise your right to sue based on the above-numbered charge will be lost.

Equal Pay Act (EPA): EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible. (If you file suit, please send a copy of your court complaint to this office.)

On behalf of the Commission

**OCT 05 1999**

| *(Date Mailed)* | Federico Costales, District Director |
|---|---|

cc:

Margaret Chriswan
Employee Relations
Department of Corrections
2601 Blair Stone Road
Tallahassee, FL 32399-2500

EEOC Form 161 (10-96

```
 1              UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
 2                  FORT LAUDERDALE DIVISION

 3                       CASE NO. 00-6006-CIV-ZLOCH

 4                       MAGISTRATE JUDGE SELTZER

 5    CARMEN BLANCO,                     )
                                        )
 6                    Plaintiff,         )
                                        )
 7    vs.                               )
                                        )
 8    MICHAEL W. MOORE, Secretary of    )
      the FLORIDA DEPARTMENT OF         )
 9    CORRECTIONS, in his Official      )
      Capacity, and FLORIDA DEPT. OF    )
10    CORRECTIONS,                      )
                                        )
11                    Defendants.        )
                                        )
12   _____

13

14

15                    Penthouse, City National Bank Building
                      25 West Flagler Street
16                    Miami, Florida
                      Friday, March 16, 2001
17                    11:00 a.m.

18

19

20
                           DEPOSITION OF
21
                           CARMEN BLANCO
22

23

24

25                            SHIPANO COURT REPORTING
```

```
 1    APPEARANCES:

 2            HENSCHEL & HENSCHEL, P.A.
              By:  DREW BEINHAKER, ESQ.
 3            On behalf of the Plaintiff

 4            KUBICKI DRAPER
              By:  PETER J. OPPENHEIMER, ESQ.
 5            On behalf of the Defendants

 6                        _ _ _

 7

 8

 9                   -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           The deposition of CARMEN BLANCO, a witness of

2    lawful age, taken for the purpose of discovery and for

3    use as evidence in the above-styled cause, pending in

4    the United States District Court for the Southern

5    District of Florida, Fort Lauderdale Division,

6    pursuant to notice, before Kathryn E. Oliver,

7    Shorthand Reporter and Notary Public in and for the

8    State of Florida at Large, at the time and place

9    aforesaid.

10                          I N D E X

11   WITNESS                                      PAGE

12   CARMEN BLANCO

13        Direct (By Mr. Oppenheimer)              4

14                          EXHIBITS

15   Defendants' No. 1                            101

16                        _ _ _

17

18

19

20

21

22

23

24

25

```
 1    Thereupon:
 2                        CARMEN BLANCO
 3    the Plaintiff herein, was called as a witness by the
 4    Defendants and, having been first duly sworn, was
 5    examined and testified as follows:
 6                        DIRECT EXAMINATION
 7    BY MR. OPPENHEIMER:
 8         Q.    Can you please state and spell your name
 9    for the record?
10         A.    Carmen, C-a-r-m-e-n, D. Blanco, B-l-a-n-c-
11    o.  D is my initial, middle initial.
12         Q.    Miss Blanco, my name is Peter Oppenheimer
13    and I've been retained by the defendant in this
14    matter.  And I'm going to ask you some questions
15    today.  Have you ever had your deposition taken
16    before?
17         A.    No.
18         Q.    I'm going to ask you a series of questions,
19    I'm sure your attorney has told you if you don't know
20    the answer just tell me you don't know, it's perfectly
21    fine.  Neither of us want you guessing at answers.
22    Also, if you don't hear something or don't understand
23    what I'm asking you please state so and I'll restate
24    the question for you.  If I ask a question and you
25    answer it I'm going to assume that you heard the
```

6

```
 1          Q.   And first marriage?

 2          A.   Yes.

 3          Q.   When were you married?

 4          A.   11/22 of '72.  31 years.  I'm sorry, I know

 5     it's in November.

 6               November 22 of 1972.

 7          Q.   Have you ever been known by any names other

 8     than Carmen Blanco?

 9          A.   No.

10          Q.   What is your maiden name?

11          A.   My maiden name is Garcia.

12          Q.   And what is your age currently?

13          A.   I am 50 years old.

14          Q.   Your date of birth?

15          A.   7/9/50.

16          Q.   Where were you born?

17          A.   I was born in Puerto Rico.

18          Q.   When did you come to Florida?

19          A.   In 1979.

20          Q.   Had you lived in Puerto Rico up to that

21     time?

22          A.   No.  I came to the United States when I was

23     three years old.

24          Q.   And where in the United States did you go

25     to?
```

```
 1        A.    New York.
 2        Q.    When did you move to Florida?
 3        A.    1979.
 4        Q.    What is your Social Security number?
 5        A.    ████████████.
 6        Q.    And what is your current home phone number?
 7        A.    ████████
 8        Q.    ████████
 9        A.    Um-hmm.  Yes.
10        Q.    You'll do that a bunch of times, it's okay.
11    Is that area code 305?
12        A.    Yes.
13        Q.    And what is your current address?
14        A.    ██████████████████████████████
15    ████████████
16        Q.    I'm sorry?
17        A.    ████████████████████████
18        Q.    And you have a 305 area code?
19        A.    When you said area code you--
20        Q.    The area code for your home phone, home
21    phone number.
22        A.    Oh, I'm sorry, ██████ It used to be ██████
23    ████████
24        Q.    Is this a house?
25        A.    Yes.
```

1      Q.    How long have you lived there?

2      A.    1984.

3      Q.    And do you own that house?

4      A.    Yes.

5      Q.    Who do you live with at that location?

6      A.    My husband.

7      Q.    Anyone else?

8      A.    No.

9      Q.    Do you currently have a valid State of

10    Florida driver's license?

11     A.    Yes.

12     Q.    Have you ever been convicted of a crime?

13     A.    No.

14     Q.    Do you have any criminal sanctions pending

15    against you as we sit here today?

16     A.    No.

17     Q.    Do you have any children?

18     A.    No.

19     Q.    Can you briefly go through your educational

20    background with me?

21     A.    I graduated high school.

22     Q.    Where was that?

23     A.    In New York.  I went to Broward Community

24    College and I went to FIU, so total I have three years

25    and a half of university.

```
1        Q.    Do you have any degrees?

2        A.    No, not yet.  I'm working on that.

3        Q.    Are you currently in school?

4        A.    No.

5        Q.    Do you hold any professional licenses?

6        A.    No.

7        Q.    Besides the lawsuit we're here over today,

8   have you ever been a party to any other lawsuits,

9   whether as a plaintiff or a defendant?

10       A.    No, that--you're talking about civil?

11       Q.    Any type of lawsuits.

12       A.    I was in a car accident, but it wasn't me

13  against anyone, it was that the guy hit me and I

14  had--he had to pay for my car damages.

15       Q.    Do you know if you filed a lawsuit in

16  regards to that?

17       A.    Yes, of course I had an attorney with that.

18       Q.    Is that currently going on?

19       A.    Yes.

20       Q.    Were you injured in that lawsuit?

21       A.    Yes, I was.

22       Q.    Who is your attorney for that lawsuit?

23       A.    Roselli.

24       Q.    Chris Roselli?

25       A.    Um-hmm.
```

```
 1        Q.    And when did that accident occur?

 2        A.    1998.

 3        Q.    What were your injuries?

 4        A.    Excuse me?

 5        Q.    What were your injuries?

 6        A.    My neck and my back and my knee, my left

 7   knee.

 8        Q.    Aside from that one auto matter, have you

 9   ever been involved in any other lawsuits besides this

10   case?

11        A.    That wasn't the only accident I had, there

12   were other accidents I've had.

13        Q.    Were there other lawsuits regarding other

14   accidents?

15        A.    The two.   There was another one before that

16   in 1997, and the same thing, they hit my bumper.

17        Q.    Were you injured in that one?

18        A.    Just my neck.

19        Q.    Did you file a lawsuit?

20        A.    Yeah.   Well, Roselli's handling both cases.

21        Q.    They're both still ongoing?

22        A.    Yeah, they're both still ongoing.

23        Q.    Aside from those two lawsuits and the one

24   we're here over today--

25        A.    That's it.
```

1       Q.    --have you been involved in any others?

2       A.    No, that's it.

3       Q.    Have you been deposed in those cases, do

4    you have depositions scheduled?  Something like this,

5    similar to this deposition?

6       A.    No.

7       Q.    Are you claiming any physical injuries as a

8    result of your treatment with the Department of

9    Corrections?

10      A.    Well, I'm not claiming, no.  Not physical.

11      Q.    No physical injuries claimed?

12      A.    Not physical.  When you say physical you

13   mean hurt, right?

14      Q.    Yes, physically, whether--

15      A.    No.

16      Q.    --problems, pains anywhere in your body.

17            You're claiming mental anguish?

18      A.    Well, let me--I went through a lot of

19   emotional stress there.

20      Q.    I'm talking about physical injuries aside

21   from emotional.

22      A.    No.

23      Q.    None?

24      A.    No.

25      Q.    And you are claiming emotional injuries as

1    a result of your treatment--

2        A.    I had to go to the doctor, yes.

3        Q.    Are you claiming emotional injuries as a

4    result of the first car accident we mentioned which is

5    the 1998 lawsuit?

6        A.    Emotional, no, that has nothing to do with

7    it.

8        Q.    How about in the prior accidents' lawsuits,

9    are you claiming emotional injuries in those?

10       A.    You know, I really don't know.  Because the

11   attorney's the one that's handling that and I know the

12   suffering I was put through, but I really don't know

13   that, what he's--it hasn't been settled yet.

14       Q.    Do you believe you suffered emotional

15   injuries in the 1998 car accident?

16             MR. BEINHAKER:  Objection, asked and

17        answered.

18             You can answer it.

19       A.    Do I have to answer?  I don't--emotional?

20   I think, you know, this is something that it doesn't--

21   when you're in an accident you do get emotional.  So

22   what you're asking me, am I claiming that, I don't

23   know if the claim--if it's needed to do that I'll do

24   that.

25       Q.    Well, my question is, in your opinion as we

1   sit here today did you suffer emotional injuries in

2   the 1998 lawsuit?

3        A.   Emotional injuries.  I got worried, yes.

4        Q.   Anything besides getting worried?

5        A.   You go through the nervousness of the body

6   and you go through all that.

7        Q.   Subsequent to the accident itself, say a

8   couple weeks later continuing on until today, have you

9   continued to suffer emotional injuries from that 1998

10  accident?

11       A.   No.

12       Q.   The 1997 accident, do you believe you

13  suffered emotional injuries in that one?

14       A.   Yes, you do--if you--yes.  Yes.

15       Q.   Do you believe you're still suffering

16  emotional injuries as a result of that 1997 accident

17  as we sit here today?

18       A.   I think so, yes, because when I hear a

19  siren I get scared.

20       Q.   Do you know who the defendant is in the

21  1998 accident?

22       A.   I don't, no.

23       Q.   How about in the 1997 accident?

24       A.   I don't remember.

25       Q.   What is the make of the current vehicle you

```
 1   drive?

 2        A.   A Toyota, '96.

 3        Q.   What model Toyota?

 4        A.   Corolla.

 5        Q.   Color?

 6        A.   Green.

 7        Q.   Have you ever been a member of a union?

 8        A.   No.

 9        Q.   What was your date of separation from the

10   Department of Corrections?

11        A.   I don't remember the exact date.

12        Q.   Does June 29th, 1998 sound correct?

13        A.   Yeah, that sounds correct.

14        Q.   Have you filled out any employment applica-

15   tions since June 29th of 1998?

16        A.   With the department or--

17        Q.   With anyone.

18        A.   In general?  Yes, I work for a temporary

19   agency right now.

20        Q.   Did you have to fill out an application

21   with the temp agency?

22        A.   Yes, I did.

23        Q.   What's the name of that temp agency?

24        A.   Unique Temporary.

25        Q.   Do you know what their phone number is?
```

```
1        A.    No.  I don't know it offhand.

2        Q.    Where are they located?

3        A.    I believe it's in Pembroke Pines.

4        Q.    Do you remember when you filled out that

5   application?

6        A.    About a year ago.

7        Q.    Sometime in the year 2000?

8        A.    Right.

9        Q.    And other than Unique Temporary located

10  somewhere in Pembroke Pines, have you filled out

11  employment applications with any other persons or

12  companies, entities, since--

13       A.    The separation date?

14             MR. BEINHAKER:  Let him finish the question

15       before you answer.

16             Go ahead.

17       Q.    Any other employment applications with any-

18  body since June 29th--

19       A.    Yes.

20       Q.    --of 1998?

21       A.    Yes.

22       Q.    Who else?

23       A.    I can't recall.  But I did go, I did fill

24  other employment applications.

25       Q.    You don't know any of them as we sit here
```

16

1    today?

2        A.    No, I don't remember.  I went to several

3    interviews for a job.

4        Q.    Do you remember anywhere you interviewed

5    at?

6        A.    Not really.  Because I went to--mainly it

7    was temporary agencies, then if I would see an article

8    in the newspaper I would probably just pick out and

9    go.  I don't remember because they never--if they

10   didn't call me back, I didn't go back for a second, I

11   would just kind of dismiss it if they didn't call me

12   back.

13       Q.    Did you start doing work through Unique

14   Temporary in the year 2000?

15       A.    Yes.

16       Q.    From 1998 through the year 2000 did you

17   work for anyone else?

18       A.    For--not really, it was a temporary agency.

19   It was also, I think, Unique, but then they moved.

20       Q.    You need to listen to the questions please.

21   The question is between 1998, your separation date,

22   June of 1998 and your beginning work through Unique

23   Temporary sometime in the year 2000, did you work for

24   anyone else?

25       A.    Yes.  I'm telling you, yes.

1        Q.    Who else did you work for?

2        A.    Who else?  Let me see.  I can't recall the

3    name.  I just can't recall the name.  I remember work-

4    ing.

5        Q.    You can't recall anybody you worked for

6    between your date of separation and when you started

7    with Unique Temporary?

8        A.    No, I can't.

9        Q.    Were you paid--

10        A.    I can't recall right now, let's put it this

11    way.

12        Q.    Were you paid by check?

13        A.    Yes.

14        Q.    Were you paid by cash for any of them?

15        A.    No.

16        Q.    Were these other temporary agencies or were

17    they companies that hired you directly?

18        A.    Temporary agency.

19        Q.    What temp agencies did you work for during

20    this time?

21        A.    There was one called Personnel or something

22    Personnel.

23        Q.    Any others?

24        A.    No.

25        Q.    And about how many different employers did

```
 1    you work for from your date of separation until the

 2    year 2000 when you started with Unique Temporary?

 3        A.    About two.

 4        Q.    You don't remember the names of either of

 5    them?

 6        A.    No.

 7        Q.    And who have you worked for through Unique

 8    Temporary since starting to get jobs through them in

 9    the year 2000?

10        A.    I worked for Republic Bank, basically it

11    was Republic Bank.  And now I'm at Nurre Caxton, a

12    company called Nurre Caxton.

13        Q.    Can you spell that?

14        A.    N-u-r-r-e  C-a-x-t-o-n.

15        Q.    Any others besides Republic Bank and Nurre

16    Caxton?

17        A.    That's it.

18        Q.    Let's start out with Republic Bank.  Do you

19    remember the approximate times you worked for Republic

20    Bank?

21        A.    No.

22        Q.    Was that the first job you received through

23    Unique Temporary?

24        A.    I'm not sure if that was the first.  No.

25    I'm not sure.
```

1        Q.    You don't know whether--

2        A.    I don't know how to answer this because I

3   don't recall exactly.

4        Q.    What did you do for Republic?

5        A.    I worked in the collection department.

6        Q.    What was your rate of pay?

7        A.    I think I started something like $8 an

8   hour, something like that.

9        Q.    How long did you work for them?

10       A.    Approximately eight months or something

11  like that.

12       Q.    And was your job the same for that entire

13  eight months?

14       A.    Basically.

15             Yes.

16       Q.    Did your rate of pay change at all during

17  that eight months?

18       A.    I'm sorry?

19       Q.    Did your rate of pay change at all through-

20  out that eight months?

21       A.    I think, yes, after--almost towards the end

22  they put it at $10 an hour.

23       Q.    And what location of Republic did you work

24  at?

25       A.    It was in downtown Fort Lauderdale next to

```
 1    the library.  I don't remember the exact address.
 2         Q.    Who was your supervisor?
 3         A.    I don't remember his name.
 4         Q.    Do you remember any of the names of the co-
 5    workers you worked with there?
 6         A.    No.
 7               Well, there was a girl called--I remember
 8    one girl called Cathy Mohammed or something like that.
 9         Q.    Why did you leave that position?
10         A.    I think they were moving.  I didn't leave
11    that position, they kind of like told people they have
12    to start looking for another job because they were
13    moving to some state in the middle of--
14         Q.    Were you laid off, is that what you're
15    trying to say?
16         A.    Yeah, I think so, yeah.  That came out in
17    the newspaper.  They moved to a different state or
18    something like that.
19         Q.    Did you receive any benefits from them?
20         A.    No, not really.
21         Q.    What were your exact duties?
22         A.    Calling up customers and putting--sort of
23    like accounts receivable, mainly, whatever duties go
24    with accounts receivable.
25         Q.    And the job with Nurre Caxton?
```

```
 1        A.    That's also the accounting department.
 2        Q.    When did you start with them?
 3        A.    About a year ago.  I don't remember the
 4   exact date.
 5        Q.    Are you still working for them now?
 6        A.    Yes, I am.
 7        Q.    Where are they located?
 8        A.    They're located in Sunrise Boulevard.
 9        Q.    What kind of company are they?
10        A.    A frame company.
11        Q.    I'm sorry?
12        A.    Frame.
13        Q.    Like artwork type frame?
14        A.    Yeah, artwork.
15        Q.    Is this a store or is it--
16        A.    This is a company.  It's a company.
17        Q.    And what is your pay?
18        A.    $10 an hour.
19        Q.    And has that remained the same--
20        A.    Yes.
21        Q.    --since you began approximately a year ago?
22        A.    Yes.  Because it's the temp agency now,
23   this is through the temp agency.  I work--
24        Q.    Do you receive any benefits?
25        A.    --for the temp agency.
```

```
 1              No, no benefits.
 2       Q.    Who's your supervisor?
 3       A.    His name is John Bartell.
 4       Q.    Are there any co-workers you work with on a
 5  regular basis?
 6       A.    There's three people there.
 7       Q.    What are their names?
 8       A.    Christine, Madeliene, and Angela, a new
 9  girl that started there.
10       Q.    Do you know any of their last names?
11       A.    Madeliene Rose was one of them.
12       Q.    R-o-s-e?
13       A.    Right.  The other one is Alvarez, Angela
14  Alvarez.  And--
15       Q.    Do you know Christine's last name?
16       A.    Marino; I'm not sure.
17       Q.    What are your actual duties that you have
18  at Nurre Caxton?
19       A.    It's accounts receivable.
20       Q.    What does that include?
21       A.    That includes putting data into the
22  computer, word processing, accounts receivable.
23  Everything that entails accounts receivable.
24       Q.    Have you worked for anyone else besides
25  these two entities--
```

```
 1        A.    No, then it was the Department of Correc-
 2   tions.
 3        Q.    So nobody else since your separation date
 4   from the Department of Corrections?
 5        A.    No, nobody else.
 6        Q.    Who did you work for prior to the Depart-
 7   ment of Corrections?
 8        A.    Well, it was also a personnel agency, I
 9   think it was Personnel Pool.
10        Q.    Personnel Pool?
11        A.    Um-hmm.
12        Q.    What were the dates of that?
13        A.    I can't recall.  This is going back.
14        Q.    Approximately.
15        A.    19--maybe 1991 or maybe 1989, someplace
16   around there.  From '89 to '92 when I started with the
17   department I was having like part-time jobs because I
18   was going to school.  So I would take different part-
19   time jobs.
20        Q.    Do you remember anyone you worked for?
21        A.    They sent me to so many different places.
22        Q.    Do you know the names of any of them?
23        A.    Discount Auto Parts.  These are like
24   temporary jobs.  I don't remember most of them.
25        Q.    Do you remember the names of any of the
```

```
1    others you worked for aside from Discount Auto Parts?
2         A.    I'm pretty sure I did but I don't remember
3    the names.  They were short-term assignments.  I don't
4    remember.
5         Q.    Prior to starting with Personnel Pool do
6    you remember who you worked for?
7         A.    I can't recall.
8         Q.    Do you remember any of the employers you
9    worked for prior to Personnel Pool?
10        A.    No.  No, because when I left a job--no.
11        Q.    Did you ever file any claim of discrimina-
12   tion with anyone, any type of complaint with any
13   employer prior to working at the Department of
14   Corrections?
15        A.    No.  Not that I can recall.  No.
16        Q.    Have you filed any complaints since working
17   at the Department of Corrections regarding any
18   employer aside from the Department of Corrections
19   itself--
20        A.    No.
21        Q.    --any complaints of discrimination?
22        A.    No.
23        Q.    Have you ever been terminated from a job?
24        A.    No.  Not that I can recall.
25        Q.    Pardon?
```

```
 1          A.    I can't recall.  But I'm pretty--I don't
 2     recall ever being terminated from a job.
 3          Q.    Do you currently own a cell phone?
 4          A.    Yes, I do.
 5          Q.    What's the number?
 6          A.    Well, no, no.  Me, under my name, no, I
 7     don't.
 8          Q.    Your husband does, I take it?
 9          A.    Yeah, my husband does.
10          Q.    Do you ever use that cell phone, keep it
11     with you?
12          A.    Yes, I do.
13          Q.    What's the number for that cell phone?
14          A.    It's
15          Q.         rea code?
16          A.    Right.
17          Q.    Did you file tax returns for the five
18     years, the five calendar years prior to beginning with
19     the Department of Corrections--
20          A.    I file my taxes--
21          Q.    --in 1992?
22          A.    I file my taxes every year.
23          Q.    Do you have copies of those tax returns at
24     home, do you know?
25          A.    Um-hmm.
```

```
 1        Q.    Yes?
 2        A.    Yes.
 3        Q.    Do you know how far back--
 4        A.    I should get them, yes.
 5        Q.    Do you know how far back the tax returns
 6    you have at your house go?
 7        A.    About ten years.
 8        Q.    So if we were to request you to produce
 9    those would it be a problem?
10        A.    No.
11        Q.    Is your husband currently employed?
12        A.    He's retired, my husband.
13        Q.    How long has he been retired?
14        A.    I don't know the exact time, but he's been
15    retired--can I do an approximation maybe?
16        Q.    Yes.
17        A.    Eight years, something like that.
18        Q.    How old is your husband?
19        A.    He's 76.
20        Q.    And what did he retire from?
21        A.    Bookkeeper.
22        Q.    Does he currently get any benefits pursuant
23    to his retirement?
24        A.    From what?
25        Q.    Pursuant to his retirement does he get
```

1    benefits?

2         A.    Well, he gets--I don't know how much,

3    that's what he's supposed to get.

4         Q.    Is it Social Security or does he have a

5    retirement plan?

6         A.    What do they call that, Medicare, he has

7    Medicare and he has the benefits that they allocate to

8    everybody when they retire after 65. I don't know

9    what it is now, but that's what he gets.

10        Q.    What are your current sources of income as

11   we sit here today, your temporary job, aside from

12   that? If you have any.

13        A.    I don't have any other income. My

14   temporary position.

15        Q.    What is your top year of income over the

16   last five calendar years which would have been 2000,

17   '99, '98, '97 or '96?

18        A.    An estimate you're saying?

19        Q.    Yes.

20        A.    Maybe 17 per year or something like that.

21        Q.    What year was that? Would that have been

22   while you worked for the Department of Corrections?

23        A.    Right, while I worked for the Department of

24   Corrections.

25              I think 14, 17, I don't know. I really

```
 1    don't know.
 2         Q.    Are you making a claim of lost wages as a
 3    result of your treatment at the Department of
 4    Corrections that you've alleged in your complaint?
 5              MR. BEINHAKER:  Objection, calls for a
 6         legal conclusion.
 7              You can go ahead and answer it if you can.
 8         A.    I don't know.
 9         Q.    You don't know if you're making a claim for
10    lost wages?
11         A.    Well, what I'm saying is that I did lose
12    wages, but that will be something that will be--I
13    don't know, I don't know what to tell you.  I mean I
14    did lose wages.
15         Q.    And that would start with your date of
16    separation in June of 1998 or would it be any time
17    before that?
18         A.    No, June of '98, because that's when I
19    left, I believe.
20         Q.    Can you quantify what you believe your lost
21    wages are from June of 1998 when you have stated they
22    started until today?
23         A.    You know, I think they were paying me back
24    then $8 an hour, I think, or seven, something like
25    that.
```

1        Q.    So your lost wages is going to be that

2    seven or eight dollars?

3        A.    14,000 a year or something like that.

4        Q.    It's going to be the hourly rate by 40

5    hours a week by however many weeks you've missed since

6    June of 1998?  Is that what you believe your lost

7    wages are as of today?

8        A.    Yes.

9        Q.    Is that a yes?

10       A.    Yes.

11             That question that you asked me, can you be

12   a little bit more specific?  Because are you saying

13   during the time, the whole time that I worked for the

14   department?

15       Q.    Any lost wages you're claiming as we sit

16   here today.

17       A.    Okay, so that would be from '98 to today,

18   yes.  And benefits, you know, I don't have insurance,

19   health insurance right now.  Because temporary

20   agencies don't give you that.

21       Q.    As far as the actual dollar amount, can you

22   quantify a dollar amount as we sit here today for your

23   total lost wages you are claiming up to today?

24             MR. BEINHAKER:  Same objection.

25             MR. OPPENHEIMER:  What's your objection?

```
1                  MR. BEINHAKER:  It calls for a legal con-
2          clusion.
3                  MR. OPPENHEIMER:  Calls for a legal con-
4          clusion if she can quantify what her lost wages
5          are as of today?
6                  MR. BEINHAKER:  She has to interpret what
7          type of wages, what benefits, all those type of
8          things.
9                  MR. OPPENHEIMER:  I'm talking about just
10         dollar amounts.  Do you still have an objection
11         to that?
12                 MR. BEINHAKER:  Yes, same objection.
13         Q.    You can answer if you know.
14         A.    I really don't know.  You know, it's hard
15    to say the amount, I can't put a figure.
16         Q.    What benefits have you lost?
17         A.    I lost the--I think they had a lot of plans
18    with the department that I lost.
19         Q.    Can you identify any specific benefits that
20    you have lost?
21         A.    Health insurance I lost, there were like--
22    programs that I can't even remember right now within
23    the department that would help you save money and grow
24    within the company, and if you would take some money
25    out of your salary the department would put too.
```

```
1     Different programs that at this point I can't recall.
2          Q.    Any other benefits?
3          A.    They had educational benefits there that
4     they would pay for your tuition when you went to
5     school, I lost that.
6          Q.    Any others?
7          A.    I can't recall anything else.
8          Q.    Between your date of hire in 1992 and your
9     date of separation in 1998 did you ever apply for any
10    educational benefits?
11         A.    I did.  And they used to give you like
12    waivers, but--
13         Q.    Did you ever exercise any of those--
14         A.    No.
15         Q.    --educational benefits that you were
16    entitled to?
17         A.    I applied, but I never got them.
18         Q.    Do you know why?
19         A.    No.
20         Q.    Did you ever check out why you didn't
21    receive them?  Did you ever call anybody, find out?
22         A.    I guess there was seniority, I don't know
23    why, but I think they would pick a certain group to go
24    to these universities and then that's it.
25         Q.    Do you believe you didn't get any of these
```

1    benefits because you were discriminated against?

2        A.    I think so, yes.

3        Q.    Do you have any proof of that?

4        A.    I might have copies of the applications

5    that I put and never got a response.

6        Q.    Do you know if you have any copies?

7        A.    I'm not sure, but I used to keep copies.  I

8    might have copies.

9        Q.    The applications or the denials?

10        A.    I don't know exactly what they were, but

11   I'm pretty sure when I used to apply--I'm into the

12   habit of making copies when I apply to something.

13        Q.    What are your claims of discrimination

14   based on as we sit here today?  Is it age, sex, race,

15   religion, color, creed, what are they that you believe

16   as we sit here today?

17        A.    I think it's because of my being Puerto

18   Rican.

19        Q.    Your nationality?

20        A.    I believe so, yes.

21        Q.    Now, is it being Puerto Rican or being

22   Hispanic?

23        A.    I can say--I don't know how they term it,

24   but I'm Spanish.  I don't know how they term it, but

25   I'm Spanish and I'm Puerto Rican.

```
1         Q.    Do you believe your discrimination that
2    you're claiming is based on the fact that you're
3    Hispanic in general, categorized that way, or you are
4    Puerto Rican within the Hispanic categorization and
5    that is what your discrimination is based on, as
6    opposed to being Cuban or being from a country in
7    South or Central America?
8         A.    No, I think it was both.
9         Q.    These educational benefits which you didn't
10   receive, do you know if anybody who is of Puerto Rican
11   descent received those benefits?
12        A.    No, I don't.
13        Q.    Do you know if any Hispanics received
14   benefits under this educational plan?
15        A.    No.  I don't know.
16        Q.    Do you know if any minorities received any
17   benefits under these plans, any other minorities?
18        A.    The African-Americans, yes, in the depart-
19   ment got those benefits.
20        Q.    Do you know whose decision it was to award
21   these benefits or not award them?
22        A.    I think the immediate supervisor would be
23   the one to approve them or not approve them.  And then
24   they would send them to the regional office to be
25   approved.
```

1        Q.    And who were your immediate supervisors at

2    any of the times you applied for these benefits?

3        A.    There was lady there named Diana Thompson,

4    she was a supervisor.  There was--McDonald.

5        Q.    First name?

6        A.    Karen McDonald.  There was another, Linda

7    Scarlett was my supervisor.

8        Q.    Any others?

9        A.    That's all I can remember.  That's it.

10       Q.    And do you believe Diana Thompson had

11   anything to do with you not receiving these education-

12   al benefits?

13       A.    I think so.  I think so.

14       Q.    How about Karen McDonald?

15       A.    I think so.

16       Q.    How about Linda Scarlett?

17       A.    I think so.

18             I should have said yes.

19       Q.    Anyone else besides these three people who

20   you believe had anything do with your being denied

21   these educational benefits?

22       A.    Mr. Ruegetz (phonetic), course, Mr. Gary

23   Ruegetz.

24       Q.    Anybody else?

25       A.    That I can recall, that's all I can recall

1    for now.

2        Q.    Do you believe these four people were

3    directly involved in your denial of educational

4    benefits while you worked for the Department of

5    Corrections?

6        A.    Yes, I do.   There was another person named

7    Barry Groves.

8        Q.    Barry Groves?

9        A.    Um-hmm.

10        Q.    Was he directly involved?

11        A.    Well, he was--he would approve if you

12    wanted to--if you didn't have his approval you

13    couldn't go to school.

14        Q.    Do you believe he discriminated against you

15    because of your nationality, Puerto Rican?

16        A.    I think so, yes, he did.

17        Q.    Anyone else?

18        A.    Well, there's Bill Crosby.

19        Q.    Do you think he was directly related in

20    your denial of benefits based on your nationality,

21    Puerto Rican?

22        A.    Yes.  Yes.

23        Q.    Anyone else?

24        A.    I can't recall her name but she was a

25    supervisor III.

```
1        Q.    I'm sorry?
2        A.    I can't recall the person's name, but Miss
3    McDonald's supervisor.  I can't recall her name
4    exactly.
5        Q.    She was directly involved--
6        A.    With Miss McDonald, yes.
7        Q.    She was directly involved in discriminating
8    against you?
9        A.    Yes, yes.
10       Q.    Anyone else?
11       A.    That's it.
12       Q.    If you need to take a break or something,
13   want to get some water, go to the bathroom, just tell
14   me and we can stop a minute when you like.
15       A.    Yes, I'd like to take a break.
16             MR. OPPENHEIMER:  Why don't we take a break
17        for five minutes.
18             (Brief recess.)
19       Q.    Aside from the benefits you've identified
20   so far, health insurance, certain other programs,
21   these educational benefits, is there anything else you
22   can identify as we sit here today?
23             MR. BEINHAKER:  Objection to form.
24             You can answer if you can.
25             If you want to be a little more specific,
```

1       when you say identify, in reference to what?

2       Q.    Any benefits that you believe you have lost

3   as a result of any discrimination you faced while

4   being employed by the Department of Corrections.

5       A.    Well, I don't know if I mentioned health

6   benefits--

7       Q.    You mentioned health, you mentioned

8   education.

9       A.    They had like retirement plans that I could

10  have lasted for years and retire from there that I'm

11  never going to get because I was only there six years.

12  If that didn't happen I would have been there God

13  knows how long.

14      Q.    Had you partaken in any retirement plans

15  prior to your date of separation?

16      A.    You know, I can't recall exactly, but they

17  used to send us some form of the benefits that were

18  given to every employee, and I don't have that right

19  now to be specific with that.

20      Q.    Do you have any of those documents at home,

21  any of those forms?

22      A.    Yes, I do.  I have copies of all of that.

23  I might have copies of the stubs where it tells you

24  what benefits I had while I was there.

25      Q.    Any other benefits that you can think of?

1          A.      No, I can't think of any right now.

2          Q.      Do you believe you lost out on any raises

3     as a result of your discrimination?

4          A.      Well, there was a 10 percent raise every

5     time you applied for a position, and I could have

6     gotten some of those positions and I lost that 10

7     percent raise.

8          Q.      How many times did you apply for positions?

9          A.      About 11 times.

10         Q.      Do you believe you would have gotten a 10

11    percent raise with each of those 11 promotions had you

12    gotten them?

13         A.      Yes, I think so.

14         Q.      And is that a standard 10 percent with each

15    of those positions?

16         A.      That was my understanding, yes.

17         Q.      Were any of them the same position or was

18    it 11 higher-up positions consecutively?

19         A.      No, it was like a senior clerk position,

20    secretary.

21         Q.      With any one specifically you would have

22    gotten 10 percent but it's not 10 percent exponential-

23    ly as you go up to the next one, next one, next one?

24         A.      No, it's as you apply for the position they

25    would give you the 10 percent, and then eventually as

1    time goes by they would give you a 3 percent raise.

2    But that will be everybody, that will be the whole

3    department that would get a 3 percent raise every year

4    for, they used to call it--

5        Q.    Cost of living?

6        A.    Cost of living raises.

7        Q.    And were some of those promotions, promo-

8    tions that you applied for, would they be equivalent

9    to each other, would they be lateral to each other,

10    the next level up?

11        A.    A couple of them were the next level up and

12    then the other ones were like two levels, maybe, up or

13    something like that.

14        Q.    Do you believe you're going to lose wages

15    in the future as a result of any discrimination you're

16    claiming to have suffered while working for the

17    Department of Corrections?

18        A.    Well, you know, in a way when you go to

19    most of these--the reason why I'm with temporary

20    agencies, because there you, for example, me for

21    example--yeah, I feel I have lost, let's put it that

22    way, yes.  Let me answer it just yes.

23        Q.    Can you quantify what you believe those

24    lost wages are in the future as we sit here today?

25        A.    If I had not been discriminated against I

```
 1    probably would have been with the department 20 years
 2    like everybody else has, you know, been there, and
 3    gotten--grown more with different trainings and
 4    salary.  I probably would have, had I been treated
 5    like the rest, I probably would have been having
 6    better salary and growing with the company.
 7         Q.    And can you quantify that?  Have you
 8    attempted to quantify what you believe your future
 9    lost wages will amount to as we sit here today?
10              Can you put a dollar amount on it?
11         A.    I really can't put a dollar amount on it,
12    but I know that if I had not been treated the way I
13    was I would have been there maybe 20 years.
14         Q.    What's the basis for that belief?
15         A.    Because, the basis for that belief is that
16    as a human being you work for a living and you don't
17    want to be jumping around and you want stability and
18    you want to stay put, you know.
19         Q.    You don't believe you would have attempted
20    to change jobs with a different company, continue your
21    education--
22         A.    If they offer you growth within the company
23    why would anyone want to move, you know.  But if they
24    don't offer you that, of course you're going to leave.
25         Q.    You need to let me finish my question if
```

```
1    you would please.

2         A.    Okay.

3         Q.    You said you were denied 11 promotions?

4         A.    Um-hmm.

5         Q.    Let's go through each of them individually.

6    What was the first one you applied for that you can

7    remember?

8         A.    I think it was a secretary position.

9         Q.    Do you know when that was in relation to

10   when you started working for the Department of

11   Corrections?

12        A.    I think that was like--something like six

13   months after I was in the department.

14        Q.    Do you know why you were denied that job?

15        A.    They just gave it to someone else, the

16   position.

17        Q.    Do you know who they gave it to?

18        A.    I can't recall her name, but I know she

19   was--she came after me.  I was there before her.

20        Q.    Was she a minority?

21        A.    She was an African-American.

22        Q.    Do you know what her qualifications were?

23        A.    She just had high school.

24        Q.    Were you given a reason for being passed

25   over for this promotion and it going to this African-
```

1    American person?

2         A.    No.   Just a letter saying that I didn't get

3    the position.

4         Q.    And who do you believe denied you of this

5    position and discriminated against you?

6         A.    Well, I think it was the supervisors at

7    17-4, I think, 17-4 was the branch that I started

8    working at and I was just--

9         Q.    One seven four?

10        A.    One seven four, yes.   17-4.

11              And this supervisor, Diana Thompson, just

12   simply told me I wasn't going to get the position.

13   That it didn't matter what I do, I wasn't going to get

14   ahead within the department.

15        Q.    She told you you wouldn't get the position?

16        A.    Yes.   Because I wasn't Anglo or I wasn't

17   African-American.   She specifically said--I don't know

18   if you want me to continue with this.

19        Q.    Yes.

20        A.    She specifically said when there was an

21   African-American that was manager of that branch that

22   secretary had to be African-American.   And if it was

23   Anglo it had to be Anglo.   It couldn't be anything

24   else other than that.

25              Oh, and that I couldn't pin all my little

1    to the bulletin board because I wasn't going to get

2    ahead.

3        Q.    You couldn't what?

4        A.    Take those little papers that they sent you

5    through the mail that you didn't get the position and

6    just pin them to the billboard, because I wasn't going

7    to get anywhere.

8        Q.    What did you do in response to these state-

9    ments?

10        A.    Well, I couldn't believe it, I couldn't

11    believe what I was hearing.  I kept applying, I tried

12    to think that maybe that wasn't true.

13        Q.    After the denial of this secretarial

14    position did you complain to anybody formally, oral or

15    written complaint?

16        A.    I filed a grievance after so many attempts

17    to try to--

18        Q.    I'm talking about after this first one and

19    after these comments were supposedly made to you by

20    Diana Thompson, did you make any type of formal oral

21    or written complaint?

22        A.    I can't recall right now if I did or not.

23        Q.    Did you know you were allowed to make a

24    complaint?

25        A.    You're talking within the department was I

1    allowed?

2         Q.    Anywhere.  To make a complaint anywhere.
3    Did you know at this time these statements were
4    supposedly made to you you could make a complaint to
5    anyone?

6         A.    I didn't--let's put it this way, maybe I
7    might have known, but when you're new in a job you
8    don't do that.  You just kind of--you try to see if
9    that's not true.  I mean that's how I felt.  Give it
10   time and maybe when they get to know you they don't
11   treat you this way.

12        Q.    What was the second job you applied for?
13        A.    I think they had positions there that were
14   lateral positions and then I wanted to just leave, I
15   felt so bad after that happened that I asked for a
16   transfer to another branch.

17             MR. OPPENHEIMER:  Can you read me back my
18        question please.

19             (Thereupon, the preceding question was read
20   back by the court reporter as above-recorded.)

21        A.    I think it was another secretary position.
22        Q.    Was this a lateral position or was it a
23   promotion to a higher position?

24        A.    That one was a promotion.

25        Q.    The first secretarial position, was that

```
1    lateral or was this a promotion?

2         A.    No, that was a promotion.

3         Q.    About how long had you been there?

4         A.    About a year.

5         Q.    Were you denied this position?

6         A.    I was sent to that position to try it out.

7         Q.    So you received the position and you tried

8    it out?

9         A.    I can't recall exactly how I got that

10   position.  I can't recall exactly.

11        Q.    Did you get this secretarial position?

12        A.    I got that position, the first three

13   weeks--yeah, I got the position.  I got that position,

14   but with no increase in salary.

15        Q.    How long did you hold that position for?

16        A.    Probably--I can't recall.  Anywhere from

17   three to six months.  I'm not sure.

18        Q.    Do you know if anyone else applied?

19        A.    I don't recall how many people applied for

20   that position.

21        Q.    The person you were working for when you

22   got this position, what was the race or nationality of

23   that person?

24        A.    She was Anglo, I guess.  I don't know

25   exactly what nationality.
```

1         If she was Irish or what, I don't know what
2    she was, Jewish, Irish.

3         Q.    Whose decision was it, if you know, to
4    allow you to have that position?  Was Miss Thompson
5    involved, some other supervisor?

6         A.    I can't recall exactly who was the one that
7    authorized that.

8         Oh, I think it was Mr. Ruegetz, the one
9    that authorized that.  But, okay, you just want me to
10   answer specifically.

11        Q.    You can go on if you'd like.

12        A.    Well, the reason why I got that position
13   was because after I told Mr. Ruegetz what Miss
14   Thompson had said, now I recall, it was sort of like a
15   transfer type of a promotion, something like that.  I
16   can't recall how he put it exactly.  But it was to get
17   me out of 17-4 to 17-1.  Because there was--I wasn't
18   being treated correctly at 17-4, and they transferred
19   me immediately.  Rather than solving the problem they
20   take you up and transfer you.

21        Q.    Do you believe you were discriminated
22   against in getting this promotion at all?

23        A.    I was, yes.  Yes.

24        Q.    So you received the promotion you wanted
25   and you still believe you were discriminated against?

1      A.    I didn't receive the promotion I wanted.
2    That's not a promotion, to go to a place and you know
3    that there's a 10 percent increase and they don't give
4    you that increase, that's not a promotion.
5      Q.    You applied for this job and you received
6    it without this 10 percent increase and you believe
7    that was the discrimination, just the not getting the
8    10 percent increase?
9      A.    No.
10     Q.    What other discrimination was there, if you
11   applied for this job and you received it without the
12   increase?
13     A.    Well, the discrimination is that when I got
14   to this other job they gave me a hard time there too.
15   That's the discriminatory part.
16     Q.    I'm not talking about what happened after
17   you got the job. I'm talking about the actual promo-
18   tion itself. Do you believe you were discriminated
19   against at all, when you received this promotion you
20   applied for?
21     A.    Did I believe I was discriminated against,
22   yes.
23     Q.    What did that discrimination consist of?
24     A.    To the fact that they were just trying to
25   appease what had happened at 17-4. That's why I got

1    that. I don't believe I got it because they were

2    trying to promote me.

3         Q.   Do you have any proof of that?

4         A.   I think their records because I complained

5    within the department. I filed grievances. Yes, I

6    think there's proof of that.

7         Q.   Do you have any records establishing that

8    this promotion which you applied for and you got was

9    done to discriminate against you?

10        A.   Well, the negative way that I was treated,

11   as far as I'm concerned, is discriminatory towards me.

12   Because the promotion, you get it when you're going to

13   excel and I didn't excel at that other place, and I

14   consider that discriminatory.

15        MR. OPPENHEIMER: Please read me back my

16       question.

17        If you would listen to it and try to answer

18       the question I would appreciate it.

19        (Thereupon, the preceding question was read

20   back by the court reporter as above-recorded.)

21        A.   No, of course not.

22        Q.   Did you file any complaints regarding this

23   promotion which you applied for and received?

24        A.   Yes.

25        Q.   Written or oral?

```
 1       A.     Written.  Both.  Written and oral.

 2       Q.     Who was the oral complaint to?

 3       A.     To Linda Scarlettt.

 4       Q.     What was that complaint?

 5       A.     Well, the complaint was that she was not

 6    treating me correctly.

 7       Q.     Who was not treating you correctly?

 8       A.     Miss Scarlett, Miss Linda Scarlett.

 9       Q.     You made a complaint to her that she was

10    not treating you correctly--

11       A.     Right.

12       Q.     --by granting your wish for a promotion?

13       A.     No.  You see, the way you're putting it, I

14    find it not correct, because what I'm saying is that

15    she did not want me there and she made it clear that

16    she wanted that position for another girl that was

17    within that department.  And she--

18       Q.     Miss Scarlett told you--

19       A.     Yes.  She made it very clear she did not

20    want me there.  That, I think, I had like three weeks

21    or something like that to try to--to try to go ahead

22    and--she used to degrade me, let's put it that way.

23    See if I could do that position and stuff like that.

24       Q.     Did you make a specific complaint to her

25    about receiving this promotion?
```

```
 1        A.    I don't recall, no.  I don't recall.
 2              Well, she was the one that made it clear to
 3   me, anyway, that she didn't want me there.  So--
 4        Q.    That's not my question.  My question is,
 5   simply, did you make a specific complaint to her,
 6   either oral or written, about receiving this complaint
 7   and you thought it was discriminatory?  Receiving the
 8   promotion itself.
 9        A.    Receiving the promotion.
10        Q.    Not anything that happened afterwards.
11        A.    No, no.
12        Q.    After you received this promotion, what was
13   the next promotion you applied for?
14        A.    I think it was a senior clerk position at
15   17-2 or something like that.  In the 17-2 office I
16   think.
17        Q.    Someone else got that position?
18        A.    No explanation.
19        Q.    How long had you been at DOC by this time?
20        A.    About three months.
21        Q.    Three months longer or three months total?
22        A.    Three months within--I think I stood at
23   17-1 for three months and I applied for the position
24   as a senior clerk.  I think it was at the 17-0
25   office.
```

51

```
 1        Q.    You said this is the senior clerk at 17-2
 2   or 17-0?
 3        A.    You know, I can't recall exactly because I
 4   applied like 11 times and you're asking me things
 5   that--
 6        Q.    If you don't know that's fine, you can just
 7   tell me right out.
 8        A.    I don't recall.
 9        Q.    Do you remember who the person is who got
10   the job?
11        A.    I don't recall, no.
12        Q.    Do you know what nationality they were?
13   What race, color, creed?
14        A.    I think it was an African-American.
15        Q.    And the person who this African-American
16   person was working for, do you know what color they
17   were?  What creed, what religion, what race, whatever
18   discrimination you believe you're suffering?
19              MR. BEINHAKER:  Objection to the form.
20        A.    I don't remember.
21        Q.    Do you know if this person was more or less
22   qualified?
23        A.    I don't remember if she was more or less
24   qualified or not.
25        Q.    Do you remember the person's name?
```

```
 1        A.    I can't recall the name, no.

 2        Q.    Who do you believe is the specific person

 3   who discriminated against you, if there was one, in

 4   regards to this position?

 5        A.    I think, specifically--see, I can't

 6   remember the names of the supervisors that were there

 7   at that time.  I can't remember.

 8        Q.    What's the next position, the fourth

 9   position you applied for?

10        A.    Basically it was around--it's the same--

11   every time they would deny me a position I would apply

12   again and again and again and again.  So it could have

13   been three positions of secretary or four positions of

14   senior clerk or--

15        Q.    Do you know what the official title of the

16   fourth position you applied for and you were denied

17   based on your claim of discrimination was?

18        A.    I think it was another senior clerk

19   position.

20        Q.    Do you know how long after you applied for

21   the previous senior clerk position you applied for

22   this one?

23        A.    Maybe six months.

24        Q.    Do you know the qualifications of the

25   person who got the job?
```

```
 1          A.     No.
 2          Q.     Do you know what nationality they were?
 3          A.     I don't recall.
 4          Q.     Did you believe you were discriminated
 5     against based on the fact you were Puerto Rican in
 6     being denied this fourth job?
 7          A.     Well, I know that every, almost every
 8     position that I applied for, either an Anglo or an
 9     African-American would get it.  But not a Spanish
10     person.  So to answer your question, did I feel I was
11     discriminated, yes, I was.
12          Q.     Do you have any proof of that?  For this
13     fourth position--
14          A.     No, I don't.
15          Q.     --aside from your opinion?
16          A.     No, I don't.
17          Q.     Do you know who the supervisor was that
18     denied you this position?
19          A.     I think that was--I can see the girl's face
20     but I can't remember the name.
21          Q.     If you don't know that's fine.
22          A.     Yeah, I can visualize them, but I just
23     don't remember the names.
24          Q.     Do you remember what the next--
25          A.     I have records and their names at home, all
```

1    these positions I applied for.  So I can supply you

2    with those, that information at a later date.

3         Q.    Do you know what the next position you

4    applied for was, the fifth one?

5         A.    I think I applied for personal aide, and

6    that I remember.

7         Q.    How long after the previous application as

8    the second time for senior clerk was the personal aide

9    position applied for?

10        A.    Something like six months, something like

11   that.

12        Q.    Do you know the qualifications of the

13   person who got the job?

14        A.    No, I don't remember.

15        Q.    Do you know the nationality of the person

16   who got the job?

17        A.    She was, I think, she was Anglo.

18        Q.    Do you know what nationality her immediate

19   supervisor was?

20        A.    He was Anglo.

21              I think it was Mr. Stilson.  Mr. Stilson.

22        Q.    Do you know whose decision it was to deny

23   you this promotion?

24        A.    Mr. Stilson, I suppose.

25        Q.    So you believe he discriminated against you

1     based on your nationality?  Is that your claim as we

2     sit here today?

3          A.    Yes.

4          Q.    Did you make any complaint about this

5     discrimination as of this time?  Either oral or

6     written?

7          A.    I did, I think to Teresa Baker, a lady

8     there at the regional office, her name was Teresa

9     Baker.

10         Q.    Was it written or oral?

11         A.    Oral.  Oral complaint.

12         Q.    What was this complaint?

13         A.    I made it known to her that I felt I

14    qualified and I didn't understand why I was denied the

15    position.  I had already been there a year, I think,

16    or something like that when I applied for that

17    personal aide position, they had transferred me to the

18    regional office.

19               And I played it--I kept, even while I was

20    at the regional office, I kept applying for other

21    positions.  And that was one of the positions that I

22    applied for.  And I just made it known to her that I

23    felt--how I felt.

24         Q.    Did you tell her to take any actions on

25    your behalf or do anything formally on your behalf?

1          A.      I don't recall.

2          Q.      What was the next position?

3          A.      I think it was secretary position for 17-0.

4    And they gave that to a girl, I can't remember her

5    name, but I know she had only been there a year or

6    something like that.  And she was African-American,

7    that I remember.  I can't remember her name.

8          Q.      Do you know whose decision it was to give

9    her this position?

10         A.      Barry Groves.

11         Q.      Do you believe Mr. Groves discriminated

12   against you based on your being Puerto Rican?

13         A.      Yes, I do.

14         Q.      Do you know what this person's qualifica-

15   tions were who got the job?

16         A.      I think she was just a high school

17   graduate.

18         Q.      Did you make any complaints about not

19   receiving this position to anyone?  This specific

20   position.

21         A.      That specific position.  I don't recall.  I

22   really don't recall.

23         Q.      Did you know at this time if you would be

24   entitled to make a formal complaint, either oral or

25   written, regarding the denial of this promotion to you

1    because you thought it was based on your being Puerto

2    Rican?

3         A.    I knew, I guess by this time after applying

4    so much--this calls for yes or no answer, did I know?

5         Q.    Did you know?

6         A.    Did I know.  I kind of like don't know--

7    well, I knew, I knew.  I had filed grievances already

8    so, yes, at that point I had already filed, yes, I

9    knew that I could.  And I did.  I'm pretty sure I did.

10   But I'll have to see if I have proof of that.

11   Because--

12        Q.    By this time how many grievances had you

13   filed?

14        A.    Verbal, probably about seven.  Written,

15   about four.

16        Q.    What was the next position?

17        A.    Cashier's clerk or something like that at

18   the regional office.

19        Q.    Do you know what race or nationality the

20   person who got this job was?

21        A.    I think--she was African-American.

22        Q.    Do you know what this person's qualifica-

23   tions were?

24        A.    No.

25        Q.    Do you know if you were more qualified?

58

1         A.    Yes, I was.

2         Q.    If you don't know what her qualifications

3    were how do you know you were more qualified than her?

4         A.    Because of my educational background.

5         Q.    But again, if you didn't know what her

6    qualifications were how did you know you were more

7    qualified?

8         A.    Because I had been with the department

9    longer than her.  I don't think somebody that comes in

10   new is going to know more than somebody who's been

11   there.

12        Q.    Do you know how long she had been with the

13   department?

14        A.    Well, she was about eight months.

15        Q.    Do you know who this person was?

16        A.    I don't recall her name.

17        Q.    Did you know any of her qualifications

18   based on her background prior to beginning these eight

19   months with the Department of Corrections, whether she

20   had gone to college or any college classes, whether

21   she had worked in any other jobs, her experience,

22   anything?

23        A.    Well, I know that--that she was being

24   trained for that position.  And she came after me so I

25   didn't understand why she was being trained for a

```
 1    better position than me when I was there longer.  So--

 2         Q.    My question to you is, did you know any-

 3    thing about her background prior to the Department of

 4    Corrections, any of her qualifications prior to the

 5    Department of Corrections?

 6         A.    No, no.

 7         Q.    Did you make any complaints regarding this

 8    denial of the promotion?

 9         A.    I don't recall if I did or not.

10         Q.    Whose decision was it for you not to get

11    this position, if you know, that discriminated against

12    you in your claims?

13         A.    I think that was Miss McDonald, was it?

14               Miss McDonald.

15         Q.    What was the next position, if you know?

16         A.    I can't recall right now at this point.  I

17    can't recall.

18         Q.    Do you remember any of the other positions?

19         A.    There were all--I remember applying for

20    mainly secretarial positions, senior clerk positions,

21    in the area of accounting.  I believe I applied one

22    time as an accounting clerk or something like that

23    within the department.

24         Q.    Any other positions that you can remember?

25         A.    That's it I can recall.
```

```
1          Q.    I'll ask you just general questions in
2     regard to these other positions.  Can you identify who
3     specifically denied your promotions?  Any of these.
4          A.    Miss McDonald, Karen McDonald.  Barry
5     Groves, Mr. Ruegetz, Teresa Baker, the personnel
6     office.  Mr. Stilson.  That's who I can remember right
7     now.
8          Q.    Did all of these positions go to African-
9     Americans, Anglos, other--
10         A.    Mostly African-Americans.
11               Both.  Both.
12         Q.    Any of the positions to Hispanics?
13         A.    No.
14         Q.    Do you know the qualifications of any of
15    the persons who were hired for the jobs that you
16    applied for?
17         A.    No.
18         Q.    Did you make any formal complaints regard-
19    ing these other positions?
20         A.    Yes, I did.  Verbally.
21         Q.    How many verbal complaints?
22         A.    I'd say about four.  About four.
23         Q.    Who did you make those four verbal
24    complaints to?
25         A.    To Mr. Ruegetz, Barry Groves, Miss
```

1     McDonald.

2          Q.     Anyone else?

3          A.     There were other people, I just can't
4     recall their names right now.

5          Q.     How about any written complaints?

6          A.     About six times or something like that.  I
7     don't recall the exact amount but they have like six
8     written complaints or more.  Maybe more than that, I
9     don't know.

10         Q.     Who did these written complaints go to?

11         A.     They were addressed to the regional office:
12    Mr. Ruegetz, Barry Groves, Mr. Stilson.

13         Q.     Did you ever go higher than the regional
14    office?

15         A.     Yes.  Tallahassee.  I called Tallahassee
16    and I told them how I was being treated and they were
17    going to send somebody down to investigate.  They did,
18    an Inspector Spear was supposed to have come down.

19         Q.     So you made a single phone call to
20    Tallahassee or more than one?

21         A.     More than one.

22         Q.     How many?

23         A.     Oh, I don't recall.  Many.

24         Q.     Do you know who you spoke to at any time?

25         A.     I can't recall.

```
 1      Q.    Did you save any records of that?

 2      A.    Yes, I do have that.

 3      Q.    You have records of who you spoke with?

 4      A.    Matter of fact, now that you--I'm sorry?

 5      Q.    Do you have a record of who you spoke with?

 6      A.    Yes, I do.

 7            There are, now that I recall, there's a lot

 8   of records and meetings that occurred because one time

 9   I brought a court reporter like her (indicating) in

10   one of those meetings.

11      Q.    Do you remember who you met with?

12      A.    Mr. Ruegetz and Barry Groves.  And they

13   cancelled the meeting and the lady had to go back

14   home.

15      Q.    You arranged for a court reporter?

16      A.    I arranged for a court reporter.

17      Q.    And that meeting, did it ever take place?

18      A.    Never took place.

19      Q.    Did you try and reschedule it?

20      A.    They rescheduled it for another, later date

21   and--that's it.  They rescheduled.

22      Q.    How come you didn't go when they

23   rescheduled it?

24      A.    No, I went.  I went.

25      Q.    You went without the court reporter?
```

1      A.    Without the court reporter, right, I went

2   without the court reporter.

3      Q.    Did they tell you you couldn't bring a

4   court reporter?

5      A.    Not really, no.   They didn't say, You

6   couldn't bring a court reporter.

7      Q.    You're saying it was a total of 11

8   promotions you applied for, correct?

9      A.    Um-hmm.

10     Q.    Yes?

11     A.    Yes.

12     Q.    Were you qualified for all of these that

13   you applied for?

14     A.    Yes.

15     Q.    Do you believe you were better qualified

16   than the person who received the position ultimately?

17     A.    Yes.

18     Q.    Is it your claim that you did not get any

19   of these 11 positions only because you are Puerto

20   Rican?

21     A.    Yes.

22     Q.    I guess it would be ten because you got at

23   least one of them?

24     A.    Well, that was more a transfer than any-

25   thing else, but you keep saying--it was presented as a

1    promotion but it was really a transfer.  It will be--
2    it would have to be--
3         Q.    Is that one of the 11 that you're talking
4    about?
5         A.    Yes.
6         Q.    Out of any of the other ten did you receive
7    the promotion, whether it be a transfer laterally or a
8    promotion upwards?
9         A.    No.
10        Q.    What proof do you have that you were better
11   qualified than the persons who received these other
12   ten positions?
13             MR. BEINHAKER:  Objection, asked and
14        answered.
15        Q.    Do you have any written documents or is it
16   just your opinion?
17        A.    There are written documents that I know I
18   was more qualified, yes.
19        Q.    Do you have yourself copies of written
20   documentation that would show that you were more
21   qualified than the person who received the position
22   and that the only reason you didn't get it was because
23   you were Puerto Rican?
24        A.    No.
25        Q.    So this is your own interpretation of what

1    happened and who got the job, correct?

2        A.    No.

3        Q.    What is it based on if you have no proof?

4        A.    It's based on the fact that I was there

5    longer than them and they were trained for better

6    positions than I when I should have been trained for a

7    better position and not just been somebody else that

8    comes new.    That's what it's based on.    And that the

9    reason they didn't train me for a better position was

10   because I'm Puerto Rican.

11       Q.    You have no physical proof of that--

12       A.    Of course not.

13       Q.    --like you said a moment ago?

14       A.    Of course not.

15       Q.    That's your opinion, that these people were

16   better trained and because you're Puerto Rican they

17   discriminated against you, is that what you're saying?

18       A.    No.    What I'm saying is the fact that I was

19   there, I had seniority, and within the department when

20   you have seniority you're supposed to be trained for a

21   better position, not just someone else be trained for

22   a better position.

23       Q.    Is this a written rule of the Department of

24   Corrections, that people who are more senior are auto-

25   matically trained for better positions?

```
 1        A.      That's what my understanding was.  Whether
 2    there's a rule, I don't know if there is a rule there
 3    or not.
 4        Q.      So back to my initial question, you have no
 5    physical proof of this discrimination, correct?  No
 6    paperwork?
 7        A.      No, no paperwork.
 8        Q.      Have you ever had anyone give you an
 9    affidavit or testify that this occurred?
10        A.      No.
11        Q.      And you don't know if it's a practice or a
12    procedure of the Department of Corrections to automat-
13    ically give the person who is more senior, the person
14    with seniority, the opportunity to train for a better
15    job?
16        A.      Well, I've seen that they've done that.  My
17    observation while I was working at the department was
18    that I saw that happen.
19        Q.      But you don't know if that's a rule, a
20    specific rule?
21        A.      No, I don't know.
22        Q.      So if you have no written documents, you
23    have no affidavits or other proof, you don't know of
24    any rule or practice that you can identify for the
25    Department of Corrections, you're basically basing
```

1    your claim of discrimination on your interpretation of

2    what happened, is that correct?

3         A.    No, that is not correct.

4         Q.    What do you have that you are basing your

5    interpretation of discrimination on if you don't have

6    any of those items?

7         A.    Well, on the way I was treated negatively

8    within the department.  That's my proof.

9         Q.    It's your interpretation of how you were

10   treated, correct?

11        A.    It's how I was treated.  It's not an

12   interpretation as you say.  You're saying that it's an

13   interpretation.

14        Q.    Whose opinion is it that you were treated--

15        A.    It's not an opinion, it's a fact.

16        Q.    What proof do you have?

17        A.    I have proof.

18        Q.    What proof do you have?

19        A.    I can subpoena people that saw how I was

20   treated there, that's the proof I have.  And that are

21   willing to testify if I need to call them.  That they

22   observed exactly how I was being treated.

23        Q.    Who are these people?

24        A.    Mr. Jose Torres that was there, Jane Perez

25   that was there, many--

```
1        Q.    Anyone else?

2        A.    Jorge Gonzalez, Maria Cortez, Peggy Sierra.

3        Q.    I'm sorry, Maria Cortez?

4        A.    Cortez, yes.

5        Q.    And the name after that?

6        A.    Peggy Sierra.

7        Q.    Anyone else?

8        A.    I have a list.  I can't recall, but I have

9    a list of people that are still there that witnessed

10   what I went through.  And how I was being treated.

11       Q.    Where is this list?

12       A.    Where is it?

13       Q.    Yes.

14       A.    Where is the list?

15       Q.    Yes.

16       A.    In my head.

17       Q.    You haven't written it--

18       A.    No.  I'll never forget.

19       Q.    Who else besides these people?  You've

20   named off five people, who else besides these five?

21       A.    There was a supervisor by the name of Mr.

22   Hill.  Mr. Subramani.

23       Q.    I'm sorry, can you spell the name?

24       A.    Subramani, S-u-b-r-a-m-a-n-i, Subramani.

25   There were other supervisors there.
```

```
1        Q.    Was Subramani a supervisor?

2        A.    Yes.

3        Q.    What other supervisors?  What other people

4    in general besides the seven people you've now named?

5        A.    I have a list, I--

6        Q.    You just told me you don't have a list, you

7    have a list in your head and you'll never forget it.

8    Do you have a list--

9        A.    I have a list, not a big list, but if I sit

10   here and start recalling I can remember.

11       Q.    That's what I'm asking you to do.

12             Who else?

13       A.    At this point I can't recall anyone else.

14       Q.    As we go through these if there's anyone

15   else you can think of go ahead and tell me.

16             Start out with the first one, Jose Torres.

17   First of all, what nationality is he?

18       A.    Puerto Rican.

19       Q.    Has he been discriminated against?

20       A.    I don't know that.  He would be the one to

21   know that.

22       Q.    Has he ever told you he's been discriminat-

23   ed against?

24       A.    Yes, he did.  He applied for positions that

25   he didn't get.
```

1      Q.    That was based on the fact that he's Puerto
2    Rican?
3      A.    I don't know.  He would have to tell you
4    that.
5      Q.    Has he ever told you that he was discrimi-
6    nated against because he's Puerto Rican?
7      A.    He felt that way, yes, he told me how he
8    felt.
9      Q.    Has he told you he felt he was discriminat-
10   ed against--
11     A.    Right.
12     Q.    --because he was Puerto Rican?
13     A.    Because he applied for positions and he was
14   Puerto Rican and they didn't give it to him.
15     Q.    What did he see in relation to your claims
16   of discrimination?
17     A.    I don't know that.
18     Q.    Have you ever spoken with him about it?
19     A.    No, because he left.  He retired early and
20   he moved.  But he made it clear to me that--he just
21   let me know he felt he had been discriminated against.
22     Q.    Have you spoken with him since he left the
23   Department of Corrections?
24     A.    No, I haven't.
25     Q.    When was the last time you spoke with him?

1          A.    Well, since the last time I left the

2     Department of Corrections.  About a year before that.

3          Q.    Do you know in regards to his claims of

4     discrimination what they are?

5          A.    I don't know.  He would know that, not I.

6          Q.    Do you know if he's filed a lawsuit or made

7     any claims?

8          A.    I have no idea.

9               MR. BEINHAKER:  Counsel, not to interrupt

10              you, but do you plan to take a lunch break?  You

11              want to just see--

12              MR. OPPENHEIMER:  Whatever time you want to

13              go.  You want to take a break for a half hour, an

14              hour, whatever you want.

15              MR. BEINHAKER:  A short one, but if you

16              want to finish up a line of questioning here I

17              can wait another half hour or whatever you

18              prefer.

19              MR. OPPENHEIMER:  No, we'll just go on with

20              the next person when we get back.  Why don't we

21              take a break for a half an hour.

22              (Lunch recess.)

23         Q.    We were talking about people that you said

24     you can subpoena that will support your position and

25     we discussed one person, Jose Torres.  The next person

1    you mentioned was someone by the name of Jane Perez?

2        A.    Yes.

3        Q.    Before we go there, have you thought of

4    anybody else besides the names you gave me before?

5    And there were, looks like seven of them?

6        A.    Not yet, no.

7        Q.    And what nationality is Jane Perez?

8        A.    She's Puerto Rican.

9        Q.    How do you know she's discriminated

10   against?

11       A.    Because she applied for a position and they

12   didn't give it to her.

13       Q.    Just one position?

14       A.    Only one that I know of.

15       Q.    Do you know if she's ever gotten a promo-

16   tion?

17       A.    No, I don't.

18       Q.    Let me go back to Mr. Torres.  Do you know

19   if he's ever gotten any promotions?

20       A.    No.

21       Q.    No, he hasn't, or you don't know?

22       A.    No, I don't know.

23       Q.    What will he be able to say in support of

24   your claims, if you know?

25       A.    Well, he applied for a position and they

```
 1    didn't give it to him.  It was a supervisor position,
 2    he was with the department 12 years or something like
 3    that.
 4         Q.    And you believe that supports your position
 5    that you were discriminated against, the fact that he
 6    didn't get a supervisor position that he applied for?
 7         A.    Yes.
 8         Q.    And do you know the qualifications of the
 9    person who did get that supervisor position?
10         A.    No, I don't.
11         Q.    Do you know who got the position specifi-
12    cally?
13         A.    An African-American.
14         Q.    Do you know who that person was?
15         A.    I don't recall the name.
16         Q.    Was that while you were working for the
17    Department of Corrections?
18         A.    Yes.  That was in 1998.  1998 at the 17-0
19    office.
20         Q.    When was the last time you spoke with Jane
21    Perez?
22         A.    About a year ago.
23         Q.    And does she know any of the details of
24    your claims?
25         A.    I don't know.
```

1      Q.     Have you ever discussed it with her?

2      A.     I don't recall.  I really don't.

3      Q.     Aside from the fact that she didn't get a

4   promotion, is there anything else that you believe in

5   relation to her supports your claims that you were

6   discriminated against because of your nationality?

7      A.     She witnessed it one time, I think, when

8   they didn't want to--they were sort of being negative

9   towards me.

10     Q.     Who?

11     A.     Jane Perez and--I think she filed a

12  grievance, as a matter of fact.  I can't recall the

13  details but I think she filed a grievance against what

14  she saw as an officer that she didn't like the way

15  they were treating me.  You'll have to pick that up

16  with her, I don't recall exactly what she filed.

17     Q.     Did she tell you she witnessed something?

18     A.     No, she was there.  She didn't tell me she

19  was actually there, it was--

20     Q.     Did she tell you afterwards she had

21  witnessed whatever this was?  Did she tell you about

22  it, what she saw?

23     A.     Yeah.  She said she walked by, she saw what

24  happened, she was going to write a report referring to

25  it.

1      Q.    What did she see?  What did she tell you
2   she saw?
3      A.    She saw me in the front needing help and
4   not getting help, and she felt that other people there
5   got help when they were called and I didn't get the
6   help that I needed.
7      Q.    And she saw you not getting help and other
8   people were, did she hear anybody talk about it, did
9   she--
10     A.    No, she just said, "I don't like what I
11  saw, I'm going to file a report."  And she did.
12     Q.    Do you have a copy of this report?
13     A.    The department has a copy of that.  Because
14  she filed a report, so that has to be within the
15  department.
16     Q.    Do you have a copy of this report?
17     A.    No, I don't.
18     Q.    Have you ever seen it?
19     A.    Nuh-uh.  No.  I'm sorry.  I'm not supposed
20  to say nuh-uh.
21     Q.    Do you know if she's filed any lawsuits or
22  has any claims against DOC for herself?
23     A.    She told me she was but I don't know.  I
24  don't know.
25     Q.    She said she was going to make a claim?

```
 1        A.    I don't know.  I know she told me she was
 2   going to file; whether she did, I don't know.
 3        Q.    Did she ask for your support in her claim?
 4        A.    No, no.
 5        Q.    Do you know what her claim was in regards
 6   to?
 7        A.    She applied for a position and they didn't
 8   give it to her.
 9        Q.    Do you know the qualifications of any
10   persons who got any positions she wanted?
11        A.    No.
12        Q.    Do you know what promotions if any she
13   received?
14        A.    No.
15        Q.    Do you know if she got any promotions
16   without identifying what they were?
17        A.    No.
18        Q.    The next person is Jorge Gonzalez.  Is he
19   Puerto Rican also?
20        A.    Yes.
21        Q.    And has he been discriminated against?
22        A.    Yes.
23        Q.    What did that discrimination consist of?
24        A.    Well, he got demoted when he got sick.  He
25   felt he was discriminated against because, according
```

1    to what he told me, other people had been sick and

2    they don't get demoted and he got demoted from his

3    position.

4         Q.    Do you know any of the details of that

5    demotion?

6         A.    No.  That's all I know.  That's what I can

7    remember.  I can't remember nothing else regarding

8    that particular incident with him.

9         Q.    Besides the demotion, did he ever tell you

10   he was discriminated against in regards to a promotion

11   he applied for, a position, any other type of

12   discrimination?

13        A.    No.  No.

14        Q.    When was the last time you spoke with Mr.

15   Gonzalez?

16        A.    Oh, about two years ago.

17        Q.    Is he still at DOC?

18        A.    Yes.  And probably after that, because we

19   would still go to lunch once in a while and just meet

20   for lunch and stuff like that.  That was about a year

21   and a half ago, something like that.  I can't be very

22   specific with the exact date.

23        Q.    Did you have any other type of social

24   relationship with him outside work after you left

25   DOC--

```
 1        A.    No.
 2        Q.    --besides going to lunch?
 3        A.    No.
 4        Q.    Did you see Miss Perez since you left the
 5   Department of Corrections?
 6        A.    No.
 7        Q.    Mr. Torres, did you ever see him socially
 8   outside of work?
 9        A.    No.
10        Q.    Mr. Gonzalez, have you ever seen him
11   socially outside of work--
12        A.    No.
13        Q.    Have you seen him since you left the
14   Department of Corrections?
15        A.    No, he moved.
16        Q.    The next person is Maria Cortez.  Is she
17   Puerto Rican?
18        A.    Yes.
19        Q.    And was she discriminated against?
20        A.    I wouldn't know if she was or not.
21        Q.    What discrimination in regards to your
22   claims is she a witness to or will she testify to in
23   your behalf?
24        A.    When I was at the regional office she saw
25   how Mr. Bill Crosby would treat me and she didn't--she
```

1    made a comment towards the fact that she didn't feel

2    right about it.   That's all.

3         Q.    Besides this one occasion where she made

4    this comment, do you know of any other knowledge she

5    has regarding your claims of discrimination?

6         A.    No.

7         Q.    Have you discussed this with her, your

8    claims?

9         A.    While I was at the regional office I think

10   I mentioned it to her, that I didn't appreciate how I

11   was being treated.   But that's about it.

12        Q.    When was the last time you spoke with her?

13        A.    A couple of months ago.

14        Q.    Where was that?

15        A.    That was just over the phone.   I just touch

16   base with her every once in a while.

17        Q.    Did you call her?

18        A.    I call her every once in a while.

19        Q.    Do you consider her a friend of yours

20   socially outside of the work arena?

21        A.    No.   No.

22        Q.    Why have you continued to speak with her

23   outside of work?

24        A.    I made a lot of friends at the department

25   that I still touch base with.   You just make friends.

1      Q.    You don't consider her a social friend

2    outside of the work arena, even though you continue to

3    call her?

4      A.    These are people you meet, you like; you

5    just touch base, that's all.

6      Q.    Do you know if she's filed any grievances?

7      A.    I have no idea, no.

8      Q.    Next person is going to be Peggy Sierra.

9    Is she Puerto Rican?

10     A.    Yes.

11     Q.    Has she been discriminated against--

12     A.    Yes.

13     Q.    --that you know of?

14           What is that discrimination, as far as your

15    understanding?

16     A.    Well, she just told me she had been there

17    16 years--16 or 12 years, I can't recall the exact

18    years, and that they promoted someone, that she had

19    applied for the position of a supervisor and they

20    didn't give her the position, they gave it to somebody

21    from the street.  And she was going to file but then

22    she said she didn't--she was afraid to lose her job so

23    she didn't file.

24     Q.    Do you know any of the qualifications of

25    the person who got this supervisor position?

1          A.    Nuh-uh.  No.

2                I keep saying nuh-uh, I'm sorry.  I have to

3      keep saying no or yes, I can remember that.

4          Q.    You don't know any of the qualifications of

5      the person who got the position instead of Miss

6      Sierra?

7          A.    Brenda--her name was Brenda, I can't

8      remember her last name.

9          Q.    But do you know any of her qualifications?

10         A.    No, I don't.

11         Q.    Do you know what knowledge she has regard-

12     ing the claims you are making in your discrimination--

13         A.    No, I don't know what knowledge she has,

14     no.

15         Q.    Has she witnessed any discrimination

16     against you?

17         A.    Yes.

18         Q.    What discrimination has she witnessed?

19         A.    It had something to do with the insurance.

20     I can't recall exactly the incident, but had something

21     to do with changing the insurance and them allowing

22     someone else to change and me not change some bene-

23     fits.  I can't recall the exact situation, but she was

24     at that time handling the insurance forms, and when

25     she complained then they allowed me to go ahead and

1     make the proper changes that I had to to adjust my

2     insurance.  But I think she filed a complaint.

3              This is stuff the department has.  All

4     those complaints, the department has copies of that.

5         Q.    When was the last time you spoke with her?

6         A.    I think in November.  Before the holidays

7     this year.

8         Q.    The year 2000?

9         A.    Yes.  Year 2000.

10        Q.    Have you ever done anything with her

11    socially outside of the work arena?

12        A.    No.

13        Q.    Do you know if she's filed any grievances?

14        A.    No.

15        Q.    Do you know if she's made any specific

16    claims or filed any lawsuits?

17        A.    No.

18        Q.    Have you discussed any of your claims with

19    her since leaving the Department of Corrections?

20        A.    No, not really, no.  She knows because she

21    works in the department, she gets the personnel file.

22    Even though she doesn't tell me nothing she's well

23    aware of what's going on.

24        Q.    Have you specifically--

25        A.    No.

```
 1        Q.    --discussed with her your claims against
 2    leaving the Department of Corrections?
 3        A.    No.
 4        Q.    Do you know if she's ever been denied any
 5    promotions?
 6        A.    The supervisor promotion.  She applied for
 7    supervisor position and was denied.
 8        Q.    Aside from that one?
 9        A.    That's the only one I know of.
10        Q.    And this person, Brenda, who got the
11    position, what is her nationality if you know?
12        A.    She's Anglo.
13        Q.    The next person is a Supervisor Hill.  Has
14    he ever been discriminated against?
15        A.    I believe he felt that he was, but--I know
16    he filed, but I don't know exactly what he filed.
17        Q.    What nationality is he?
18        A.    He's African.
19        Q.    Do you know any of the details of his
20    discrimination claim?
21        A.    No, I don't.
22        Q.    Do you know what details he knows in
23    regards to your discrimination claims?
24        A.    Well, he was supervisor during the time
25    that I was at 17-1 and he witnessed some things that
```

 1    he did not agree to, how they were treating me.

 2        Q.    What did he specifically witness?

 3        A.    Well, I think he witnessed their negative

 4    behavior toward me.

 5        Q.    Whose negative behavior?

 6        A.    Miss Linda Scarlett and another supervisor

 7    there by the name of Weiss.  I can't recall her first

 8    name.

 9        Q.    What specifically, what was the negative

10    behavior that he witnessed?

11        A.    Well, they had me like clean the tables in

12    the--they had a party and then I had to clean the

13    tables.  He didn't think that was correct.

14        Q.    They told you you had to clean the tables?

15        A.    Um-hmm.

16        Q.    Yes?

17        A.    Yes.

18        Q.    And who was that?  Was that--

19        A.    That was, I think, Supervisor Weiss.  There

20    was another supervisor, I couldn't remember who she

21    was.  And that's it.

22        Q.    When was the last time you spoke with him?

23        A.    Wow.  Since I left the department two years

24    ago, something like that.

25        Q.    Have you spoken with him since leaving?

1        A.    No.

2        Q.    Besides witnessing you having to clean the

3    tables as you explained a moment ago, do you know if

4    he witnessed any other forms of discrimination against

5    you you're claiming in this lawsuit?

6        A.    No.

7        Q.    I think you stated a moment ago you don't

8    know what the specific discrimination he's claiming or

9    he has claimed?

10        A.    I don't know, but I know that he did file.

11    But I don't know specifically what happened.

12        Q.    Do you know if that's race based?  Based on

13    him being an African-American?

14        A.    I don't know.

15        Q.    And you believe he'll support your position

16    that you were discriminated against based on being a

17    Puerto Rican?

18        A.    Yes.

19        Q.    And the last one is Supervisor Subrmani,

20    Subramani?

21        A.    Subramani.  Subramani.

22        Q.    What race or nationality is he?

23        A.    He's a Hindu.

24        Q.    Has he been discriminated against?

25        A.    I don't know.

1        Q.    Has he witnessed any discrimination against
2    you?

3        A.    Yes.

4        Q.    What discrimination?

5        A.    There was a lady there by the name of
6    Trensgrise (phonetic) or something like that.  And I
7    trained her for her position, and then she was trying
8    to correct my work and we got into a discussion and he
9    saw the whole thing, I think.  So he approved, kind of
10   approved for me to leave that day because I was, I
11   think, pretty upset that day, and he signed my form so
12   that I could go home or something like that.   The
13   department has record, a record of that.

14       Q.    Do you have a copy of that record?

15       A.    No.

16       Q.    Have you ever seen that record?

17       A.    No.

18       Q.    This person, Trensgrise, do you know how to
19   spell that?

20       A.    I don't know.  Trensgrise, something like
21   what.

22       Q.    This person you trained and then she
23   corrected what of yours?

24       A.    They trained her kind of like for when the
25   supervisor wasn't there, for her to sit in for the

```
 1    supervisor.

 2         Q.    And what did she correct?

 3         A.    She didn't--she just put like notes for me

 4    to redo--

 5         Q.    Was she the acting supervisor at this time?

 6         A.    She was not the acting supervisor.  She had

 7    just gotten into the department, she had been there

 8    like six months, and then one day the supervisor was

 9    out and she was sitting in, I guess, yeah.

10         Q.    Was she told to assume that position when

11    the supervisor left?

12         A.    I don't know if she did or not.

13         Q.    Do you know if she was not told?  Do you

14    know anything--

15         A.    She said that the supervisor told her to

16    give that to me and to make the corrections.

17         Q.    Do you know that to be true or not be true?

18         A.    Well, when she did it was because somebody

19    told her to do it.

20         Q.    And you thought that was discrimination,

21    because she told you to make corrections on something?

22         A.    No, not because of that.  I felt it was

23    discrimination for her to be trained for a better

24    position than me.  Because I trained her--

25         Q.    Do you know what her qualifications were?
```

```
1        A.    I trained her for the position that she had
2    as a word processor.  So she was being trained for the
3    supervisory position.  So, of course, I felt very bad
4    that she'd come and correct my work when I was the one
5    who trained her.
6        Q.    Do you know what nationality--
7        A.    She's Anglo.
8        Q.    Do you know any of her qualifications?
9        A.    No.  I don't.
10             But she was there as a word processor.
11       Q.    But you don't know any of her qualifica-
12   tions?
13       A.    No.
14       Q.    What did she ask you to correct?
15       A.    She just was--in other words, trying to be
16   my supervisor.  This is what I picked up.
17       Q.    What did she ask you to do?
18       A.    To go ahead and--she corrected my work.
19       Q.    What did she correct?
20       A.    I don't know.  She put some notes on there
21   about--something about one of the post-sentence
22   investigations, I can't recall.
23       Q.    Were you writing this yourself or were you
24   just typing it out?  Was she making grammatical
25   corrections or was she--
```

 1         A.    No, I just saw her note--as I recall, this
 2    was such a long time ago--just a note on Redo or
 3    something like that.
 4         Q.    Is this something you were doing yourself
 5    or were you typing up for someone else?
 6         A.    No, this is stuff, daily work that I did
 7    every day and it would go to the supervisor.  But
 8    since she wasn't there that day for her to review then
 9    Miss Trensgrise sat in that position to review all the
10    work for that day.
11         Q.    What kind of work was this?  I'm not
12    familiar with what you did.
13         A.    Like a post-sentence investigation or
14    something like that.
15         Q.    Where did you get the information from that
16    you inputted?
17         A.    From the record.  From the clients, the--
18         Q.    So you just took information off the record
19    and typed it into something else, is that what you're
20    saying?
21         A.    You take the information that they give
22    you, that the officer gives you, and then you type it
23    into a form that's called post-sentence investiga-
24    tions.
25         Q.    She asked you to correct whatever you had

1    typed in initially?

2        A.    Right.  All right.  But it was like--it's

3    like you do a day's work and somebody comes in and

4    corrects it.

5        Q.    Does the supervisor normally do that of

6    you?

7        A.    No.  Never.  I used to correct my own work.

8        Q.    And whatever she told you to correct, did

9    it need to be corrected?

10       A.    Not really, because I could have done that

11   myself.

12       Q.    Not really, yes or no?  I mean, did it need

13   to be corrected whether you were going to do it your-

14   self or not?

15       A.    No.  It did not need to be corrected, no.

16       Q.    Did you make any corrections to it?

17       A.    I don't recall if I did or not.

18       Q.    Did she look at it again?

19       A.    I left.  I left.  I got, you know, I just

20   left.  I was very upset over the whole incident.  And

21   I talked to Mr. Subramani that I wanted, you know, to

22   go, and he approved my leave and so I left.  Because I

23   felt I was being harassed at that point with my work.

24       Q.    Did you make any complaints about it

25   besides--

```
 1         A.    Yes, I did.

 2         Q.    --asking Mr. Subramani to leave?

 3         A.    Yes, I did.

 4         Q.    What complaint did you make?

 5         A.    I felt it was inappropriate that she did

 6    that.

 7         Q.    Who did you make the complaint to?

 8         A.    Did it to Miss McDonald and to Mr. Barry

 9    Groves.

10         Q.    What was the outcome of those complaints?

11         A.    The outcome, I got written up.

12         Q.    You got written up?

13         A.    I got written up.

14         Q.    What did you get written up for?

15         A.    They said that I--they called it, I don't

16    know what they said, I verbally--verbal altercation or

17    something like that.

18         Q.    Verbal altercation?

19         A.    Yeah, that's what they said.  I don't know

20    what they called it.

21         Q.    For arguing with Trensgrise?

22         A.    Right, for arguing with her or something

23    like that.  For voicing my opinion, let me put it that

24    way.

25         Q.    Did you voice your opinion to Miss
```

1    Trensgrise?

2         A.    Yes, I did.  I told her exactly how I felt.

3    And she smirked.  And then I just--I felt I was being

4    harassed and I just said, "I don't think I should

5    tolerate this."  And I talked to the supervisor about

6    it and--

7         Q.    Do you know if she complained about it?

8         A.    I don't know if she did or not.

9         Q.    Any other incidents that Supervisor

10   Subramani knew of?

11        A.    Well, no.  That's it.

12        Q.    When was the last time you spoke with him?

13   Still at DOC or since?

14        A.    While I was at DOC.

15        Q.    Do you know if he's filed any claims

16   against DOC?

17        A.    No, I don't know if he has.

18        Q.    Do you know if he still works for DOC?

19        A.    I think he still works for DOC.

20        Q.    Do you know if he's ever been denied any

21   promotions?

22        A.    No, I don't.

23        Q.    Did you ever discuss with him the fact that

24   you were written up for this verbal altercation with

25   Miss Trensgrise?

1        A.    No.  No.

2        Q.    Do you believe all the discrimination you

3   received was based on being Puerto Rican?

4        A.    Yes.

5        Q.    Do you believe it was any other reason for

6   your claims of discrimination?  Your gender, your age,

7   anything else?

8        A.    No.

9        Q.    Have you ever made any claims about dis-

10  crimination based on any other reason besides being

11  Puerto Rican?

12           MR. BEINHAKER:  Objection to the form of

13       the question.

14           You can answer it if you can.

15       A.    I don't recall whether or not.

16       Q.    You don't recall if you've made any other

17  claim of discrimination for any other reason besides

18  the one in this, being Puerto Rican?

19       A.    I don't recall.  I don't recall.

20       Q.    Have you ever sought the specific reasons

21  that other people were promoted to positions which you

22  believed you were discriminated against and denied?

23       A.    Yes, I did.

24       Q.    What did you do on that matter?  What

25  exactly did you undertake to find this out?

1      A.     One of the girls I talked to.

2      Q.     Who was that?

3      A.     That was at the--she was at the 17-4

4   office, I can't remember her full name.  But she was

5   one of the girls that got promoted to the secretary

6   position.  She was an African-American and I just

7   wanted to know her background, and I asked her and she

8   said she only had like a high school diploma or some-

9   thing like that.  So right there and then I knew that

10   I was--I had more education than her, anyway.

11      Q.     Did you have more experience?

12      A.     No.  She was hired there as a word

13   processor.

14      Q.     Did you ever find out any other reasons,

15   did you identify any other reasons that you believe

16   that other people were promoted ahead of you?  Aside

17   from this one you've mentioned.

18      A.     I can't remember right now.  I can't recall

19   right now.

20      Q.     Of the ten positions that you applied for

21   and didn't get and that you believe you were

22   discriminated against because you are Puerto Rican and

23   that's why you didn't get them, can you identify a

24   specific reason why you didn't get the positions that

25   you can quantify?  That you had better education, that

1    you had better qualifications, that you're better
2    experienced than the person getting the job aside from
3    your claim that you were just discriminated against?
4          MR. BEINHAKER:  Objection to the form.
5          Q.   Is there anything that you know of that you
6    can identify in relation to these positions?
7          A.   Well, yes.
8          Q.   What can you specifically identify as to
9    which position, aside from being Puerto Rican and the
10   person who got the position not being Puerto Rican, is
11   there any other reason?  Is that the only reason you
12   didn't get any of these positions, these ten?
13         A.   Well, no, that's the only reason I can
14   think of.  The only reason.  And I guess maybe my age,
15   but I was what, 40-something then, I don't know.
16   Maybe my age, I don't know.  But it would have to be
17   Puerto Rican or my age, there's nothing else.
18         Q.   Are you making any claim of age discrimi-
19   nation?
20         A.   No, I don't think I did.  I don't recall,
21   let's put it that way, I don't recall because I could
22   have mentioned it at the EEOC.  They have records of
23   this, you know, all these questions you're asking me,
24   the EEOC has all those records.  Because everything
25   you're asking me, I gave it to the EEOC.  And they

1    have that.  They have that.

2         Q.    EEOC did an investigation, correct?

3         A.    According to my understanding they did,

4    yes.

5         Q.    And they concluded there was no finding of

6    discrimination, is that correct?

7         A.    No, that is not correct.

8         Q.    They found discrimination?

9         A.    They felt--they felt that, yes, that they

10   had discriminated against me and needed to go further,

11   but at one point it just stood still.  And I didn't

12   hear from them anymore after a while.

13        Q.    Did they conclude from their investigation

14   that you had been discriminated against?

15        A.    I don't know.  You're asking me something

16   that I don't know.

17        Q.    Did they conclude from their investigation

18   that you weren't discriminated against?

19        A.    That I wasn't?  I don't recall, to be very

20   honest with you.

21        Q.    Do you know what their conclusions are at

22   all?

23        A.    No, I don't.

24        Q.    Did you quit or were you terminated?

25        A.    I--I left and I sent them a letter resign-

1    ing until the problem got solved.  And they have a
2    record of that.

3        Q.    You gave them an ultimatum, you would not
4    work until the problem was resolved?

5        A.    Exactly.

6        Q.    Do you know if this was allowed within the
7    rules of the State of Florida Department of Correc-
8    tions, if this was one of your avenues of redress?

9        A.    Well, I don't know that.

10       Q.    Do you know any ways you could have dealt
11   with this problem within the rules of the DOC and the
12   State of Florida?

13       A.    Well, I think I filed enough grievances and
14   I went to verbal meetings and I exhausted all, what I
15   thought was all the avenues to solve the problem and
16   it never got solved.  So at that point was when I
17   decided to make that letter and it got to the point
18   where I didn't--it was affecting my health a little
19   bit and I had to go to the doctor, so I decided it's
20   better to leave than for it to affect me.

21       Q.    Did you ever request a medical leave of
22   absence?

23       A.    I did at one time but it's not related to
24   the discrimination.  It had to do with my husband, he
25   was sick.

1      Q.   So you never requested any medical leave

2   for this discrimination, health problems you're

3   claiming to have suffered, correct?

4      A.   No, that is not correct because--no.  No.

5      Q.   You just stated a moment ago you requested

6   medical leave one time and it was for your husband and

7   his health problems?

8      A.   Right.

9      Q.   Did you ever request medical leave for any

10   problems you were having with your health as a result

11   of the discrimination you're claiming in this lawsuit?

12      A.   No, not really, no.

13      Q.   No, not really?  It's a yes or no question.

14      A.   You see, when I went because of the

15   emotional stress I was under it wasn't a medical

16   leave--what do you mean by medical leave?  Explain

17   that--

18      Q.   Did you request any type of medical leave

19   at any time--

20      A.   Yes, then I did, yes.

21      Q.   How many days did you request, or did you

22   just take a day off?

23      A.   No, I would go, whenever I needed to, to go

24   to the doctor to get medication.

25      Q.   Did you request any medical leave besides

```
 1    days off to go to doctors?

 2         A.    No.

 3         Q.    What were the dates your husband was sick?

 4         A.    Oh, I can't--March of--I don't know.

 5               I remember what, four, five years ago.

 6         Q.    Approximately what time?

 7         A.    March, month of March?

 8         Q.    What year?

 9         A.    Probably four years ago; that was what,

10    19--

11         Q.    That would be 1997?

12         A.    '97, something like that.

13         Q.    What was his health problem?

14         A.    He had colon cancer.

15         Q.    Did you ever look into any other ways you

16    could have dealt with this discrimination aside from

17    writing this letter and resigning, giving this

18    ultimatum of getting it corrected and you would not

19    return until then?

20         A.    Well, the EEOC was the only--the other.

21         Q.    Was that while you were working or after?

22         A.    While I was working.

23         Q.    Had the EEOC finished their investigation

24    by the time you resigned?

25         A.    No.
```

```
 1        Q.    Were there any other avenues that you knew
 2   of that you could have undertaken within your rights
 3   as an employee of the State of Florida--
 4        A.    No.
 5        Q.    --or the DOC?
 6        A.    No.
 7        Q.    Didn't know of any others?
 8        A.    No.
 9        Q.    Do you know if the EEOC ever concluded
10   there was any discrimination against you?
11              MR. BEINHAKER:  Objection, asked and
12        answered.
13        Q.    You can answer.
14        A.    I think I already did answer that before.
15              MR. BEINHAKER:  Answer it again.
16              MR. OPPENHEIMER:  You want to repeat the
17        question for me please?
18              THE WITNESS:  Yes, repeat the question
19        please.
20              (Thereupon, the pending question was read
21   back by the court reporter as above-recorded.)
22        A.    I think, yes, yes.
23        Q.    Yes, they did?
24        A.    Well, I'm not sure.  I don't recall.  I
25   don't recall.  I don't recall.
```

1          Q.    Do you know if the Office of the Inspector
2     General did an investigation?
3          A.    No.
4          Q.    You don't know if they did or no, they
5     didn't?
6          A.    I don't know if they did.
7                MR. OPPENHEIMER:  Let me copy something
8          real quick.  I'll be back in one second.
9                (Defendants' Exhibit No. 1, a copy of memo
10    dated 10/5/99, was marked for identification.)
11         Q.    We have marked the Dismissal and Notice of
12    Rights from the EEOC as Defendants' Exhibit 1.  I've
13    given a copy to your attorney.  Have you ever seen
14    this document before?
15         A.    You know, I saw something like this, but it
16    also stated that if I disagreed with it to go ahead
17    and get an attorney, which I did.  So I didn't
18    consider this a conclusion.  This says it is unable to
19    conclude, where it says "X," and that's exactly how I
20    took it, that they didn't reach a conclusion.  Maybe I
21    misread this, but that's what it looks like.
22         Q.    Did you think they had any findings of
23    discrimination against you through their investiga-
24    tion?
25         A.    I don't recall.  I'm not going to say

```
 1    specific answering that because I don't recall.

 2         Q.    Did you ever ask what their findings were

 3    of anything?

 4         A.    Well, I recall having gotten this letter

 5    and I went to an attorney after that.  So--

 6         Q.    Have you ever requested any of the docu-

 7    ments from the EEOC--

 8         A.    No.

 9         Q.    --regarding their investigation?

10         A.    No, I didn't.

11         Q.    Have you ever seen any of the documenta-

12    tion?

13         A.    No.  I saw something like this, I recall

14    now having seen something like this (indicating).

15         Q.    Do you know who they spoke to?

16         A.    No.  I went twice to the EEOC.  They gave

17    me--they had me look at some documents, I signed an

18    affidavit, and that was about it.

19         Q.    You don't know if they spoke with any of

20    the people we've identified through this deposition?

21         A.    No.  Really I don't.  I really don't

22    recall.

23               Did I meet with them over there?  No, I

24    don't recall meeting them over there.  I don't recall

25    that.
```

    1        Q.    Do you have any reason to believe you have
    2    diabetes?
    3        A.    No.
    4        Q.    Do you have any reason to believe you've
    5    come in contact with the AIDS virus?
    6        A.    No.
    7        Q.    Are you a smoker?
    8        A.    No.
    9        Q.    Have you been involved in any accidents
   10    since this occurrence, any--
   11        A.    No.
   12        Q.    --car accidents, driver, passenger,
   13    pedestrian?
   14        A.    No.
   15        Q.    Have you ever been involved in any other
   16    accidents, slip and fall, trip, things like that?
   17        A.    No.
   18        Q.    Have you ever filed a workers' compensation
   19    claim?
   20        A.    I don't recall, no.
   21        Q.    Have you ever heard of the name Michelle,
   22    M-i-c-h-e-l-l-e, Gruss, G-r-u-s-s?
   23        A.    I don't recall.
   24        Q.    How about Aindata, A-i-n-d-a-t-a, Demoya,
   25    D-e-m-o-y-a?

```
 1        A.    No, I don't recall,

 2        Q.    Douglas Sweredoski, S-w-e-r-e-d-o-s-k-i?

 3        A.    You're saying if I just recall their names?

 4        Q.    If you recall their names.

 5        A.    Him, his name sounds familiar, but I think

 6   it was from 17-1 office or something like that, I'm

 7   not sure.

 8        Q.    Do you know why it sounds familiar?

 9        A.    No.  I don't.  Maybe it was a co-worker.  I

10   don't know.

11        Q.    Jesse Nolan, N-o-l-a-n?

12        A.    No.

13        Q.    Linda DeFelice, D-e-F-e-l-i-c-e?

14        A.    No

15        Q.    Gonzalez Sorrell, S-o-r-r-e-l-l?

16        A.    No.

17        Q.    Carolyn Baker?

18        A.    No.

19        Q.    Of the six people I just mentioned, do you

20   know any of the qualifications of those people?

21        A.    No.

22        Q.    Do you know if any of them received

23   positions that you applied for?

24        A.    No, I don't.

25        Q.    Do you know what any of their races are,
```

```
 1   national origins, backgrounds, anything, any of that?
 2       A.   No.
 3       Q.   Have you ever heard of something called a
 4   Career Service Class Specification?
 5       A.   Yes.
 6       Q.   Do you know it being abbreviated KSA?
 7       A.   No, I don't know what that is.
 8       Q.   You don't know those as being the same
 9   things--
10       A.   No.
11       Q.   --KSA and Career Service Class Specifica-
12   tion?
13       A.   I don't know.
14       Q.   What is the Career Service Class
15   Specification?
16       A.   You're asking me to describe that to you?
17       Q.   What is it?
18       A.   I mean--that's, according to my understand-
19   ing, a document that the Department of Corrections has
20   that specifies the position you're applying for.  In
21   there it tells you the qualifications that you're
22   supposed to meet for that particular position.
23       Q.   Do you complete any portion of the Career
24   Service Class Specification?
25       A.   Did I complete?
```

```
 1        Q.    Do you complete any portion of a Career
 2   Service Class Specification?
 3        A.    I can recall the ones I applied for, yes, I
 4   did.
 5        Q.    It's a specific form you complete?
 6        A.    No, that's a form that every employee from
 7   the DOC completes when they're applying for a job.
 8        Q.    Is that called the Career Service Class
 9   Specification or is that a form done in relation to
10   that?
11        A.    No, it's not a form done in relation to
12   that.
13        Q.    What does the employee complete?
14        A.    The employee just completes, I think it's a
15   form that looks something like this (indicating) and
16   it just has--tells you the job number and the title.
17        Q.    An application form?
18        A.    I don't know what they call it, to be very
19   honest with you.  It's part of it but I don't know the
20   specific name.
21        Q.    Did you see the Career Service Class
22   Specification for each of the 11 positions--
23        A.    Yes.
24        Q.    --you applied for?
25        A.    Yes, I did.
```

```
 1        Q.    And for each of the respective 11, did you
 2    meet all the of the respective classifications for
 3    those 11 jobs?
 4        A.    Yes, I did.  Yes, I did.
 5        Q.    Is it your belief as we sit here today that
 6    none of the jobs you were denied, of those 11, were
 7    based on lack of qualifications?
 8              Let me ask it another way.
 9        A.    Yeah, because the way--
10        Q.    You were denied ten out of 11 jobs.  Were
11    any of those ten that you know of based on a lack of
12    qualifications for the job--
13        A.    No.
14        Q.    --or were they all based on your being
15    Puerto Rican, all ten of the denials?
16        A.    I believe they were all because I was
17    Puerto Rican.
18        Q.    Do you know if any of them were based on
19    lack of qualifications?
20        A.    No, I don't.  I don't know that.
21        Q.    What have you done to find out if that's
22    true, if it was based on being Puerto Rican, based on
23    you just weren't qualified for the job?
24        A.    What have I done.  I filed a lot of
25    grievances with the department, I've had verbal
```

```
 1    meetings with them, I called Tallahassee back.  So I
 2    didn't know what more to do.  That's it.
 3               And after 11 times you try, then that's it.
 4         Q.    Were you ever told you just weren't
 5    qualified for the job you applied for?
 6         A.    In the letter, yes, that I got.  Every
 7    letter said that they found somebody more qualified or
 8    something like that.  I guess it's yes or no.
 9         Q.    Did they say they found somebody more
10    qualified or did they say you weren't qualified for
11    the job?
12         A.    That somebody else got the position.  And
13    that's it.  It was a three letter--it was a one-page
14    letter that said, We found somebody else that got the
15    position.  Thank you very much for applying.  And
16    that's all I remember.
17         Q.    Did it ever say you were unqualified?
18         A.    I don't recall.  I don't recall exactly.
19         Q.    Did it ever say someone else was more
20    qualified?
21         A.    I don't recall.
22         Q.    What have you done to show that you were
23    more qualified for these positions, these ten
24    positions, than the person who got them?
25         A.    Well, the department has records of what I
```

 1    did within the department, so they know that I was

 2    qualified for the position.

 3        Q.    What have you done to show that you were

 4    more qualified for any of these ten positions?

 5        A.    I don't--you know, I worked there so I knew

 6    I was qualified.  What do you do more than working and

 7    work performance?

 8        Q.    What did you do to show them you were more

 9    qualified?

10        A.    The--every three months they find out if

11    you meet the requirements of the department and if you

12    are doing your job, and if you have a good evaluation

13    that means you are qualified for promotion.  That is

14    what I did.  I passed every evaluation so I did

15    qualify for a promotion whether I got it or not.

16              It's there in the records, that's why I'm

17    surprised at all these questions.  They have the

18    records, they know I'm qualified.

19        Q.    Is it your position that passing an

20    evaluation, a prior evaluation for the job you are in

21    makes you automatically qualified for a promotion?

22        A.    Yes, yes.

23        Q.    Do you know if you lacked any experience or

24    qualifications for any of the ten positions you were

25    denied?

```
 1        A.    No.
 2        Q.    No, you don't know or no, you didn't lack
 3   any of the qualifications?
 4        A.    No, I don't know.
 5        Q.    So if you don't know whether you were
 6   qualified for these positions, you can't say for sure
 7   whether you didn't get them because you were Puerto
 8   Rican or because you just simply weren't qualified, is
 9   that correct?
10             MR. BEINHAKER:  Objection to the form.
11        A.    I know that I didn't get them because I'm
12   Puerto Rican.
13        Q.    How do you know that?
14        A.    Because I qualified.
15        Q.    You just told me you don't know if you had
16   the qualifications for these positions and now you're
17   telling me you know you were qualified; which is it?
18        A.    No, no, what--you see, what you're asking
19   me, the way you're asking me these questions, and
20   you're not asking it as a yes or no answer, what
21   you're asking me right now is you're trying to say,
22   Well, did I have to show proof.  You're making it
23   sound like I have to show proof that--
24        Q.    Let me start again.
25        A.    Yes, because--
```

1        Q.    Did you meet all of the qualifications for
2    all of these ten positions when you applied for each,
3    respectively?
4        A.    Of course.  Of course.
5        Q.    You know you met every--
6        A.    I know I qualified as far as my performance
7    reviews for promotions.  Based on the service program
8    and what they were asking for, yes, I did qualify.
9        Q.    Do you know if you met all of the qualifi-
10   cations that were listed?
11       A.    Not all.  See, when you throw in the word
12   all, I don't know that I met all.  But 80 percent,
13   yes, I can say I did.
14       Q.    So you don't know if you met all of the
15   qualifications, is that your testimony?
16       A.    Yes.
17       Q.    So you can't tell me as we sit here today
18   the reason were you not hired for these positions or
19   given these promotions was not based on a lack of
20   qualifications one hundred percent; you don't know
21   that, do you?
22            MR. BEINHAKER:  Object to the form.
23       A.    No, I don't.
24       Q.    It's your position, however, that the
25   reason you did not get these positions has nothing to

112

1    do with your qualifications, it has only to do with

2    your being Puerto Rican?

3         A.    Yes.

4              MR. OPPENHEIMER:  It's a little before 3

5         o'clock right now, we're at right about three

6         hours.  I know you said you wanted to take a

7         break so what we'll do is we'll adjourn this and

8         reserve the rest of the time for when it's

9         convenient to finish up this deposition.

10             MR. BEINHAKER:  Fair enough.

11             (Thereupon, the deposition was adjourned at

12   3:00 p.m., sine die.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      CERTIFICATE OF OATH

2      STATE OF FLORIDA )
                        )
3      COUNTY OF DADE   )

4                I, the undersigned authority, certify that

5      CARMEN BLANCO personally appeared before me and was

6      duly sworn.

7                WITNESS my hand and official seal this

8       4    day of April, 2001.

9

10                    KATHRYN E. OLIVER

11                    Notary Public - State of Florida
                      My Commission No. CC 829931
12                    Expires:  5/15/03

13
                         OFFICIAL NOTARY SEAL
14                        KATHRYN E OLIVER
                      NOTARY PUBLIC STATE OF FLORIDA
15                      COMMISSION NO. CC829931
                      MY COMMISSION EXP. MAY 15,2003

16

17

18

19

20

21

22

23

24

25
```

114

```
 1                REPORTER'S DEPOSITION CERTIFICATE
 2     STATE OF FLORIDA  )
                         )
 3     COUNTY OF DADE    )
 4               I, KATHRYN E. OLIVER, Court Reporter,
 5     certify that I was authorized to and did
 6     stenographically report the deposition of CARMEN
 7     BLANCO; and that the transcript is a true and complete
 8     record of my stenographic notes.
 9               I further certify that I am not a relative,
10     employee, attorney or counsel of any of the parties,
11     nor am I a relative or employee of any of the parties'
12     attorney or counsel connected with the action, nor am
13     I financially interested in the action.
14               DATED this  4    day of April, 2001.
15
16                         _____
17                         KATHRYN E. OLIVER
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CARMEN BLANCO,                              CASE NO. 00-6006-CIV-ZLOCH

Plaintiff,                              MAGISTRATE JUDGE SELTZER

V.

MICHAEL W. MOORE, Secretary
of the FLORIDA DEPARTMENT
OF CORRECTIONS, in his Official
Capacity, and FLORIDA DEPT. OF
CORRECTIONS.

Defendants.

_____/

## DEFENDANT, DEPARTMENT OF CORRECTIONS' ANSWERS TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant, DEPARTMENT OF CORRECTIONS, by and through its

undersigned attorneys, answers the Plaintiff's First Set of Interrogatories dated

September 20, 2000, as follows:

1    Please state the name, address and telephone number of each person who
participated in, or contributed to, answering these interrogatories.

ANSWER:  Margaret Scott Chrisawn
Department of Corrections
Bureau of Personnel
2601 Blair Stone Road Tallahassee, FL 32301

    2.  Please state the names of witnesses with knowledge or information relevant to the subject matter of this action, including addresses if known, and the nature and substance of each witness's knowledge.

ANSWER:  The following persons have knowledge of Plaintiff's employment with Defendant, her job performance, applications for promotional positions, or issue of alleged discrimination she may have raised during her employment. For current employees, their business addresses are shown. For former employees who were not certified officers and whose addresses are therefore not exempt from the provisions of Chapter 119, the last known address is indicated:

Joyce D. Haley
Tony V. Harper
Kristine Simpson
189 East SW First Street
Suite 201
Delray Beach, FL 33431

Gary Rogatz
4343 West Flagler Street
Suite 100
Miami, FL 33130

Barry Groves


Grace Fishter

Thomas Stillson
1400 West Commercial Boulevard
Second Floor
Ft. Lauderdale, FL 33309

Linda Scarlett
Former Correctional Probation Senior Supervisor

Nancy Diane Knight
1400 West Commercial Boulevard
Second Floor
Ft. Lauderdale, FL 33309

Ronald E. Crosby
1400 West Commercial Boulevard
Second Floor
Ft. Lauderdale, FL 33309

Karen McDonald
10 West Olas Boulevard
Suite 100
Ft. Lauderdale, FL 33301

Arline Weiss



Carl Berry



Teresa Baker

3.    Please state the names of all persons Defendant intends to depose or call as witnesses to trial regarding the facts and circumstances of the subject matter of this action, including addresses if known, and the nature of each witness' knowledge.

ANSWER:  Those persons identified in response to No.2 above will likely be called as witnesses.  Because discovery is ongoing, we do not know the subject matter of their knowledge.  However, defendant's counsel reserves the right to call additional witnesses based on the progress of discovery in this matter. The identity of any additional witnesses, if any, will be made available to Plaintiff through her counsel.

4.    Please state the name, position and business address of each person employed by Defendant, or any agent of Defendant, who has custody, control, or possession of any documents relating to Plaintiff's employment with Defendant.

ANSWER:  Thomas Stillson, Personnel Officer, Ft. Lauderdale Service Center, 1400 West Commercial Boulevard, Ft. Lauderdale, FL 33309, has custody of documents relating to plaintiff's employment, specifically her complete personnel and confidential medical files.

5.    Please identify the existence, custodian, location, and general description of documents relevant to the subject matter of this action, including pertinent insurance agreements, and other physical evidence, and information of similar nature.

ANSWER:  Plaintiff's complete personnel file and any application and selection packets for promotional positions for which she applied that have not been destroyed in accordance the Department of State Records Retention Schedule are maintained by Thomas Stillson at the address identified in No. 4 above.

Official files regarding Plaintiff's charge of alleged discrimination filed with EEOC are in the custody of Margaret Chrisawn at the address identified in No. 1 above.

Blanco v. Florida Dept. of Corrections, et al.
Case No. 00-6006-CIV-ZLOCH
Page 5

6.    Please identify any and all policies of insurance that you contend cover or may cover you for the allegations set forth in Plaintiff's Complaint and as to each policy, please state:

   a.    The name of each insurer;
   b.    The number of each policy;
   c.    The effective date of each policy;
   d.    The limits of liability of each policy; and
   e.    The name and address of the custodian of each policy.

ANSWER.  Defendant is covered by a general liability policy, as are agencies. Specifics regarding this policy as requested herein, of which policy Defendant does not have custody, must be obtained from the Department of Insurance, Division of Risk Management.

7.    Please state with specificity Defendant's discrimination policies in effect at the time of Plaintiff's employment with Defendant. Please state the date each policy was created and the date each policy went into effect. Describe how these policies were developed, implemented, disseminated and enforced, and identify all documents which relate to the policies, their creation, implementation, dissemination and enforcement, and identify all documents upon which you rely in responding to this interrogatory.

ANSWER:  Defendant has two policy statements concerning discrimination: one covering Title VII, and the other specifically addressing sexual harassment. The Title VII anti-discrimination policy statement was first developed in 1988, as was the policy on sexual harassment. Both were developed by Defendant's Civil Rights Unit, now the Employee Relations Section, who also has the responsibility for revising these policy statements, and has done so in 1992, 1995 and 1997. The policy statements are signed by Defendant's Secretary and Deputy Secretary and copies are posted on official bulletin boards in every institution, facility, and offices statewide.    Additionally, each new employee, without exception, is given copies of the policy statements during orientation, and must sign a receipt acknowledging that he/she has read, understood and will comply with the provisions of the policy statements. When the, policy statements are revised, each employee is given a copy for which he must

sign an acknowledgment. Further, Defendant has mandatory training for all employees on discrimination, and the discipline that may result from violation of Defendant's policy statements on discrimination

Copies of the policy statements and relevant documents will be produced in response to Plaintiff's First Request to Produce No. 19.

8.    Please state the name, last known address, and telephone number of all applicants or employees who have complained or charged, either orally or in writing, internally or externally, Defendant or any of Defendant's agents or employees with national origin or racial discrimination within the past 10 years, and identify all documents upon which you rely in responding to this interrogatory.

ANSWER:  Object as to scope and relevancy. Object that request is overly broad. Plaintiff's allegations are based on national origin and retaliation only, not racial discrimination. Further, complaints filed statewide both before and after Plaintiff's employment have no bearing on the subject of this action. Plaintiff only worked at one Department of Corrections facility. Request should be limited to that facility or region where the facility is located. Without waiving the foregoing objections, defendant states that the following employees or applicants have filed complaints alleging discrimination on the basis of national origin and/or retaliation in Region IV, where Plaintiff was employed, between 1993 and 1998, when Plaintiff was employed with Defendant. Defendant relies on its official copies of their complaint files for its answers to this interrogatory. The home addresses and telephone numbers of former employees who were correctional officers or correctional probation officers are exempt from disclosure under the provisions of Chapter 119, and cannot be provided.

Jane E. Abel
Putnam Correctional Institution
Post Office Box 279
East Palatka, FL 32131
(904) 325-2857

Blanco v. Florida Dept. of Corrections, et al.
Case No. 00-6006-CIV-ZLOCH
Page 7

Anthony Acierno



Abdolmajid Amirzadehsbams

Julio C. Casanova
1400 West Commercial Boulevard
Second Floor
Ft. Lauderdale, FL 33309
(954) 202-3800

Deverine Christopher

Maria Garcia
1400 West Commercial Boulevard
Second Floor Ft. Lauderdale, FL 33309
(954) 202-3800

Amparo Glukstad
South Florida Reception Center
Post Office Box 02-8538
Miami, FL 33102
(305) 592-9567

Jorge L. Gonzalez
1400 West Commercial Boulevard
Second Floor
Ft. Lauderdale, FL 33309
(954) 202-3800

Paraskevas Kililis

Shirley Mitchell

Agustin Novo
Everglades Correctional Institution
1601 SW 187Avenue
Miami, FL 33185

Aida Pacheco
1400 west Commercial Boulevard
Second Floor
Ft. Lauderdale, FL 33309
(954) 202-3800

Tyrone Rodriguez

Jose Rodriguez

Norman Silversmith
[redacted]

Ayotunde R Ware
South Florida Reception Center
Post Office Box 02-8538
Miami, FL 33102
(305) 592-9567

9. Please state whether or not the Plaintiff was eligible and qualified for any promotion during her employment with Defendant and, if your answer is in the negative, explain the basis for such answer.

ANSWER: Plaintiff applied for seven promotions during her employment with Defendant. She was eligible and qualified for five of these positions. She was determined ineligible two positions based on the specific knowledge, skills, and abilities (KSAs) listed for the positions.

10.    Please list each promotional position for which Plaintiff applied, and the complete reason she did not obtain each. Additionally, please list the names, addresses, and phone numbers, if known, of the individual who received such positions.

ANSWER:  Position #12513 - Personnel Aide - closing date January 5, 1994
             Although Plaintiff was qualified, the hiring authority selected another
             applicant as better suited.
             Position received by:
             Michelle A. Gruss
             10250 Harbor Inn Place, #20
             Coral Springs, FL 33071
             (954) 753-3058

             Position #079167-Administrative Secretary-closing date January 31, 1996
             Although Plaintiff was qualified, the hiring authority selected another
             applicant as better suited.
             Position received by:
             Nineata Maso Demoya
             1400 West Commercial Boulevard
             Second Floor
             Ft. Lauderdale, FL 33309

             Position #13357-General Services Specialist [Facilities Services Manager
             Assistant]-closing date February 7, 1996
             Plaintiff was determined to be ineligible based on the KSAs listed for this
             position. Specifically, she lacked the requisite experience.
             Position received by:
             Douglas A. Sweredoski
             1225 Omar Road
             West Palm Beach, FL

             Position #24494-Purchasing Agent II-closing date January 31, 1996
             Plaintiff was determined to be ineligible based on the KSAs listed for this

position.  Specifically, she lacked the requisite experience.
Position received by:
Jesse F. Nolan
1400 West Commercial Boulevard
Second Floor
Ft. Lauderdale, FL 33309

Position #30643-Senior Clerk-closing date January 31, 1996
Although Plaintiff was qualified, the hiring authority selected another
applicant as better suited.
Position received by:
Linda DeFelice
1400 West Commercial Boulevard
Second Floor
Ft. Lauderdale, FL 33309

Position #05836-Executive Secretary-closing date May 15, 1996
Although Plaintiff was qualified, the hiring authority selected another
applicant as better suited.
Position received by:
Fe Gonzalez Sorrell
1400 West Commercial Boulevard
Second Floor
Ft. Lauderdale, FL 33309

Position #27756-Fiscal Assistant II-closing date October 25, 1997
Although Plaintiff was qualified, the hiring authority selected another
applicant as better suited.
Position received by:
Carolyn Baker
1400 West Commercial Boulevard
Second Floor
Ft. Lauderdale, FL 33309

Blanco v. Florida Dept. of Corrections, et al.
Case No. 00-6006-CIV-ZLOCH
Page 11

11.    Describe each objective criterion relied upon by Defendant in assessing Plaintiff's work performance and eligibility and qualifications for promotion during the period she was employed by Defendant, and state all the reasons why Plaintiff failed to satisfy such criterion.

ANSWER:    The objective criteria used to assess Plaintiff's or any employee's job performance are the written position description for each specific position, and the written performance standards for each position.

Employees in the personnel office who determine eligibility for each applicant or employee applying for a position, do so based on the written Career Service Class Specifications for the position, the written KSAs for the position, any screening criteria prepared for the position and the information contained on each application. These employees receive specific training in eligibility determination.

Plaintiff failed to satisfy the written KSAs for two positions because she lacked the requisite experience

12.    Please state with specificity Defendant's reason for the termination of Plaintiff's employment and identify all documents upon which you rely in answering this interrogatory.

ANSWER:    Plaintiff was not terminated from her employment with Defendant. Rather, she submitted a written letter of resignation dated June 29, 1998.

13.    Please state the total number of persons who were employed by Defendant during Plaintiff's employment with Defendant. Include both full and part time employees. How many employees are employed by Defendant at the present time? Include both full and part time employees. Identify all documents upon which you rely in answering this interrogatory .

ANSWER:  Defendant has relied on no documents for its response. Rather, a database search program was used for the numbers of full-time employees. However, the database was not created for this purpose until 1995. Defendant does not track numbers of part-time employees.

| 1995 | 24, 748 (as of June 30) |
| 1996 | 26,242 |
| 1997 | 26,824 |
| 1998 | 26,808 |
| 1999 | 26,127 |
| 2000 | 25,675 (as of October 10) |

14.    Please state the name, last known address, and telephone number of the person with the most knowledge regarding the following:

a.   Plaintiff's termination;
b.   Defendant's harassment policies;
c.   Defendant's discrimination policies;
d.   Defendant's retaliation policies;
e.   Defendant's Answers and Affirmative Defenses

ANSWER:  Because Plaintiff was not terminated from her employment with Defendant, there is no person having knowledge with regard to this issue. However, those individuals with knowledge concerning her resignation are Joyce Haley, Gary Rogatz, Barry Groves, Grace Fishter, and Karen McDonald, whose addresses are provided in response to No. 2 above.

Margaret Scott Chrisawn, address also provided in No. 2 above, has most concerning Defendant's policies with regard to discrimination.

Defendant's Answer and Affirmative Defenses
Counsel for Defendant in this matter, but most knowledge is subject to attorney-client and work-product privileges

Blanco v. Florida Dept. of Corrections, et al.
Case No. 00-6006-CIV-ZLOCH
Page 13

15.    Identify all persons Defendant intends to can as expert witnesses at trial. the nature of each witness' testimony. the basis of the testimony. and the reasons for the testimony.

> ANSWER:    None at this time. Defendant reserves the right to supplement this response.

16.    Please state the following as to each expert witness:
a.    All data and information considered by the expert in forming his opinions;
b.    All exhibits to be used as a summary of or in support for the opinions;
c.    List the qualifications of the expert. including a list of all publications authored by the expert within the preceding ten years;
d.    The amount of compensation to be paid for the expert's study and testimony; and
e.    All other cases in which the expert has testified as an expert at trial or by deposition within the preceding four years.

ANSWER:    See answer to No. 15.

17.    State whether any of Defendant's management officials or any outside consultant made any inquiry or investigation into any of Plaintiff's allegations of discrimination during the period in which Plaintiff was employed and, if so, identify all persons who made or assisted in such inquiry or investigation. and identify all documents referring or relating to such inquiry or investigation.

> ANSWER:    Defendant does not use any outside consultant for inquiries or investigations into allegations of discrimination, and has no knowledge whether Plaintiff's allegations were investigated by agents of EEOC.
>
> Plaintiff's allegations of discrimination filed with DOC's EEOC were investigated by Correctional Officer Senior Inspector Philip B. Speer with Defendant's Inspector General's Office
>
> If and when Plaintiff alleged discrimination or harassment other than through the Complaint process, management responded as

KUBICKI DRAPER
Attorneys for Defendants
City National Bank Building
25 West Flagler Street, PH
Miami, Florida   33130
Tel: (305) 982-6612
Fax. (305) 374-7846

By: _____
ELIZABETH M. RODRIGUEZ
Florida Bar No. 821690

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was sent by and by U.S.

Mail this 2nd day of _____, 2000, to: ANDREW S. HENSCHEL, ESQ.,

Henschel and Henschel, P.A., 951 NE 167 Street, Suite 205, North Miami Beach, FL

33162.

_____
ELIZABETH M. RODRIGUEZ

Page: 1 Document Name: Ca.

```
PR05 0                                                        03/23/98 11.51.
   PERB005                      APPLICANT INFORMATION        PRNT:        PAGE 00

SSN:                    NAME: BLANCO, CARMEN D.
ADDRESS                   SEX: F    BIRTH DATE: 07/09/50    RACE: HISPANIC
                                    BACKGROUND:
                                              Sr Clerk PG 11
  APPL DATE            APPLICANT HISTORY
  03/29/93   POSITION: 07945  CLASS: 0004   LOCATION: U4PP   CLOSING: 03/31/
    VETERAN PREF: N    SOURCE: SR    SELF REFERRAL        CERT: 0    NONE
    REQ FOR PROM: Y    ELIG?: Y    INELIG/RECOMM RSN:
    APPL. STATUS: N    NOT HIRED      AS OF: 04/20/93    APPT. TYPE: N
  04/13/93   POSITION: 13473  CLASS: 0004   LOCATION: U4PP   CLOSING: 04/14/
    VETERAN PREF: N    SOURCE: SR    SELF REFERRAL        CERT: 0    NONE
    REQ FOR PROM: N    ELIG?: Y    INELIG/RECOMM RSN:
    APPL. STATUS: N    NOT HIRED      AS OF: 05/05/93    APPT. TYPE: N
  04/13/93   POSITION: 23908  CLASS: 0004   LOCATION: U4PP   CLOSING: 04/14/
    VETERAN PREF: N    SOURCE: SR    SELF REFERRAL        CERT: 0    NONE
    REQ FOR PROM: Y    ELIG?: Y    INELIG/RECOMM RSN:
    APPL. STATUS: N    NOT HIRED      AS OF: 05/12/93    APPT. TYPE: N
PF9 - TRANSFER TO PR01
                                    ENTER FOR NEXT PAGE
                                    PF5 = USERID WHO LAST UPDA
```

Attachment _____ C _____

```
PR05 0█████████                                          03/23/98 11.52.
   PERB005                      APPLICANT INFORMATION        PRNT:        PAGE 00

 SSN: █████████        NAME: BLANCO, CARMEN D.
 ADDRESS████████      SEX: F   BIRTH DATE: 07/09/50    RACE: HISPANIC
 ████████████                           BACKGROUND:    pg 10
   APPL DATE          APPLICANT HISTORY      Sec Spec
   06/21/93   POSITION: 12807  CLASS: 0105   LOCATION: U4PP   CLOSING: 06/30/
      VETERAN PREF: N   SOURCE: SR   SELF REFERRAL      CERT: 0   NONE
      REQ FOR PROM: N   ELIG?: Y   INELIG/RECOMM RSN:
      APPL. STATUS: H   HIRED        AS OF: 07/16/93    APPT. TYPE: 0    PG 10
   12/08/93   POSITION: 15653  CLASS: 0090 WPSLOCATION: U4PP   CLOSING: 12/08/
      VETERAN PREF: N   SOURCE: SR   SELF REFERRAL      CERT: 0   NONE
      REQ FOR PROM: N   ELIG?: Y   INELIG/RECOMM RSN:
      APPL. STATUS: H   HIRED        AS OF: 01/07/94    APPT. TYPE: 0
   12/30/93   POSITION: 12513  CLASS: 1003   LOCATION: U400   CLOSING: 01/05/
      VETERAN PREF: N   SOURCE: SR   SELF REFERRAL      CERT: 0   NONE
      REQ FOR PROM: Y   ELIG?: Y   INELIG/RECOMM RSN:
      APPL. STATUS: N   NOT HIRED    AS OF: 03/14/94    APPT. TYPE: N
 PF9 - TRANSFER TO PR01
 PF4 FOR PREVIOUS PAGE                       ENTER FOR NEXT PAGE
                                                   PF5 = USERID WHO LAST UPDA
```

Pers aide
pg 12

Date: 03/23/1998 Time: 11:49:25 AM

```
PR05  0                                                              03/23/98 11.52.
    PERB005                        APPLICANT INFORMATION        PRNT:        PAGE 00

 SSN:                   NAME: BLANCO, CARMEN D.
 ADDRESS               SEX: F    BIRTH DATE: 07/09/50     RACE: HISPANIC
                                 BACKGROUND:
  APPL DATE            APPLICANT HISTORY
  01/31/96  POSITION: 07916  CLASS: 0108   LOCATION: U4PP   CLOSING: 01/31/
    VETERAN PREF: N   SOURCE: SR   SELF REFERRAL     CERT: 0   NONE
    REQ FOR PROM: Y   ELIG?: Y   INELIG/RECOMM RSN:
    APPL. STATUS: N   NOT HIRED      AS OF: 04/05/96   APPT. TYPE: N
  01/31/96  POSITION: 13357  CLASS: 0831    LOCATION: U400   CLOSING: 02/07/
    VETERAN PREF: N   SOURCE: SR   SELF REFERRAL     CERT: 0   NONE
    REQ FOR PROM: Y   ELIG?: N   INELIG/RECOMM RSN: EX   LACKS EXPERIENCE
    APPL. STATUS: I   INELIGIBLE     AS OF: 02/07/96   APPT. TYPE: N
  01/31/96  POSITION: 24494  CLASS: 0812    LOCATION: U400   CLOSING: 01/31/
    VETERAN PREF: N   SOURCE: SR   SELF REFERRAL     CERT: 0   NONE
    REQ FOR PROM: N   ELIG?: N   INELIG/RECOMM RSN: EX   LACKS EXPERIENCE
    APPL. STATUS: I   INELIGIBLE     AS OF: 02/01/96   APPT. TYPE: N
 PF9 - TRANSFER TO PR01
 PF4 FOR PREVIOUS PAGE                       ENTER FOR NEXT PAGE
                                             PF5 = USERID WHO LAST UPDA
```

.

```
PR05 0[REDACTED]                                        03/23/98 11.53.
   PERB005                   APPLICANT INFORMATION     PRNT:        PAGE 00

SSN: [REDACTED]              NAME: BLANCO, CARMEN D.
ADDRESS[REDACTED]            SEX: F   BIRTH DATE: 07/09/50   RACE: HISPANIC
                                      BACKGROUND:

  APPL DATE              APPLICANT HISTORY
  01/31/96  POSITION: 30643  CLASS: 0004   LOCATION: U4PP   CLOSING: 01/31/
    VETERAN PREF: N   SOURCE: SR   SELF REFERRAL      CERT: 0   NONE
    REQ FOR PROM: Y   ELIG?: Y   INELIG/RECOMM RSN: ___ Exec Sec pg 15
    APPL. STATUS: N   NOT HIRED       AS OF: 02/13/96   APPT. TYPE: N
  05/09/96  POSITION: 05836  CLASS: 0114 ─LOCATION: U400   CLOSING: 05/15/
    VETERAN PREF: N   SOURCE: SR   SELF REFERRAL      CERT: 0   NONE
    REQ FOR PROM: Y   ELIG?: Y   INELIG/RECOMM RSN:
    APPL. STATUS: N   NOT HIRED       AS OF: 05/22/96   APPT. TYPE: N
  06/11/96  POSITION: 13254  CLASS: 0004   LOCATION: U400   CLOSING: 06/12/
    VETERAN PREF: N   SOURCE: SR   SELF REFERRAL      CERT: 0   NONE
    REQ FOR PROM: N   ELIG?: Y   INELIG/RECOMM RSN:
    APPL. STATUS: N   NOT HIRED       AS OF: 07/30/96   APPT. TYPE: N
PF9 - TRANSFER TO PR01
PF4 FOR PREVIOUS PAGE                        ENTER FOR NEXT PAGE
                                             PF5 = USERID WHO LAST UPDA
```

```
PRO5 0̶██████████                                              03/23/98 11.53.
    PERB005                        APPLICANT INFORMATION      PRNT:        PAGE 00

SSN:    ⌐  ·4          NAME: BLANCO, CARMEN D.
ADDRESS▬▬▬▬▬          SEX: F   BIRTH DATE: 07/09/50    RACE: HISPANIC
██████████                            BACKGROUND:
    APPL DATE            APPLICANT HISTORY   fiscaldato pg 12
    10/15/97  POSITION: 27756  CLASS: 1418  LOCATION: U400  CLOSING: 10/15/
       VETERAN PREF: N   SOURCE: SR   SELF REFERRAL      CERT: 0  NONE
       REQ FOR PROM: Y   ELIG?: Y   INELIG/RECOMM RSN:
       APPL. STATUS: N   NOT HIRED    AS OF: 11/10/97   APPT. TYPE: N
    **END**   POSITION:       CLASS:       LOCATION:        CLOSING:
       VETERAN PREF:    SOURCE:                         CERT:
       REQ FOR PROM:    ELIG?:    INELIG/RECOMM RSN:
       APPL. STATUS:            AS OF:            APPT. TYPE:
             POSITION:       CLASS:       LOCATION:        CLOSING:
       VETERAN PREF:    SOURCE:                         CERT:
       REQ FOR PROM:    ELIG?:    INELIG/RECOMM RSN:
       APPL. STATUS:    -       AS OF:            APPT. TYPE:
PF9 ~ TRANSFER TO PR01
PF4 FOR PREVIOUS PAGE                       ENTER FOR FIRST PAGE
                                            PF5 = USERID WHO LAST UPDA
```

```
                       EMPLOYEE HISTORY BROWSE              08/02/1999 16:01:35
                                                                          ETB/1
SSN.........             NAME........ BAKER,CAROLYN                 SUF..
POSITION......... 27756  CLASS/NAM (01/1418)FISCAL ASSISTANT II
COPES ORG....... 304000  SAMAS ORG.. 70040100221  FTE............... 1.00

DATE    POS   ORG    ACTION      CO       CLASS/PREVIOUS NAME        PAY RATE
05211999 27756 703040 PERF EVAL(R) 06 (01/1418)FISCAL ASSISTANT II
10021998 27756 703040 MISC CHG     06 (01/1418)FISCAL ASSISTANT II
10011998 27756 703040 PAY CHG (29) 06 (01/1418)FISCAL ASSISTANT II
05221998 27756 703040 STATUS CHG   06 (01/1418)FISCAL ASSISTANT II
04011998 27756 703040 MISC CHG     06 (01/1418)FISCAL ASSISTANT II
01011998 27756 703040 PAY CHG (29) 06 (01/1418)FISCAL ASSISTANT II
12011997 27756 703040 MISC CHG     06 (01/1418)FISCAL ASSISTANT II
11241997 27756 703040 ORIGINAL     06 (01/1418)FISCAL ASSISTANT II
05091997 27756 703040 SEPARATE(01) 06 (01/1418)FISCAL ASSISTANT II
04171997 27756 703040 MISC CHG     06 (01/1418)FISCAL ASSISTANT II
04161997 27756 703040 PERF EVAL(R) 06 (01/1418)FISCAL ASSISTANT II
01011997 27756 703040 PAY CHG (29) 06 (01/1418)FISCAL ASSISTANT II
04161996 27756 703040 PERF EVAL(7) 06 (01/1418)FISCAL ASSISTANT II
P _
                              DISPLAY MORE? _            EMP INQ MENU _
        NEXT SSN - DATE  _____  -  __ __ ____         MAINT MENU _
```

Date: 8/2/1999 Time: 03:55:59 PM

```
                        EMPLOYEE HISTORY BROWSE              08/02/1999 16:04:29
                                                                          ETB/1
SSN........        _ _   NAME........ BAKER,CAROLYN                    SUF..
POSITION.........  27756  CLASS/NAM (01/1418)FISCAL ASSISTANT II
COPES ORG.......  304000  SAMAS ORG..  70040100221  FTE...............  1.00

DATE     POS   ORG      ACTION     CO      CLASS/PREVIOUS NAME       PAY DATE
01011996 27756 703040 PAY CHG (29) 06 (01/1418)FISCAL ASSISTANT II
05231995 27756 703040 PERF EVAL(7) 06 (01/1418)FISCAL ASSISTANT II          -
11271994 27756 703040 PERF EVAL(7) 06 (01/1418)FISCAL ASSISTANT II
11271994 27756 703040 STATUS CHG   06 (01/1418)FISCAL ASSISTANT II
11011994 27756 703040 PAY CHG (29) 06 (01/1418)FISCAL ASSISTANT II
05271994 27756 703040 ORIGINAL     06 (01/1418)FISCAL ASSISTANT II
05271994 27756 703040 ERROR CORR   06 (01/1418)FISCAL ASSISTANT II
```

P _

                                                               EMP INQ MENU _
                NEXT SSN - DATE          -                      MAINT MENU _
LAST HISTORY TRANSACTION FOR THIS EMPLOYEE IS DISPLAYED

Date: 8/2/1999 Time: 03:58:42 PM

```
                        EMPLOYEE HISTORY BROWSE               08/02/1999 15:45:58
                                                                         ETB/1
   SSN.........              NAME........ BLANCO,CARMEN D            SUF..


DATE      POS   ORG    ACTION        CO       CLASS/PREVIOUS NAME        PAY RATE
05251994 18477 703040 STATUS CHG     06 (01/0090)WORD PROCESSING SYST
01211994 18477 703040 REASSIGNMENT   06 (01/0090)WORD PROCESSING SYST
01161994 12807 703040 STATUS CHG     06 (01/0105)SECRETARY SPECIALIST
01071994 15653 703040 REASSIGNMENT   06 (01/0090)WORD PROCESSING SYST
10011993 12807 703040 PAY CHG (29)   06 (01/0105)SECRETARY SPECIALIST
07161993 12807 703040 REASSIGNMENT   06 (01/0105)SECRETARY SPECIALIST
07161993 12807 703040 STATUS CHG     06 (01/0105)SECRETARY SPECIALIST
03131993 21210 703040 PERF EVAL(D)   06 (01/0090)WORD PROCESSING SYST
09131992 21210 703040 STATUS CHG     06 (01/0090)WORD PROCESSING SYST
03131992 21210 703040 ORIGINAL       06 (01/0090)WORD PROCESSING SYST


P _

                                                             EMP INQ MENU _
         NEXT SSN - DATE            -                          MAINT MENU _
LAST HISTORY TRANSACTION FOR THIS EMPLOYEE IS DISPLAYED
```

Date: 8/2/1999 Time: 03:40:13 PM

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

CASE NO.:  00-6006-CIV-ZLOCH

CARMEN BLANCO,                    )
                                  )
            Plaintiff,            )
                                  )
vs.                               )
                                  )
FLORIDA DEPARTMENT OF             )      **COPY**
CORRECTIONS,                      )
                                  )
            Defendant.            )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )


Suite 1600
One East Broward Boulevard
Fort Lauderdale, Florida
Monday, 10:00 a.m.
March 19, 2001



D E P O S I T I O N

of

KAREN McDONALD
Taken on behalf of the Plaintiff
pursuant to a Notice of Taking Deposition

-------------------------------------------------------

THOMAS H. INMAN
Certified Shorthand Reporter
Registered Professional Reporter
* * * * *
9704 Northeast 2nd Avenue
Miami Shores, Florida   33138
(305) 754-7056

APPEARANCES:

        HENSCHEL & HENSCHEL, P.A.,
        BY: DREW BEINHAKER, ESQ.,
        On behalf of the Plaintiff.

        KUBICKI DRAPER
        BY: ELIZABETH RODRIGUEZ, ESQ.,
        On behalf of the Defendant.

              * * * * *

              I N D E X

WITNESS            DIRECT   CROSS   REDIRECT   RECROSS

KAREN McDONALD        3

              * * * * *

```
 1   THEREUPON:
 2                        KAREN McDONALD
 3   was called as a witness and, having been duly sworn,
 4   was examined and testified as follows:
 5                     DIRECT EXAMINATION
 6   BY MR. BEINHAKER:
 7        Q.   Good morning, Miss McDonald.
 8             How are you today?
 9        A.   All right.
10        Q.   My name is Drew Beinhaker.  I am an
11   attorney in a lawsuit with the Department of
12   Corrections.
13        A.   Okay.
14        Q.   I am going to ask you a few questions
15   today.  If you don't understand a question, please tell
16   me so that I know you didn't understand it.
17             I ask that you say yes or no instead of
18   um-hum or uh-uh, so the court reporter can take down
19   your response.
20             Please state your full name for the
21   record.
22        A.   Karen Wendy McDonald.
23        Q.   Miss McDonald, are you under any
24   medication currently?
25        A.   No.
```

THOMAS H. INMAN

```
 1            Q.   Is there anything that would prevent you

 2     from understanding or being able to answer the

 3     questions I ask you?

 4            A.   No.

 5            Q.   What is your Social Security number?

 6            A.   ███████████████

 7            Q.   And your residence address currently?

 8            A.   ████████████████████████████████

 9     ████████████████████████

10            Q.   How long have you lived at that address?

11            A.   Since December 29th of last year.  We just

12     bought it.

13            Q.   Prior to living there, where did you live?

14            A.   ████████████████████████████████

15     █████████████████

16            Q.   Are you currently married?

17            A.   Yes.  I'm going through a divorce.

18            Q.   Your husband's name?

19            A.   Is that relevant, because, I mean, we're

20     not together since '92.

21            Q.   It's for identification purposes.

22            A.   Okay.

23                 Donovan McDonald.  I hate to bring his

24     name up.

25            Q.   What is your current business address?
```

THOMAS H. INMAN

1          A.    2928 North State Road 7, Lauderdale Lakes,

2     Florida, 333 -- I think -- 13.

3          Q.    How long have you been at that address at

4     work?

5          A.    Approximately two years we moved there.

6          Q.    What is your employment status currently?

7          A.    Clerical supervisor.

8          Q.    With the Department of Corrections?

9          A.    Yes.

10         Q.    How long have you held that position?

11         A.    Approximately four years.

12         Q.    Prior to being a clerical supervisor, what

13    position did you hold?

14         A.    Criminal justice technician.

15         Q.    How long did you hold that position for?

16         A.    Approximately a year and a half, two

17    years.

18         Q.    Prior to that position what were you, if

19    you can recall?

20         A.    Word processing systems operator, WPSO,

21    two years.

22         Q.    So, if my math is correct, it's about '93

23    to '94 roughly that you were a word processing

24    operator; does that sound right?

25         A.    From '92 -- I started March of '92 with

THOMAS H. INMAN

```
 1    the department; so '92, '93, '94, yeah.

 2              Q.   Could you discuss a little bit about your

 3    educational background starting with high school?

 4              A.   I graduated high school.  I have

 5    approximately maybe two years of college.

 6              Q.   Where did you go to high school?

 7              A.   In Jamaica, Saint Andrews High for Girls.

 8              Q.   Were you born in Jamaica?

 9              A.   Yes.

10              Q.   What year were you born?

11              A.   '65.

12              Q.   When did you come to the States?

13              A.   September of '84.

14              Q.   Okay.

15                   Prior to working with the DOC, did you

16    have any other employment?

17              A.   Yeah.  I was in the Air Force.

18              Q.   What year, approximately, were you in the

19    Air Force?

20              A.   From '86 through December of '91 and I'm

21    currently in the Air Force Reserves still.  The first

22    one was active duty.

23              Q.   Between '86 and '91 you were active duty?

24              A.   Yeah.

25              Q.   From 1984 to 1986 did you hold any
```

THOMAS H. INMAN

```
 1   employment?
 2          A.    Yeah, McDonald's and like Woolworth and
 3   other stores.
 4          Q.    So, after leaving active duty with the Air
 5   Force in '91 ---
 6          A.    I started working with the department in
 7   March of '92.
 8          Q.    Other than the high school background that
 9   you had in Jamaica, was there any further educational
10   courses that you took here in the States perhaps?
11          A.    Yeah, BCC.
12          Q.    What years was that, if you can recall?
13          A.    Oh, '92 -- it was probably around like
14   '93, '94 and prior to that I did some prerequisites
15   while I was living in California in the military,
16   evening classes.
17                Right now I'm enrolled in Scranton College
18   in Pennsylvania doing a two-year correspondence course
19   in applied computer science.
20          Q.    What was your major and your area of study
21   in BCC?
22          A.    Just algebra, English, college courses,
23   history.
24          Q.    Was that at a night program you were
25   taking?
```

THOMAS H. INMAN

```
 1              A.    Yeah, probably evening class or a
 2    Saturday.  I remember taking one Saturday class.
 3              Q.    So, if I'm not mistaken, you said, clerk
 4    of supervisors with the Department of Corrections?
 5              A.    The actual title is clerical
 6    supervisor/word processing systems operator supervisor.
 7              Q.    What are your duties and responsibilities
 8    in that position, if you can describe them generally
 9    for me?
10              A.    I supervise approximately maybe six, five
11    employees.  Sometimes if the other supervisor is out
12    maybe a total of eight.
13                    My primary responsibility is make sure the
14    job gets done, the phones are answered at the front
15    desk, the reception, take paperwork, distribute it.
16    Typing is done for investigations, warrants, that sort
17    of stuff.  I do time sheets, evaluations, scheduling
18    different job tasks on a weekly basis.  That's
19    primarily what I do.
20              Q.    Have you ever been in a deposition before?
21              A.    Yes.
22              Q.    Under what circumstances; were they
23    lawsuits where you were involved as a party?
24              A.    No, no.
25                    One was for a restaurant, which I was a
```

THOMAS H. INMAN

9

1    witness to somebody falling and injuring themselves,

2    and I was a witness in one other case in a courtroom

3    that involved my brother and he subpoenaed me.

4         Q.    How did you prepare for today's

5    deposition?

6         A.    I met with Miss Rodriguez this morning at

7    nine.

8         Q.    Can you explain or describe any of the

9    policies with the Department of Corrections that they

10   have for anti-discrimination; is there a written

11   policy; is there a handbook?

12        A.    Well, I'm sure there is a written policy

13   that they don't tolerate -- they don't discriminate

14   against race, origin, sex. I think that's on your

15   application when you fill it out.

16        Q.    Have you read the handbook?

17        A.    I don't recall. I mean, I have been

18   employed so long I probably read it when I started with

19   the department back in '92, but I don't recall

20   specifically what day I read it or ---

21        Q.    As far as you remember, are all new

22   employees required to read the handbook?

23        A.    I can't say for sure, because they have

24   orientation and orientation is done with the regional

25   office. So, they probably go through a lot of that

1    stuff during the first week of employment, because they

2    have like twenty hours of training they do and I know a

3    lot of it is like right to know, different things that

4    we do.

5         Q.    Okay.

6         A.    I really can't think right now

7    specifically which ones.

8         Q.    Do you know if the handbook is offered in

9    Spanish or other languages?

10        A.    I have no knowledge whether or not it is.

11        Q.    Let's talk about the training you received

12   other than just, say, the handbook training in

13   reference to anti-discrimination or anti-sexual

14   harassment with the Department of Corrections.

15        A.    We do have a training called Human

16   Diversity you are required to go to and it's a room

17   full of different employees and you are basically

18   learning everybody's culture and learn how to interact

19   with people from different countries, race, origin, and

20   we all go through that and we do that once a year, I

21   believe.

22        Q.    Approximately, how long is that cultural

23   diversity training class?

24        A.    If I'm not mistaken, I think it takes up

25   about two or three days, I think.

THOMAS H. INMAN

```
 1            Q.    Are there any videos that you watch with
 2      the department with reference to anti-discrimination?
 3            A.    I think sometimes they do put on videos
 4      during the class.
 5            Q.    Were you ever the supervisor for Carmen
 6      Blanco?
 7            A.    Yes.
 8            Q.    During what period of time?
 9            A.    Excuse me.
10                  I would say approximately -- I know it was
11      in the last part before I left.
12                  Hold on a minute.  Let me think.
13                  Probably '98, '99, about two years,
14      approximately.
15            Q.    When you were supervising Miss Blanco,
16      what was her employment position, if you can recall?
17            A.    A word processing systems operator.
18            Q.    What responsibilities did you have in
19      overseeing her employment?
20            A.    I signed her time sheet, did her
21      evaluations, you know, scheduled different assignments
22      for each employee, you know, to do, looked at typed
23      work, you know, reviewed it, stuff like that.
24            Q.    Do you know how many years Miss Blanco was
25      with the Department of Corrections?
```

THOMAS H. INMAN

1         A.    About the same, probably seven years,

2    approximately.

3         Q.    When was the first time you met her?

4         A.    Probably about '98 when she first came to

5    the intake office, Downtown Fort Lauderdale.  I don't

6    recall what specific month, you know, unless I'm

7    looking at something, but it's around about that time,

8    I believe.

9         Q.    What role did you have in making decisions

10   whether to hire or promote or demote, say, a word

11   processor?

12        A.    I had no decisions as far as promote --

13   well, as far as promotions, being that I am the

14   supervisor, as a WPSO supervisor if you are going for a

15   promotion, likely I am not going to be the one sitting

16   on the panels.  I usually sit on panels having

17   something to do with my positions, which is word

18   processing systems operator.  It would be a different

19   supervisor for that position you are applying for.  If

20   you ask me to write you a recommendation, then I would

21   follow it if you asked me to.

22        Q.    What does the panel consist of that would

23   hear someone seeking a promotion who is a word

24   processing operator, either the individuals or their

25   positions in the department, if you can remember?

THOMAS H. INMAN

```
1          A.    It could be like a clerical supervisor,
2     the office supervisor and other office supervisors that
3     would be in the panel, and it's usually three persons,
4     a three-person panel.
5          Q.    So, it could be a clerical supervisor?
6          A.    Right.  It could be a clerical supervisor,
7     because sometimes we supervise the clerical justice
8     technicians, which are technician positions.
9          Q.    Did you ever sit on a panel in which Miss
10    Blanco was in front of?
11         A.    No.
12         Q.    How about would you sit on a panel where
13    someone would take a job of word processing?
14         A.    And that's a first ---
15         Q.    Entry level.
16         A.    Right, entry level position in the
17    department.
18         Q.    Are you familiar with the term temporary
19    duty additive in terms of wages with the Department of
20    Corrections?
21         A.    Not really.
22         Q.    You don't know what that is?
23         A.    No, not really.
24               Temporary duty additive?
25         Q.    Yes.
```

THOMAS H. INMAN

1        A.    Unless you are referring to -- my

2   understanding, if you are saying if a person is in one

3   position and they are covering for somebody out in

4   another position higher than their position, if they

5   work in that position for over a certain amount of days

6   time period, they are required to get paid at that

7   position; is that what that is?

8        Q.    I am asking you if you have heard of the

9   term.

10       A.    I don't know if that term refers to what I

11   am trying to explain to you.  That's what I understand,

12   if that's what that is.  I don't know.

13       Q.    What does it mean if your position is one

14   of career service with the Department of Corrections?

15       A.    Career service you get paid overtime if

16  you work overtime.

17       Q.    How do you qualify to become career

18  service eligible?

19       A.    I guess after you do your six months

20  probationary period then you are considered permanent,

21  unless you are in an excluded position, which is

22  usually just office supervisors or circuit

23  administrators, not clerical staff.

24       Q.    Were you personally aware of any personal

25  grievances made by Miss Blanco to the Department of

THOMAS H. INMAN

1    Corrections?

2         A.    Yeah, the one that she made to me while

3    she was under my supervision.

4              Prior to her coming to my office under my

5    supervision, she has expressed to me things that were

6    before being under my supervision, things that happened

7    where she had filed grievances with former supervisors,

8    and we are talking way back when, '92, '93, '94.  So,

9    that's from what she's told me.

10        Q.    Just from what she told you is prior to

11   her being under your supervision?

12        A.    She had problems prior to coming under my

13   supervision.

14        Q.    Other than what she told you, were you a

15   witness or do you have personal knowledge of the

16   grievance made prior to your supervision?

17        A.    If I had knowledge of them prior to the

18   ones under my supervision?

19        Q.    Other than Carmen telling you or conveying

20   to you.

21        A.    No, I had no knowledge of them whatsoever.

22        Q.    What was your understanding of the nature

23   of the complaints either before or after she came under

24   your supervision?

25        A.    Well, I'm just going by what she says or

THOMAS H. INMAN

```
 1   how she felt she was being discriminated against and
 2   she was never promoted within the department, but
 3   that's her personal feelings or opinion.
 4        Q.   Do you feel that she was treated fairly at
 5   the department?
 6        A.   I can't speak for other people, but while
 7   she was under my supervision I did know that she did
 8   have, you know, one particular incident that took place
 9   and I don't think she was treated fairly, you know,
10   with that particular incident that took place, and I
11   can only speak for that one particular incident.
12        Q.   And this incident you are referring to,
13   can you explain it a little bit?
14        A.   You want me to elaborate?
15             Okay.
16             One day she was under my supervision, I
17   asked her to go to the ninth floor to retrieve a
18   postage check, which was Mr. Rogatz' secretary, Sharon.
19   She told me that an incident transpired up there and I
20   was like, "That took place within the little time I
21   sent you to get the check?"
22             I was personally called to come to Mr.
23   Rogatz' office, which is the circuit administrator,
24   pertaining to the incident.  They told me what
25   transpired.  What they told me and what Carmen told me
```

THOMAS H. INMAN

1    were two different ways it happened and, you know, I

2    was told, "Well, since I'm her supervisor I should deal

3    with it," and I asked, "What you mean by deal with it,

4    you know?"  I was told, "I don't care what you want to

5    do, you are her supervisor."  I said, "Well, I don't

6    intend to give her a reprimand for this.  I will

7    document we had this conversation, that your behavior

8    is unwarranted and not tolerated in the department,"

9    and at that time both employees should have been

10   disciplined for what had transpired, because you can't

11   single out one employee when both parties were wrong

12   with their behavior and -- I mean, I did, you know, had

13   my conversation with Carmen in the office documenting

14   we had the conversation in the office based on the

15   behavior and it shouldn't happen again and that

16   behavior, the loud outbursts that took place, and

17   that's primarily what I was documenting.

18        Q.    Who was the individual that told you that

19   she had to be reprimanded for her behavior?

20        A.    Mr. Rogatz.

21        Q.    Specifically, what did Carmen convey to

22   you had happened?

23        A.    He didn't really specifically say,

24   "Reprimand her," but his statement was, "You are her

25   supervisor, you deal with it."

THOMAS H. INMAN

1       Q.    Okay.

2             What specifically did Carmen convey to you

3    that had happened?

4       A.    Well, she told me when she went up there

5    to retrieve the check -- I had called Sharon to let her

6    know Carmen was coming to receive the check.  Carmen

7    told her to make a copy over by the copy machine.  I

8    don't know how she spoke to her.  She took offense to

9    it.  She said, "No, the copy machine is there.  You

10   could have made the copy yourself and given it to me."

11   She refused to go over there.  I guess they got verbal

12   with each other, it escalated, and Mr. Rogatz came out

13   of his office to see what the commotion was about.  I

14   wasn't there.  I'm just going by what she said.

15      Q.    Going by what Carmen told you?

16      A.    Right.

17      Q.    You sent her up there to make a photocopy

18   on the ninth floor?

19      A.    No.  I sent her up there to retrieve a

20   postage check.

21      Q.    When you got up there ---

22      A.    When she got up there.

23      Q.    When she got up there, Sharon ---

24      A.    Sharon was supposed to give her the check

25   and she said, "Go make a photocopy of it."

THOMAS H. INMAN

```
 1              Q.    What did Carmen tell you happened after
 2      that?
 3              A.    I guess she didn't like the way Sharon was
 4      talking to her, as if she was a child, in her words,
 5      and she said no, she's not going over there to make a
 6      copy and she could have done it herself, because she
 7      knew she was on her way up to get it.
 8                    I guess they probably went back and forth
 9      and got loud.
10              Q.    Do you have personal knowledge or are you
11      familiar with Miss Blanco's personnel file with the
12      Department of Corrections?
13              A.    No.
14              Q.    How much input did you have into her
15      personnel file?
16              A.    The only thing as far as the personnel
17      file, when I did her evaluations they went to her
18      personnel file.  I mean, if I had to answer a memo or
19      anything, those were all forwarded to her personnel
20      file.  I didn't, per se, ever go over to the regional
21      office and pull her personnel file to see what was in
22      there previous to my supervising her.  I never did
23      that.
24              Q.    Would you agree with the proposition that
25      if a negative writeup goes into someone's personnel
```

THOMAS H. INMAN

1   file that generally that would reflect negatively and

2   hurt their chances of a promotion in a general sense?

3        A.    I don't want to say in a general sense,

4   because it depends on what the statement is or what's

5   in her personnel file.

6        Q.    I'm not talking about Miss Blanco in this

7   incident.

8             Generally speaking, if someone gets

9   written up in their personnel file in a negative way,

10  would you agree that that will hurt his or her chances

11  with a promotion with the Department of Corrections?

12       A.    It may.

13       Q.    What is the policy at the DOC, if you

14  know, with regards to making a personnel file

15  accessible to an employee for his or her review?

16       A.    Well, I know your personnel file is at the

17  regional office and you have to put in a request to

18  review it.  You can't walk in and say, "I want to see

19  my personnel file."  You have to request and they would

20  set up an appointment with you, because there are

21  certain things they pull out of the personnel file.

22  Well, not -- if it's not you, if someone else wanted to

23  see it, they would pull out medical from there.

24       Q.    The individual can submit a written

25  request?

THOMAS H. INMAN

1   A.   Yeah.  You can see it, as long as you
2   submit your request.  I don't know if it has to be
3   written or you can make a phone call and say, "I'd like
4   to see my personnel file," and they schedule an
5   appointment and set up a date for you.
6   Q.   You don't know whether the department has
7   a written rule making accessible someone's personnel
8   file?
9   A.   No.  They may, but ---
10   Q.   Here is a copy of this.  I am going to
11   mark this as Plaintiff's Exhibit One.
12   A.   As far as -- if I can say something else
13   with regards to the personnel file, in the office we
14   also have working files, you know, which is kept in the
15   office, where things like -- you know, any little
16   thing, you know, leave requests, some memos or
17   whatever, and, you know, that employee may want to see
18   that too.
19   Q.   Are performance evaluations contained in
20   these working files?
21   A.   I don't think so.  They are forwarded to
22   the personnel file.
23   Q.   So, am I understanding correctly, a
24   working file ---
25   A.   Is just what an office supervisor wants to

THOMAS H. INMAN

1    keep tabs on this particular individual, while you are

2    here under my supervision. It has nothing to do with

3    your official personnel file at the regional office.

4         Q.    Is it possible something would be in the

5    working file and not in the personnel file?

6         A.    It's possible.

7         Q.    If you could review this document we have

8    marked as Plaintiff's Exhibit One, is that your

9    signature on the bottom?

10        A.    Yes, it is.

11        Q.    Okay.

12              You have had a chance to review it?

13        A.    Um-Hum.

14        Q.    First off, for identification purposes,

15   what is this document?

16        A.    A Record of Oral Step Union Grievance.

17        Q.    What is that?

18        A.    An employee filing a grievance.

19        Q.    Okay.

20              Who was the grievant in this one?

21        A.    Carmen Blanco.

22        Q.    And you were her supervisor at the time?

23        A.    Yes.

24        Q.    Do you recall specifically this incident

25   that was reported?

23

```
 1              A.    I recall it happening, yeah.
 2              Q.    After reviewing it, does it appear to you
 3   that Miss Blanco attempted to see her personnel file?
 4              A.    Her working file, which is different from
 5   your personnel file.
 6              Q.    What is the policy for seeing your working
 7   file?
 8              A.    I don't believe there is a policy on
 9   seeing your working file.
10              Q.    There is no written submissions that have
11   to be made?
12              A.    No.
13              Q.    Can an employee just go in and take a look
14   at his personnel file without asking the supervisor?
15              A.    I would assume so.
16                    Well, yeah, I would assume so.  They
17   probably do it out of courtesy.  You are walking into
18   somebody's office and she is sitting there and you
19   would say, "Isabel, can I see my personnel file or
20   whatever," but ---
21              Q.    Who is Miss Fishter?
22              A.    The office supervisor at the time.  She
23   was the office supervisor, which is my immediate
24   supervisor.
25              Q.    Does it appear to you Miss Fishter denied
```

THOMAS H. INMAN

24

```
 1    Miss Blanco's request to see her personnel file in this
 2    grievance?
 3            A.    Yes, that's what Carmen is alleging.
 4            Q.    If I'm not mistaken, you said there was no
 5    policy for seeing a personnel file?
 6            A.    I never knew of one; working file, not
 7    personnel file.
 8            Q.    Excuse me, working file.
 9                  Did you ever speak with Miss Fishter about
10    this incident?
11            A.    I don't recall.  I don't recall speaking
12    to her in particular about it.
13                  I vaguely remember Carmen voicing her
14    opinion that she's not allowed to see her working file
15    and that's a bunch of -- you know, why, and I don't
16    think I got involved at that particular point, because,
17    like I said, I mean, I have no -- I didn't know, you
18    know, Miss Fishter's reasoning of not letting her see
19    her working file.  I mean, to me it was no big deal.
20            Q.    You can understand why an employee would
21    want to see his or her working file at the department?
22            A.    Yes, because she probably wanted to see if
23    there was anything in there she was not aware of.
24            Q.    That leads to my next question.
25                  Is there a policy within the department
```

THOMAS H. INMAN

1   that when something goes into the working file or

2   personnel file of an employee, that he or she signs off

3   on or gets notice of a file entry?

4           A.    I don't know about the notice of file

5   entry, but usually you are required to sign anything

6   placed in the file. They give you that opportunity to

7   review it. You can refuse to sign it. That doesn't

8   mean it's not going to go in there.

9           Q.    Is that for every entry in a personnel

10  file or working file or just a writeup or evaluation?

11          A.    Probably writeup evaluations, not for

12  filling out a leave request or nothing like that.

13          Q.    So, after Miss Blanco made this grievance

14  that she was denied access to her working file by Miss

15  Fishter, what was done, as far as you can recollect, in

16  response or in reaction to this grievance?

17                You mentioned, I believe, you never spoke

18  to Miss Fishter or you don't recall speaking to Miss

19  Fishter.

20          A.    I don't recall speaking to Miss Fishter as

21  to why she was denying Carmen seeing her working file

22  and I guess that's based on what Miss Blanco states

23  here, "It could not be resolved at the Step 1 level,"

24  because I was not denying her and being Grace was my

25  immediate supervisor I was not going to pull it out and

THOMAS H. INMAN

```
 1   be insubordinate to her.  That's exactly what I would
 2   be doing if I did that.
 3              Q.    Say, for example, Grace, your immediate
 4   supervisor, was doing something you felt was
 5   inappropriate, is there anyone you could go to; if she
 6   was mistreating or discriminating to an employee, would
 7   you speak to someone above her?
 8              A.    I would probably try to speak to her first
 9   before going above her.
10              Q.    Okay.
11                    Suppose after your conversations with her
12   things weren't reconciled and then you would go above
13   her, who would you go to?
14              A.    Mr. Barry Groves, who is the deputy
15   circuit administrator.
16              Q.    Would you hesitate to speak to Mr. Groves
17   if you felt it was necessary to rectify a problem in
18   the department or would you feel there was
19   repercussions?
20              A.    At that particular time I would have
21   hesitated to speak to him.
22              Q.    Why is that?
23              A.    Because at the time this was going on and
24   Carmen was filing these grievances I had knowledge she
25   had had run ins with Mr. Rogatz before the particular
```

THOMAS H. INMAN

```
 1    incident that involved myself and I had a feeling that
 2    there was bad blood between them from way back when.
 3    So, my thinking would be if this involved her and I
 4    were to go above to get it resolved nothing would come
 5    of it.
 6           Q.    How come, because there was a personal
 7    animus or ---
 8           A.    My personal opinion, I felt there was a
 9    personal, you know ---
10           Q.    There were bad feelings between Mr. Rogatz
11    and Carmen?
12           A.    Right, and Mr. Groves is the deputy
13    administrator, which is under Mr. Rogatz, so ---
14           Q.    What do you feel is the reason for the bad
15    blood or the bad feelings between those parties?
16           A.    My feelings are irrelevant.  I am just
17    going primarily by what Miss Blanco stated and she told
18    me about one incident that transpired years before she
19    came under my supervision about a supervisor at 17-01
20    and probably involved Diane Knight.
21                 I don't know what the incident was about.
22    She was given a reprimand and Mr. Singleton got
23    involved and it turned out the supervisor was at fault.
24    They made Mr. Rogatz and Mr. Groves retract the
25    reprimand and ever since then she said they didn't like
```

THOMAS H. INMAN

28

1    what they had to do, so there has always been kind of
2    bad vibes between them and it just carried on.
3         Q.   So, the reason you mentioned you would be
4    hesitant at that time to report a grievance made by
5    Carmen, would be either, I think you stated, you don't
6    feel anything would come of it positive, but in
7    addition to that do you feel that there would be
8    retaliation against Carmen?
9              MS. RODRIGUEZ:  Objection,
10        mischaracterizes prior testimony.
11             MR. BEINHAKER:  Could you read the
12        question back, please?
13             (Thereupon, the last recorded question was
14        read back by the court reporter.)
15        Q.   (By Mr. Beinhaker) Does that conflict with
16   what you stated prior; what would be the reason you
17   would be hesitant to report to Mr. Groves this
18   grievance made by Carmen?
19        A.   Not particularly the grievance.
20             You said if there was a problem that
21   couldn't be resolved and if I felt that Grace was being
22   discriminatory, whatever, would I go above her head.
23             MS. RODRIGUEZ:  In that particular
24        instance is what she is saying.  She never said
25        she didn't forward this grievance.

THOMAS H. INMAN

1    THE WITNESS: I did forward the grievance.

2    We are not talking about the grievance.

3    Q.   (By Mr. Beinhaker) I had asked you what

4    did you do with this grievance.

5    You said you didn't speak to Miss Fishter;

6    is that correct?

7    A.   No.

8    You asked me about the working file, if I

9    spoke to Miss Fishter about that.

10   Q.   Isn't that what this grievance is all

11   about, the substance of this grievance?

12   That's what I'm referring to.

13   A.   Okay.

14   Q.   What happened after this grievance was

15   made, so we can be clear?

16   A.   I guess after the grievance was made I

17   documented it and it was forwarded to the circuit

18   office.

19   Q.   And what happens with that?

20   It goes into the personnel file; does

21   someone else review it?

22   A.   I guess someone else reviews it. Once it

23   leaves my desk and goes to the circuit office I don't

24   know what transpires after that.

25   Q.   So, as far as you know, after you

THOMAS H. INMAN

```
 1    submitted this to the circuit office, was anything done

 2    in response to this?

 3         A.   I have no knowledge if there was or

 4    wasn't.

 5         Q.   As Carmen's supervisor, would you be in a

 6    position to have knowledge of something if it was done?

 7         A.   I guess I could probably call the regional

 8    office and, you know, request -- ask questions if

 9    anything was actually done on that.

10         Q.   My question is, would you have known if

11    something was done as Carmen's supervisor, if something

12    was done in action or response to this grievance?

13         A.   Not necessarily.

14         Q.   Okay.  That's all my question was.

15              Were you aware of any derogatory comments

16    made about Hispanics at the Department of Corrections?

17         A.   Not to my knowledge.  I mean, we have

18    diverse employee groups, Hispanics, Jamaicans, blacks,

19    Americans, whites.

20         Q.   In your years with the DOC, you never

21    heard any derogatory comments about Hispanics?

22         A.   No, not that I recall, no.

23         Q.   What would be your reaction if you learned

24    say, for example, one of Miss Blanco's supervisors said

25    she would never go anywhere because she was Hispanic?
```

THOMAS H. INMAN

1          A.    What would my reaction be?

2          Q.    Yes.

3          A.    I would probably ask that supervisor how

4    could she say a thing like that.

5          Q.    How would you describe Miss Blanco's work

6    performance at the DOC?

7          A.    Well, while she was under my supervision

8    and before her illnesses and all that, she did her job.

9    If I asked her to do anything she would do it.  If I

10   asked her to train other employees she would do it.  I

11   had no problems with her doing her job.  After her

12   illnesses and after she was out, of course, she is not

13   there to work.

14         Q.    Do you believe an individual or an

15   employee has a right to complain about feelings of

16   harassment or discrimination if she feels she is wrong

17   or right and not be retaliated against?

18         A.    Yes, they have that right.

19         Q.    Okay.

20               I think you mentioned before, if I'm not

21   mistaken, that you played a role in one of the

22   investigations of a grievance made by Miss Blanco; is

23   that correct?

24         A.    What particular grievance; you are talking

25   about the same incident that transpired?

THOMAS H. INMAN

```
 1            Q.    The one on the ninth floor.
 2            A.    That's the only major incident that took
 3    place while under my supervision that I know was
 4    anything big.
 5            Q.    To your knowledge, was Miss Blanco ever
 6    interviewed or did she participate in this
 7    investigation other than by yourself?
 8            A.    Interviewed by who?
 9            Q.    Anyone in the department, any of the
10    individuals responsible for conducting this
11    investigation.
12            A.    Well, I believe she probably would have
13    spoken to Grace Fishter, the office supervisor.
14            Q.    You think she probably would have or you
15    know that she did?
16            A.    I can't say if I know that she did, but I
17    know I probably spoke to Grace Fishter after the
18    incident after speaking to Carmen.
19            Q.    Back to my question.
20                  Do you know whether other than yourself
21    anybody in the department ever interviewed her?
22            A.    I have no knowledge of that.  I don't
23    know.
24            Q.    Do you know whether it's normal procedure
25    in a department when someone makes a grievance or is
```

THOMAS H. INMAN

```
 1   involved, be it a victim or offender in an incident,
 2   whether he or she is given the opportunity to be
 3   interviewed or participate in an investigation?
 4        A.   Yeah.  I have seen inspectors come in and
 5   interview individuals.
 6        Q.   I want to show you now -- it's a Review
 7   and Performance Planning.
 8             I am going to mark that as Plaintiff's
 9   Exhibit Two, if you would take a moment to review that
10   and let me know when you finish.
11        A.   Okay.
12        Q.   What is this, for identification purposes?
13        A.   It's a review and performance planning
14   evaluation on an employee.
15        Q.   Which employee was that?
16        A.   Miss Carmen Blanco.
17        Q.   And her supervisor at the time -- there is
18   a signature; who is that?
19        A.   Karen McDonald, myself.
20        Q.   Under that it says Reviewing Authority's
21   Signature; who is that?
22        A.   Grace Fishter.
23        Q.   What are the days this performance
24   evaluation was conducted?
25        A.   March 30th, '98.
```

THOMAS H. INMAN

1      Q.   Can you read the comments that appear
2    under your name?
3      A.   "Miss Blanco performs her duties in a
4    satisfactory manner.  Ms. Blanco is always willing to
5    assist and train new employees as needed.  She gets
6    along with co-workers."
7      Q.   Do you stand by those statements today?
8      A.   Yes.
9      Q.   Are you aware of any training that was
10   given to Miss Blanco that would aid her in being
11   promoted to a new job?
12     A.   No, I have no knowledge.
13          I mean, I don't know if she had any
14   previous to being under my supervision, but while she
15   was under my supervision ---
16     Q.   No one trained her for a higher job or
17   higher promotion?
18     A.   No.
19          I mean, you really don't get trained for a
20   higher position.  There are chances that arise you can
21   be a backup for a criminal justice technician and while
22   you are a backup you can learn a job.  If there is
23   somebody already there as a backup when you come along,
24   then there is -- you are not going to be able to do
25   that, so you will be a word processing systems

THOMAS H. INMAN

```
 1   operator.  You are typing.  You are not really learning
 2   anything, per se, new.
 3        Q.   So, in your statements here that Miss
 4   Blanco was always willing to assist and train new
 5   employees, those are entry level employees?
 6        A.   Yeah, word processing systems operator
 7   once they are hired.
 8        Q.   You mentioned something about you can
 9   become a backup; who makes the decision to become a
10   backup?
11        A.   Usually, we just ask for volunteers, "Who
12   wants to volunteer to be a backup, because this person
13   is leaving?"
14             Most times people don't want it,
15   because ---
16        Q.   How come?
17        A.   Some people are just afraid to learn new
18   things.  Some don't want it.  Some would say yes.
19             When I was a word systems processing
20   operator I volunteered to be a criminal justice backup.
21   To me it was challenging and it would enhance my
22   opportunities to being promoted to that position, so I
23   volunteered to do that.  You know, those chances don't
24   arise often within an office, because some offices only
25   have one criminal justice technician and usually
```

THOMAS H. INMAN

1   somebody backs them up if they are out sick.

2       Q.  Suppose there is one volunteer for this

3   backup position; who makes the decision as to who is

4   going to get the training?

5       A.  I guess their immediate supervisor would

6   make the decision on who would.

7       Q.  As far as you know, did Miss Blanco ever

8   make a request to be trained for a higher position?

9       A.  While under my supervision?

10      Q.  Yes.

11      A.  No.

12      Q.  How about before?

13      A.  I have no knowledge.

14      Q.  So, if I understand correctly the training

15  procedures for a promotion, say, for example, there is

16  an opening for a new position not dealing with the

17  situation where there is a backup ---

18      A.  Say a clerical supervisor position.

19      Q.  Okay.  Let's take that, for example.

20      A.  Right.

21      Q.  Are all of the applicants for that

22  position trained prior to the decision when the job is

23  going to be given or is it ---

24      A.  No, no, because a WPSO can apply for a

25  clerical supervisor position.  That's what clerical

THOMAS H. INMAN

```
 1   supervisors do, you just get additional duties.  You
 2   are doing time sheets.  You are basically supervising
 3   the job you used to do.  You don't need training for
 4   that, because you are already doing it.
 5        Q.    What are the criteria for a clerical
 6   supervisor and an application with the Department of
 7   Corrections?
 8        A.    Well, I know they don't require, say, a
 9   degree, you know.  They probably take into
10   consideration, you know, your job knowledge as far as,
11   you know, the department, your duties that you do and
12   how it would impact you being a supervisor.  If you
13   have any kind of schooling, I know that is probably
14   taken into consideration.
15        Q.    And that would reflect favorably on your
16   chances, if you had more schooling; would you agree
17   with that?
18        A.    Yes.
19        Q.    Are you familiar with the abbreviations
20   KSAS?
21        A.    Knowledge, skills, and whatever the A
22   means.
23              It's not on the back here; right?
24        Q.    I'm not sure.
25              Knowledge, skills, and ability perhaps?
```

THOMAS H. INMAN

A. Yes, probably knowledge, skills, and ability.

Q. What, if you know, are KSAS in reference to an application for a new job?

A. Okay.

Say you have knowledge in, you know, like word processing 6.0, Excel, spread sheets, your typing speed is sixty words a minute versus somebody that types thirty-five words a minute, any kind of outside voluntary things that you do that would reflect good on your application, you know, involved with the community, you know, any sort of stuff.

Q. Okay.

Going back to what is marked as Plaintiff's Exhibit Two, if you could, I believe you mentioned that Miss Fishter was your immediate supervisor at the time?

A. Yes.

Q. Incidentally, what is Miss Fishter's capacity today with the department?

A. She is out indefinitely sick right now, on medical leave.

Q. Do you know why?

A. Well, from what I know, she has some kind of illness that prevents oxygen to some part of her

1    brain that causes her to black out and she is not able

2    to drive, based on what her doctors say, I guess.

3    Right now she is out on medical leave. I don't know

4    how long. I have no knowledge of that.

5         Q.   How long has she been out on medical

6    leave?

7         A.   She's probably been out maybe a year, year

8    and a half. I don't know if it's been that long, but

9    it seems like it.

10        Q.   Going back to when she was there prior to

11   her taking leave, did you observe anything in her

12   behavior that while at work on duty tended to give you

13   the impression that she was mentally ill?

14        A.   No.

15        Q.   Okay.

16             You observed nothing abnormal of her at

17   work?

18        A.   No.

19        Q.   How much contact, if you know, did Miss

20   Fishter have with Miss Blanco, actual contact, prior to

21   this evaluation in March of 1998?

22        A.   Actual contact?

23        Q.   Yes.

24        A.   I mean, she would come in the office in

25   the mornings. Everybody walks past her office. If she

THOMAS H. INMAN

1    is in there she would say good morning.  If she came to

2    the clerical office, that is Miss Fishter, she would

3    tell everybody, "Good morning, how are you doing

4    today," that sort of stuff.

5        Q.    I am going to mark this as Plaintiff's

6    Exhibit Three.  I will give you a chance to take a look

7    at that, Miss McDonald.  Let me know when you have had

8    a chance to review it.

9        A.    Okay.

10       Q.    Can you describe what that document is?

11       A.    Well, basically, it's a memo from my

12   immediate supervisor, Grace Fishter, saying that she

13   doesn't agree with the evaluation, the comments that

14   are in it, that I gave.

15       Q.    What is the date on this -- did you say

16   memorandum; is that what this is?

17       A.    March 30th, 1998.

18       Q.    In looking back now on Plaintiff's Exhibit

19   Two, is that the same signature on Reviewing

20   Authority's Signature on the bottom --

21       A.    Yes.

22       Q.    -- as is on this memorandum, Grace

23   Fishter?

24       A.    Yes.

25       Q.    So, this memorandum that states

THOMAS H. INMAN

1      Plaintiff's Exhibit Three, that states that she doesn't

2      agree with the performance evaluation, is dated the

3      same day as the date that she signs right underneath,

4      where it mentions that she discussed the evaluation

5      with you?

6            A.    Yes.

7            Q.    Can you explain that?

8            A.    This was probably signed earlier that day

9      prior to this and my opinion -- I am giving you my

10     opinion of this.  I think Miss Fishter was forced to do

11     this.

12           Q.    Forced; how do you mean?

13           A.    Well, when we do evaluations we are

14     required to usually do them like -- you know, have them

15     prepared and everything and the office supervisor and

16     the circuit administrators usually are required to

17     review them before we actually sit down with the

18     employee and give it to them and if what I am recalling

19     is correct my impression is that when this was done it

20     was reviewed and apparently they didn't agree, meaning

21     the circuit administrators or -- you know.

22           Q.    Who would that be?

23           A.    Barry Groves, specifically, the deputy

24     administrator, didn't agree with my comments and it

25     probably was forwarded back to Miss Fishter that they

                        THOMAS H. INMAN

1    didn't agree with these comments and I guess she should

2    concur as the office supervisor, being that she is my

3    immediate supervisor.

4         Q.    So, in other words, if you read

5    Plaintiff's Exhibit Three, it's signed by Grace

6    Fishter, your immediate supervisor, correct me if I'm

7    wrong, but it says, "Please be advised that on March

8    30th, 1998, I discussed your evaluation with your

9    immediate supervisor, Ms. Karen McDonald."

10        A.    Yes.

11        Q.    "I expressed my concerns and disagreed

12   with the comments made in the evaluation based on

13   documented evidence that have occurred during my stay

14   at the 17-0 office."

15        A.    Yeah, she expressed it after everybody

16   reviewed it.

17        Q.    How many times did she meet with you on

18   March 30th, 1998?

19        A.    Probably twice.

20        Q.    Probably twice or are you guessing or do

21   you remember it was twice?

22        A.    Probably twice.  I don't specifically

23   recall it was twice, but it may have been twice.

24        Q.    You met with her initially when

25   Plaintiff's Exhibit Two was executed.

THOMAS H. INMAN

1          How much time after you signed did she

2    sign; was it all in the same room?

3          A.    Yeah, her and I signed in the same room.

4          Q.    And at that time did she voice her

5    disagreement with the evaluation to you?

6          A.    Not that I recall.

7          Q.    Okay.

8          Throughout your tenure at the Department

9    of Corrections as a supervisor and all of the

10   evaluations you did, can you ever recall Miss Fishter

11   or any other supervisor ever disagreeing with any of

12   your comments on a performance evaluation other than

13   this incident?

14         A.    No.

15         Q.    Okay.

16         Now I am going to show you what I would

17   like to mark as Plaintiff's Exhibit Four.  I will give

18   you a chance to review it and let me know when you have

19   completed it.

20         Incidentally, for the record, I want to

21   note Page Two of this composite exhibit is missing.  It

22   was produced in discovery and I don't know if it was

23   our error.  It was probably an inadvertent error, but,

24   just for the record, Page Two is missing.

25         MS. RODRIGUEZ:  If I have it I will give

THOMAS H. INMAN

```
 1              it to you.
 2                      For the record, ours is missing it too.
 3                      THE WITNESS:  Okay.
 4              Q.     (By Mr. Beinhaker) You have had a chance
 5       to review it, Miss McDonald?
 6              A.     Yes.
 7              Q.     It's quite long.  I apologize.
 8                      Could you identify what this is for the
 9       record?
10              A.     It's a taped interview with an Inspector
11       Philip B. Speer, Jr.
12              Q.     When was this interview conducted?
13              A.     November 20th, '98, 10:16 a.m.
14              Q.     And you were the interviewee; is that
15       correct?
16              A.     Yes.
17              Q.     If I could direct your attention, please,
18       to Page Three, about a third of the way down, I believe
19       you make mention of an incident; is this the incident
20       we were talking about?
21              A.     On the ninth floor?
22              Q.     Right.
23              A.     Right.
24              Q.     How do you spell Mr. Rogatz?
25              A.     R-o-g-a-t-z.
```

THOMAS H.  INMAN

```
1          Q.   It's misspelled in this statement?
2          A.   Yes.
3          Q.   He is the Third Circuit Administrator?
4          A.   Right.
5               He's no longer in Broward County.  Now
6     he's transferred to Dade County.
7          Q.   When was he transferred?
8          A.   2000, last year.
9          Q.   Do you know why?
10         A.   I don't know.  They just did a switch
11    around.  They move people around occasionally.
12         Q.   You don't know the specific reason for his
13    transfer?
14         A.   It was both the deputy and the circuit
15    administrators that was switched.
16         Q.   Who is the deputy?
17         A.   Now, for Broward?
18         Q.   Yes.
19         A.   Mr. Edwards, John Edwards.
20         Q.   Who was the former deputy?
21         A.   Okay.
22              We're talking senior or deputy?
23         Q.   The former senior at your division was
24    Rogatz and he was transferred?
25         A.   Replaced by Edwards.
```

THOMAS H. INMAN

1      Q.    Okay.

2      A.    Deputy now is Monroe.

3      Q.    He is the new one?

4      A.    Right, Mr. Monroe, and the old one was

5  Barry Groves.

6      Q.    And both these transfers took place in

7  2000 you mentioned?

8      A.    Yeah.

9      Q.    Do you recall what month?

10     A.    No, but I don't believe they are in Dade

11  County. I think Mr. Groves probably went to

12  Tallahassee, I think. I'm not sure.

13     Q.    You have already gone into some detail

14  about this incident that took place on the ninth floor.

15  I want to direct your attention to specific language

16  that you used.

17           I think you said Carmen was singled out.

18  I think it goes over to the fourth page on the top;

19  what did you mean by that?

20     A.    By that I meant that being -- based on

21  what had happened and it was two employees as far as

22  the verbal altercation and the outbursts, the loudness

23  and whatever was transpired, my opinion of being

24  singled out was it was as if you are to be blamed for

25  the whole thing that transpired and that's what I got

THOMAS H. INMAN

```
 1   from that.  It wasn't, "Okay, you and -- you know, Miss
 2   Blanco, Sharon, you are both wrong.  This kind of
 3   behavior will not be tolerated in the future."
 4              It was like, "You are wrong and I am
 5   right," kind of this thing.
 6        Q.   I'm not sure if you mentioned before, but
 7   what would be the reasoning, if you know, why Miss
 8   Blanco would be singled out after this incident?
 9        A.   Well, like I said, based on what Miss
10   Blanco expressed to me in the past, that there were
11   things that had transpired between her and stuff that
12   involved the circuit administrator and deputy
13   administrator, she had a feeling there was some sort of
14   resentment or retaliation on her based on these things
15   that transpired previously.
16        Q.   Okay.
17              Now I would like to know what is your
18   view, other than what Carmen told you?
19              Do you feel this was a retaliation, her
20   being singled out and Sharon not being reprimanded as
21   well; do you feel this was retaliation against Carmen?
22              MS. RODRIGUEZ:  Objection to form.
23              THE WITNESS:  I can't say that would be my
24         personal opinion and I have no knowledge whether
25         they were.
```

THOMAS H. INMAN

```
 1          Q.   (By Mr. Beinhaker) That's all I'm asking
 2   you for is your view.
 3          A.   Yeah, I can't say whether it was.
 4          Q.   Okay.  Fair enough.
 5               If I can get you to turn to Page 5 of
 6   Plaintiff's Exhibit Four, I believe this concurs in the
 7   middle of the page what you just told us when you were
 8   posed with the question, "Would that be discrimination
 9   or would that be retaliation; I mean, you say she
10   wasn't treated fairly?"
11               You say, "Well, I don't know.  I don't
12   know."
13               Is it fair to say you don't know today
14   whether or not it was retaliation or discrimination?
15          A.   Yes.
16          Q.   Are you aware of an individual who was
17   employed with the Department of Corrections named
18   Michelle Gruss (phonetic)?
19          A.   No.
20          Q.   Never heard of that person?
21          A.   Not that I recall, no.
22               Was she a clerical staff or officer?
23               No, I don't know the name.
24          Q.   How about Nineata Maso Demoya?
25          A.   Nineata, yes.
```

THOMAS H. INMAN

```
1          Q.   You are familiar with Nineata?
2          A.   Yes.
3          Q.   When did she join the department?
4          A.   I have no idea.
5          Q.   When did you first meet her?
6          A.   When I first went to the intake office
7   back in -- let's see.
8               Approximately, about '96, when I was first
9   promoted to clerical supervisor.
10         Q.   Were you aware of a time in '96 when that
11  individual, Miss Demoya, applied for a position of
12  administrative secretary?
13         A.   No knowledge.
14         Q.   Did you have knowledge that Miss Blanco
15  had applied for that position?
16         A.   No.
17         Q.   What are the qualifications, if you know,
18  of Miss Demoya; what is her background; what would be
19  on her application; do you know; her employment
20  application?
21         A.   The only thing I know about her is that
22  she works on the ninth floor for the circuit
23  administrator and deputy administrator and that's all I
24  know pretty much.  I mean, I don't know what her job
25  entails.
```

THOMAS H. INMAN

```
 1              Q.   So, in 1996 who would have been the deputy
 2     administrator and senior administrator; would it be Mr.
 3     Groves and Mr. Rogatz?
 4              A.   Mr. Groves was a deputy administrator and
 5     Mr. Rogatz was the administrator.
 6              Q.   Do you know both of those individuals'
 7     ethnicity and background?
 8              A.   White male individuals.
 9              Q.   What about Miss Demoya; do you know her
10     ethnicity?
11              A.   Black female.
12              Q.   Do you know Douglas Edgersky (phonetic)?
13              A.   No.
14              Q.   How about Jessie Dolan?
15              A.   No.
16              Q.   Linda DeFelice (phonetic)?
17              A.   No.
18              Q.   Fay Gonzalez Sorel?
19              A.   No.
20              Q.   Carolyn Baker?
21              A.   I know a Carol Baker.  I don't know if
22     it's Carolyn Baker.
23              Q.   That would be a fiscal officer?
24              A.   No, no.  That is not the same person.
25              Q.   Do you have an opinion one way or the
```

THOMAS H. INMAN

1    other whether Miss Demoya would be more qualified for

2    the position of administrative secretary in 1996 than

3    Carmen Blanco?

4             A.    No.  I can't say, because I don't know

5    what their qualifications are.

6             Q.    Have you ever seen Miss Blanco's

7    employment application?

8             A.    No.

9             Q.    Nor Miss Demoya's?

10            A.    No.

11            Q.    What is the longest period of time that

12   you know of that an employee has been employed as a

13   word processor in the DOC and remained in that position

14   without receiving a promotion?

15            A.    Well, as far as my knowledge serves me; I

16   mean, we probably have people who have been there

17   before I was employed who are probably still a word

18   systems operator to this day.

19            Q.    So, can you quantify that with a year

20   amount?

21            A.    Ten years.

22            Q.    Can you give me an example of a specific

23   individual?

24            A.    I'm bad with names.  Right now I can't

25   think of anybody's name, because usually that

THOMAS H. INMAN

1    position -- you know, you may have somebody stay for
2    six years and then they leave the department, you know;
3    as well as, you know, it's a possibility you can have
4    WPSOs for ten years, but I don't have any under my
5    supervision right now.
6         Q.    You don't have a specific recollection of
7    a particular individual that would qualify for this
8    ten-year position for being a word processing operator?
9         A.    Who would qualify?
10        Q.    I'm sorry. I shouldn't have ---
11        A.    It's an entry level position.
12        Q.    Who would be a word processor ten years?
13        A.    No, I don't have recollection of a
14   particular individual.
15        Q.    You, in particular, how long was it before
16   you were promoted?
17             How long were you with the department when
18   you were promoted from word processor to, I believe --
19   was it criminal justice?
20        A.    Approximately two years.
21        Q.    Are you able to state whether there is an
22   average amount of years it takes within the department
23   for someone to be promoted from word processor to a
24   higher level position?
25        A.    No.

THOMAS H. INMAN

1          Q.    Give me one minute and I should be
2     finishing up in a second.

3                What are some of the duties and
4     responsibilities of a word processing systems operator?

5          A.    Reception duties, monitoring the phones,
6     processing paperwork of new intakes that come into the
7     office, typing up -- their primary duty is typing
8     investigations, warrants, affidavits, letters, stuff
9     the officers turn in that we are required to type.
10    That's their primary function.  They may have
11    additional duties, such as processing outgoing mail,
12    distributing incoming mail, you know, stuff like that.

13         Q.    Would it be the task of a word processing
14    operator to have cleaning duties, clean a table, clean
15    an office?

16         A.    No, unless they clean their own desk that
17    they sit at.

18         Q.    If another individual employee who was
19    above them asked them to clean, would that be something
20    that would be typically within their responsibilities
21    as a word processing officer?

22         A.    Well, I mean, I couldn't see somebody
23    asking somebody to clean their office.  I mean, we have
24    a storage closet, which from time to time clerical
25    staff, you know, are asked to go in there, usually

54

```
 1    voluntarily, and help straighten out boxes and put
 2    stuff on the shelves, stuff like that; not, per se, me
 3    asking an individual to clean my office.
 4          Q.    When you say clerical staff, is that word
 5    processors, the clerical staff?
 6          A.    Yes, right.
 7                We usually have people that come in at
 8    night and vacuum, clean out the bathrooms, take out the
 9    garbage.
10          Q.    Janitors?
11          A.    Right.
12          Q.    I want to touch on one more topic.  I know
13    we spoke earlier, but I want to ask you about it.
14                You mentioned there was a backup for a
15    position and you mentioned you can volunteer for that;
16    is that correct?
17          A.    Any employee that feels that would enhance
18    their ability to be promoted, if it's available, they
19    say, "Karen, I would like to be the backup for the CJs
20    when this person leaves."
21          Q.    Did you ever receive a request for that
22    from Miss Blanco?
23          A.    No, not under my supervision.
24          Q.    Did she ever ask how she could obtain
25    promotions?
```

55

```
 1           A.    No, she never asked me, because I was
 2     under the impression she was with the department a long
 3     time and she has put in for promotions prior to being
 4     under my supervision; so she wouldn't have a need to
 5     ask me.
 6           Q.    How about if she was unsuccessful in
 7     receiving the promotions; wouldn't you feel that she
 8     wasn't doing the right things to receive a promotion?
 9           A.    I have no knowledge of that.
10           Q.    Other than that idea of a backup position
11     being open when there is --
12           A.    Vacancy.
13           Q.    -- vacancy?
14           A.    Anybody can apply for it, whether they
15     have the experience or not; as well as outside people
16     can apply for these things too.
17           Q.    Are you aware of a person's qualifications
18     that may be disqualifying, such as KSAS?
19                 If you don't have a certain amount of
20     KSAS, can you be disqualified for a position; in other
21     words, ineligible for a position?
22           A.    Disqualified?
23                 That's kind of a strong word.
24                 I would say if you interview three people
25     for that same position and one person has CJ knowledge
```

THOMAS H. INMAN

56

```
 1    because she was a backup, you would lean to the person

 2    who has knowledge.

 3         Q.    When I say disqualifying, I mean your

 4    application wouldn't be considered because you don't

 5    meet the qualifications for the position.

 6         A.    No, not for that position.

 7               Basically, you are talking about entry

 8    level.  The State requires you pass your typing test

 9    and you are able to type thirty-five words a minute and

10    how you present yourself at the interview.

11         Q.    I'm not necessarily talking about entry

12    level.  I am talking about a secretary or something

13    above ---

14         A.    No.

15         Q.    You don't know of any qualification that

16    would disqualify a person?

17         A.    No.

18         Q.    Do you feel Miss Blanco would be capable,

19    if trained, to obtain a higher level position than word

20    processing systems operator?

21         A.    Yes.  Anybody is capable of being trained

22    in a higher position.

23         Q.    So, if an individual employee expressed an

24    interest to be trained for a higher level position,

25    would that training automatically be given?
```

THOMAS H. INMAN

57

```
 1          A.    Not automatically.  It depends on what
 2    position.
 3          Q.    Say for like ---
 4          A.    The criminal justice or senior clerk, if
 5    there is no room for the person to be a backup she
 6    wouldn't be trained for that particular position.
 7                I mean, there are manuals that we have
 8    that lists like the job descriptions, steps that
 9    involve those jobs, and every clerical person has one.
10    You can review it for -- you know, for knowledge and
11    you can gather knowledge from that as far as what the
12    senior clerk does, the steps that are involved.  You
13    can do that stuff.
14          Q.    On your own you can do it?
15          A.    Right, right.
16          Q.    Say, for example, a personal aide or
17    administrative secretary or executive secretary or
18    senior clerk, those positions, in order to acquire
19    training for those, you can do them on your own; is
20    there another avenue other than ---
21          A.    I don't know as far as personal aide or
22    executive secretary, but like a senior clerk position,
23    I know that those have specific job requirements and
24    they do a specific thing.  You can read what they do
25    and everything, but for personal aide I would imagine
```

THOMAS H. INMAN

1   they would go by how many years experience you have as

2   far as office work and knowledge in computer skills or

3   whatever, probably education, but everybody has the

4   opportunity to apply for a position.

5           Q.    While under your supervision, under your

6   direct supervision, do you know what positions Miss

7   Blanco had applied for?

8           A.    Under my supervision?

9           Q.    Yes.

10          A.    No.

11          Q.    Do you know if she applied for any?

12          A.    Not to my knowledge that I recall.  I

13  don't recall that she did or not.  She may have, but I

14  don't recall.  She may not have told me, because that's

15  something that some employees don't really tell you.

16          Q.    You being her direct supervisor, wouldn't

17  you play a role in determining whether or not she would

18  be accepted for that position?

19          A.    The only role would be when they actually

20  like do her reference thing and they would call like

21  her supervisor and they would ask me questions like,

22  you know, "How long has she been under your

23  supervision?  Do you want to add any comments that

24  would enhance her ability in getting this position?"

25          Q.    You don't recall that ever happening?

59

1      A.    I don't recall anybody ever calling me to

2   ask me my personal opinion of Miss Blanco with regards

3   to any promotion.

4      Q.    Do you recall while being a supervisor at

5   the DOC any other employees being called or referred

6   upon when they were applying for a promotion?

7      A.    Yeah, Beth Burns, Elizabeth Burns.  I

8   remember when she was under my supervision she applied

9   for the criminal justice technician position.

10     Q.    And you received a call from someone

11  within the department asking for your view on the

12  qualifications and the like?

13     A.    Well, the particular position she was

14  going for was still at that same office; so it was with

15  the other clerical supervisor.  She supervised that

16  position, so we were all in the same office.

17     Q.    Anybody else that you had input on when

18  they were applying for a promotion within the

19  department?

20     A.    No, not that I recall.

21          MR. BEINHAKER:  That's all I have.

22          MS. RODRIGUEZ:  I have no questions.

23          (Discussion off the record.)

24          MR. BEINHAKER:  You have the option to

25       either review your transcript and read it to

THOMAS H. INMAN

```
 1              check for clerical errors and make sure the

 2              testimony you gave was accurate or you can waive

 3              that option.

 4                        THE WITNESS:  I'll waive it.

 5                        (Thereupon, the reading and signing of the

 6              deposition were waived.)

 7                        (Thereupon, the deposition was concluded

 8              at 11:25 a.m.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THOMAS H. INMAN

1                          CERTIFICATE

2

     STATE OF FLORIDA )
3                      :SS
     COUNTY OF DADE )

4

5              I, ELISSA B. SELINGER, Notary Public in
     and for the State of Florida at Large, do hereby
6    certify that I reported the deposition of KAREN
     McDONALD, a witness called by the Plaintiff in the
7    above-styled cause; that the said witness was first
     duly sworn by me; and that the foregoing pages,
8    numbered from 1 to 60, inclusive, constitute a true and
     correct transcription of my stenographic notes of the
9    deposition by said witness.

10             I further certify that I am not an
     attorney or counsel for any of the parties, nor a
11   relative or employee of any attorney or counsel
     connected with the action, nor financially interested
12   in the action.

13             WITNESS my hand and official seal in the
     City of Miami, County of Dade, State of Florida, this
14   15th day of July, 2001.

15

16

17                          ELISSA B. SELINGER
                            Notary Public in and for the
18                          State of Florida at Large.

19   

20

21

22

23   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT
     APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS
24   UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE
     CERTIFYING REPORTER.
25

STATE OF FLORIDA
DEPARTMENT OF CORRECTIONS
PROBATION AND PAROLE SERVICES CIRCUIT 17-0 INTAKE

RECEIVED

MEMO TO:    Carmen Blanco
Word Processing Systems Operator        JUN 17 1998

FROM:    Grace Fishter
Correctional Probation Senior Supervisor    REGION IV - PERSONNEL

DATE:    June 16, 1998

SUBJECT:    WRITTEN REPRIMAND #1

This memo is to officially document that you are receiving a written reprimand
for violation of DC Rule 33-4.002(4), and 33-4-003(22) Conduct Unbecoming a
Public Employee.

This reprimand is based on the following:  On May 4, 1998, Ms. Tranghese,
WPSO, as directed by Ms. McDonald, WPSO Supervisor, placed two files on your
desk for typing corrections to be made.  At that point, you verbally attacked
Ms. Tranghese in an outburst by stating in a loud, angry voice "In the future
you are not to bring me corrections, and that after six (6) years of
employment, I do not need you to do this and furthermore, you are not my
supervisor."

Action of this nature cannot and will not be tolerated in the future.

As a Career Service Employee with permanent status you have the right to
grieve this reprimand if you feel it is unjust.  You may do so by using the
Career Service Grievance Procedure or the Grievance Procedure outlined in the
agreement between the State of Florida and A.F.S.C.M.E.

Grace Fishter
Correctional Probation Senior Supervisor
17-0 Intake Office

RECEIVED
JUN 17 1998
REGION IV - PERSONNEL

cc:    Joyce D. Haley, Director of Regional Community Corrections
Gary Rogatz, Correctional Probation Senior Administrator
Barry Q. Groves, Correctional Probation Deputy Administrator
Personnel File - Carmen Blanco

Receipt and Acknowledgement: _____ Date _____

Witness: _____    Witness: _____

GF:idp

QUALITY IS CONTAGIOUS

EXHIBIT
PAGE
CIR 17

DEPARTMENT OF CORRECTIONS
Record of Oral Step
Union Grievance

This form is to be completed by the immediate supervisor of an
employee who files a grievance at the Oral Step.

CARMEN BLANCO                          WPSO .                    17-O INTAKE OFFICE
Grievant' Name                         Class Title              Work Location

Date Oral Step grievance filed  6/23/98

Date and event giving rise to grievance:  6/23/98

On 6/23/98, Ms. Blanco returned to work after being out on sick leave.  She asked

Ms. Grace Fishter if she could review her working file at which time she indicated

Ms. Fishter had denied her access to see her file.  Ms. Blanco then asked, "Why?"

and Ms. Fishter responded, "Because I don't want to."

What Articles of the collective bargaining agreement did the
grievant allege were violated?_____

Was grievance filed within 14 days of the event? Yes

Grievant's requested remedy: That persons involved be held accountable and

that an independent committee conduct an investigation.

_____

Supervisors' decision: Based on the fact that Ms. Blanco does not feel this

issue can be resolved at the Step 1 level, this writer will forward to immediate

supervisor and all appropriate parties, in order to resolve this issue.

Karen Mc Donald                        6/23/98
Supervisor's signature                 Date employee advised of
                                       supervisor's decision

cc:  Superintendent
     Personnel Manager
     Personnel File

EXHIBIT # AL
PAGE  15  OF 20

MEMO TO:    Karen McDonald
            WPSS

FROM:       Carmen Blanco
            WPSO

DATE:       June 23, 1998

SUBJECT:    EMPLOYEE GRIEVANCE REGARDING DISCRIMINATION, HARASSMENT IN THE
            WORK PLACE AND INDIRECT RETALIATION.

Ms. McDonald, in the past six years with the department I have been
discriminated against, harassed and retaliated against indirectly.   Ms.
Fishter's behavior towards me in the past and in the present is hostile
and unprofessional. On one occasion I voiced my opinion and told her she
was wrong in her methods of solving problems, instead of fixing them she
pacifies them and doesn't solve them. It is my understanding that she did
the same thing to Keisha Cheeks, Chestina Montegue, Beth Burns, Bill Henry
and me and God knows how many others. Her hostile manner with me is
affecting not only my work performance, but my health as well.
She is building up my file with negative memos so as to discredit me and
when I asked to see if I could look at my work file, she denied me access
to my file. When I asked her why? she stated "Because I don't want to"
this behavior is uncalled for. If we are allowed to look at our personnel
file at the regional level then she is breaking the rules.

When there is unprofessional behavior within the Department we all have
choices to make. We can look the other way, or we can stand up for what
is right. I believe in doing the "Right Thing" and will continue to
request that the "Right Thing" be done. All those memos that Ms. Fishter
put in my file while I was out on sick leave must be addressed with higher
authorities.

Until there is an investigation on Ms. Fishter's behavior towards me
regarding her unprofessional behavior by an independent agency, or someone
from Tellahasee, I Carmen Blanco refuse to come to work until this problem
is solved.

I have followed the chain of commands to no avail and I am
requesting that an independent agency or Tallahassee investigate
Ms. Fishter's unprofessional behavior towards me. In the meantime
I would appreciate her not addressing herself to me.

Sincerely,

Carmen Blanco.

Carmen Blanco
WPSO

cc:  Kerry Flack, Director
     Harry K. Singletary, Secretary
     E. E. O. C.
     Attorney

EXHIBIT # $A$ L
PAGE $14$ OF Lo

**REPORT OF INVESTIGATION**
**OFFICE OF THE INSPECTOR GENERAL**
**DEPARTMENT OF CORRECTIONS**

**INVESTIGATION: #98-41395**
**EEOC: 15A980402**

| | |
|---|---|
| **CORRECTIONAL INVESTIGATOR:** | Philip B. Speer, Jr. |
| **DATE OF REPORT:** | December 28, 1998 |
| **DATE OF INCIDENT:** | April 18, 1998 |
| **CLASSIFICATION OF COMPLAINT/INCIDENT:** | Discrimination based on National Origin and Retaliation |
| **LOCATION:** | Parole and Probation Office 17-0 |
| **COMPLAINANT:** | Carmen Blanco, Former Word Processing Systems Operator, H/F,D.O.B. 07/09/50 |
| **VICTIM:** | Carmen Blanco |
| **SUBJECT:** | Florida Department of Corrections |
| **WITNESSES:** | Grace Fishter, Correctional Probation Senior Supervisor, W/F, D.O.B. 04/26/47 |
| | Karen McDonald, Word Processing Systems Operator Supervisor, B/F, D.O.B. 06/13/65 |

**SYNOPSIS:**

On 07/16/98, Former Word Processing Systems Operator Carmen Blanco filed a Charge of Discrimination with the Broward County Human Rights Division and the Equal Employment Opportunity Commission based on National Origin and

**Investigative Report #98-41395**
**EEOC 15A980402**

**Page 2**

Retaliation.  This complaint was forwarded to the Employee
Relations Section of the Bureau of Personnel on 09/24/98.

Ms. Blanco failed to respond to requests by telephone and
certified letter for an interview.

A review of Ms. Carmen Blanco's personnel file did not
reveal any documents concerning any discriminatory acts
occurring on or after Saturday, 04/18/98, as stated in her
Charge of Discrimination.

**ALLEGATION**

Former Word Processing Systems Operator Carmen Blanco has
been discriminated against based on her National Origin and
Retaliation.

**FINDINGS:**

On 07/16/98, Former Word Processing Systems Operator Carmen
Blanco filed a Charge of Discrimination with the Equal
Employment Opportunity Commission (EEOC) and the Broward
County Human Rights Division.

> Ms. Blanco indicated on the form that the date of
> discrimination took place on the earliest 04/18/98 and
> the latest 04/18/98 and it is a continuing action.  It
> should be noted that 04/18/98, is a Saturday.

> In Ms. Blanco's typed complaint the particulars are:
> "1. I have been employed by the Respondent since
> 3/12/92 as a Word Processor. I filed a complaint with
> the Respondent about being discriminated against in
> July, 1993 and 1996.  In retaliation, I have been
> further discriminated against and treated differently
> because of my National Origin by denying me equal
> wages and failure to promote.  I have been harassed
> continually since July, 1993 to the present by
> exposing me to a hostile, continuous and pervasive
> environment.  I am Puerto Rican.  2.  The Respondent
> has informed me that they do not have to give a reason
> for exposing me to differential treatment.  3.  I
> believe that I have been discriminated against in

**Investigative Report #98-41395**
**EEOC   15A980402**

Page 3

> violation of Title VII of the Civil Rights Act of
> 1964, as amended, Section 704a, and the Florida Civil
> Rights Act (Chapter 760)." **(Exhibit #A1, page 1)**

On 09/29/98, I conducted a search of the Inspector
General's Office database (IGLOGS) and could not locate any
investigation listing Carmen Blanco as a victim,
complainant or subject.  Carmen Blanco is listed as a
witness in Case #94-40662, which includes Helene Sumpter as
a victim and Ronald Catalano as the subject.  The case
concerns a verbal threat complaint and was not assigned for
investigation.  **(Exhibit #B1, pages 1 & 2)**

On 10/02/98, I reviewed Carmen Blanco's personnel file at
the Regional Office.

> The following information was obtained from documents
> located in the file:
>
> On 12/14/93, Correctional Probation Supervisor III
> Linda M. Scarlett of the 17-1 Probation Office wrote
> an Interoffice Memorandum to Secretary Specialist
> Carmen Blanco reference confirmation of a meeting
> dated 12/14/93.
>
> Present during this meeting was Word Processing
> Systems Operator Supervisor Arline Wiess and copies
> are sent to Correctional Probation Deputy
> Administrator Barry Q. Groves and Word Processing
> Systems Operator Supervisor N. Diane Knight.
>
> Ms. Linda Scarlett informed Ms. Carmen Blanco that she
> is under her supervision despite her assignment to the
> WPSO unit.  Questions concerning technical issues and
> typing assignments will be addressed through WPSOS
> Diane Knight and any other problems or concerns
> including taking leave should be directed to Ms.
> Scarlett. Ms. Scarlett states, "It is anticipated
> that you will be permanently reassigned to a WPSO
> position in Ms. Weiss' unit once an individual has
> been selected for the Secretary Specialist position."

**Investigative Report #98-41395**
**EEOC  15A980402**

**Page 4**

Ms. Scarlett states, "During our conversation you also referred to a "problem you were having with me" and the fact that you felt you were being "harassed." When asked to elaborate, you indicated that this was just something that you "felt" and did not provide further detail. As stated, I would encourage you to bring any problems or concerns to my attention for resolution. At present, I am unaware of the source of this problem or the nature of this harassment."

On 07/1/96, a letter was addressed to Carmen Blanco from Correctional Probation Regional Administrator Joyce Haley, which is signed by Mr. Tony Harper and concerns reassignment. This letter informs Ms. Blanco she is being reassigned as a Word Processing Systems Operator position at the Regional Office to the same position at the 17-1 Pompano Beach Office of Probation and Parole Services, effective 07/15/96.

On 07/01/96, Word Processing Systems Operator Carmen Blanco filed a Career Service Employee Grievance, which states, "I have been informed that on 7/15/96, I will be reassigned. Copy of letter attached. I object to my reassignment.  (2) When I questioned why I was being reassigned I was told "NO EXPLANATION NEED BE GIVEN".  (3) The decision to reassign me seems to stem from racial discrimination towards me by my Supervisor, Ronald E. Crosby [.] (4) I have been on the job for over one (1) year and the Department over (4) years.  My recent evaluations have been all Satisfactory." [sic] Under the section Employee's proposed solution states, "That I work under a Supervisor who believes in Cultural Diversity and that I not report to Mr. Crosby, That I continue my work under a different Supervisor [.]"

On 08/13/96, a letter is addressed to Carmen Blanco from Regional Director Carl D. Berry concerning a Career Service Grievance. Mr. Berry states "This is in response to the Step 2 Career Service Grievance hearing held in the Regional Office on Monday, August 12, 1996.

**Investigative Report #98-41395**
**EEOC  15A980402**

**Page 5**

> The nature of your grievance is that you were informed
> that on 07/15/96, you would be reassigned, and that
> you objected to your reassignment.  Your proposed
> solution was to work under a supervisor who believes
> in Cultural Diversity, that you not report to Mr.
> Crosby, and to continue your work under a different
> supervisor.
>
> During the hearing, you indicated Mr. Crosby made
> derogatory statements towards yourself and other
> spanish speaking people.  Additionally you felt that
> being reassigned to the 17-1 Office was placing you
> back into a-situation you had encountered with the
> clerical supervisor two years ago, and you had
> expressed a desire to be reassigned to the 17-0
> Circuit Office.
>
> As indicated in the hearing, we would not discuss
> ethnic issues, as the department has a procedure in
> place to address complaints that fall under Equal
> Employment Opportunity."
>
> The letter states, that Ms. Carmen Blanco will be
> reassigned from the 17-1 office to 17-0 office
> effective 08/23/96.
>
> On 03/30/98, A Review and Performance Planning form
> was signed by Ms. Carmen Blanco, Supervisor Karen
> McDonald and Reviewing Authority Grace Fishter.  The
> rating period is for 04/12/97 through 03/30/98.
>
> Supervisor Karen McDonald states, "Ms. Blanco is
> always willing to assist and train new employees as
> needed.  She gets along with co-workers."
>
> On 03/30/98, Correctional Probation Senior Supervisor
> Grace Fishter prepared a letter to Word Processing
> Systems Operator Carmen Blanco with copies to
> Correctional Probation Deputy Administrator Barry
> Groves, Word Processing Systems Operator Supervisor
> Karen McDonald and personnel file.

**Investigative Report #98-41395**
**EEOC   15A980402**

**Page 6**

The letter states "Please be advised that on March 30, 1998, I discussed your evaluation with your immediate supervisor, Ms. Karen McDonald. I expressed my concerns and disagreed with the comments made in the evaluation based on documented evidence that have occurred during my stay at the 17-0 office.

Please be advised that this memorandum will be attached to your evaluation and a copy placed in your personnel file."

On 04/14/98, Word Processing Systems Operator Carmen Blanco prepared a letter addressed to Word Processing Systems Operator Supervisor Karen McDonald with copies to Secretary Harry S. [sic] Singletary, Jr., Correctional Probation Deputy Administrator Barry Q. Groves, Attorney Ruben M. Garcia and Personnel File.

Ms. Carmen Blanco states "Today April 14, 1998, I was expecting to put in a full days work, but I received from Ms. Fishter a memo stating that she discussed with you my evaluation on the 30th of March 1998 and expressed her concerns about the evaluation you had given me and that she disagreed with it. What greatly disturbs me is that my evaluation took place on April 6, 1998 and I don't see how she could have discussed this with you, when it did not take place on the 30th.

Further, to this date I still don't understand why my rapp [sic] was back dated to March 30, 1998, also why the current memo that I received on the 14th of April 1998, was back dated to March 30, 1998.

Since it is my belief that these are games and strategies being played to indirectly harass me and intimidate me I am going to see my attorney to discuss this matter. I suppose that when lie detector test[s] are taken the truth will show up, but until then whenever I feel I'm being indirectly harassed or intimidated, I will seek legal counsel."...

On 04/30/98, Carmen Blanco requested a permanent flexible work schedule to accommodate her doctor's

**Investigative Report #98-41395**
**EEOC 15A980402**

Page 7

appointments for therapy. On 05/13/98, Regional
Director Carl Berry approved this request.

On 05/08/98, Word Processing Systems Operator
Supervisor Karen McDonald sent a letter to Word
Processing Systems Operator Carmen Blanco advising her
of unauthorized leave without pay for not getting her
leave approved prior to calling in on this date. Ms.
McDonald stated "When this writer asked if you had
completed a Leave Request Form for taking time off
from work, you stated to this writer in an angry tone
of voice that you did not have to request leave for
personal issues and that I was harassing you. At that
point I stated to you that I was not harassing you and
there are policy and procedures for taking leave."

This information was forwarded to Correctional
Probation Senior Supervisor Grace Fishter,
Correctional Probation Deputy Administrator Barry
Groves and Personnel File.

On 05/08/98, Word Processing Systems Operator
Supervisor Karen McDonald prepared a letter to Word
Processing Systems Operator Carmen Blanco and copied
this document to Correctional Probation Senior
Supervisor Grace Fishter, Correctional Probation
Deputy Administrator Barry Groves and Personnel File.

This letter documents a conversation between McDonald
and Blanco reference the assignments in the office
when McDonald was to be on leave (05/18/98-06/12/98).
Ms. McDonald placed a less senior employee in the
position to return work to staff that needed
corrections. Ms. Blanco indicated she intended to
fight the action and file a grievance.

On 06/16/98, Correctional Probation Senior Supervisor
Grace Fishter issued Word Processing Systems Operator
Carmen Blanco a Written Reprimand #1, which Ms. Blanco
refused to sign and is witnessed by Karen McDonald.
Copies are forwarded to Director of Regional Community
Corrections Joyce D. Haley, Correctional Probation
Senior Administrator Gary Rogatz, Correctional

**Investigative Report #98-41395**
**EEOC  15A980402**

**Page 8**

Probation Deputy Administrator Barry Groves and the
Personnel File of Carmen Blanco.

Ms. Fishter states "This memo is to officially
document that you are receiving a written reprimand
for violation of DC Rule 33-4.002(4), and 33-4-003(22)
Conduct Unbecoming a Public Employee.

This reprimand is based on the following: On May 4,
1998, Ms. Tranghese, WPSO, as directed by Ms.
McDonald, WPSO Supervisor, placed two files on your
desk for typing corrections to be made.  At that
point, you verbally attacked Ms. Tranghese in an
outburst by stating in a loud, angry voice "In the
future you are not to bring me corrections, and that
after six (6) years of employment, I do not need you
to do this and furthermore, you are not my
supervisor."

Action of this nature cannot and will not be tolerated
in the future.

As a Career Service Employee with permanent status you
have the right to grieve this reprimand if you feel it
is unjust.  You may do so by using the Career Service
Grievance Procedure or the Grievance Procedure
outlined in the agreement between the State of Florida
and A.F.S.C.M.E."

On 06/23/98, Carmen Blanco filed a Career Service
Grievance with her supervisor, Karen McDonald.

The grievance concerned "Discrimination, Harassment in
the work place and indirect retaliation, grievance is
against Ms. Grace Fishter."  Employee's proposed
solution "That the people doing this be held
accountable, and that a committee (An independent
committee do an investigation).

Attached to this is a memo to Word Processing Systems
Operator Supervisor Karen McDonald with copies to
Director Kerry Flack, Secretary Harry K. Singletary,
E.E.O.C. and Attorney. · The subject of this document

**Investigative Report #98-41395**
**EEOC   15A980402**

**Page 9**

is Employee Grievance regarding discrimination,
harassment in the work place and indirect retaliation.

Ms. Carmen Blanco states, "Ms. McDonald, in the past
six years with the department I have been
discriminated against, harassed and retaliated against
indirectly.  Ms. Fishter's behavior towards me in the
past and in the present is hostile and unprofessional.
On one occasion I voiced my opinion and told her she
was wrong in her methods of solving problems, instead
of fixing them she pacifies them and doesn't solve
them.  It is my understanding that she did the same
thing to Keisha Cheeks, Chestina Montegue, Beth Burns,
Bill Henry and me and God knows how many others.  Her
hostile manner with me is affecting not only my work
performance, but my health as well.  She is building
up my file with negative memos so as to discredit me
and when I asked to see if I could look at my work
file, she denied me access to my file.  When I asked
her why? She stated "Because I don't want to" this
behavior is uncalled for.  If we are allowed to look
at our personnel file at the regional level then she
is breaking the rules.

When there is unprofessional behavior within the
Department we all have choices to make.  We can look
the other way, or we can stand up for what is right.
I believe in doing the "Right Thing" and will continue
to request that the "Right Thing" be done.  All those
memos that Ms. Fishter put in my file while I was out
on sick leave must be addressed with higher
authorities.

Until there is an investigation on Ms. Fishter's
behavior towards me regarding her unprofessional
behavior by an independent agency, or someone from
Tallahassee, I Carmen Blanco refuse to come to work
until this problem is solved.

I have followed the chain of command to no avail and I
am requesting that an independent agency or
Tallahassee investigate Ms. Fishter's unprofessional

**Investigative Report #98-41395**
**EEOC  15A980402**

**Page 10**

behavior towards me.  In the meantime I would
appreciate her not addressing herself to me."

On 06/23/98, Ms Blanco filed a Department of
Corrections Record of Oral Step Union Grievance with
Supervisor Ms. Karen McDonald reference the same
issues in the Career Service Grievance.

On 06/29/98, Regional Personnel Officer Thomas H.
Stillson addressed a letter to Ms. Carmen Blanco at
the Circuit Office 17-0.  Mr. Stillson advised Ms.
Blanco that the grievances (Exhibit #A2, pages 14 and
15) were being returned because she could not file
with both the state and the union. Mr. Stillson also
advises her that complaints reference allegations of
discrimination are not grievable and must be filed
with the Equal Employment Opportunity Commission,
Florida Commission on Human Relations or internally
with the Florida Department of Corrections by
contacting his office.

On 06/29/98, Word Processing Systems Operator Carmen
Blanco faxed her resignation to Word Processing
Systems Operator Supervisor Karen McDonald.  The
subject of the document states "CAREER GRIEVANCE
REGARDING INDIRECT RETALIATION, HARASSMENT AND
DISCRIMINATION."

The text states "Ms. McDonald, We all have choices to
make.  We can stand up for what is right or we can
join others in doing what is wrong.  I believe in
doing the "Right Thing".  All those memos that Ms.
Fishter put in my file while I was out on sick leave
must be addressed with higher authorities.

Until there is an investigation from an independent
agency, regarding the unethical and professional
behavior towards me. I Carmen Blanco resign from the
Department of Corrections as of June 29, 1998.

I am confident, that in a Court of Law the "Right
Thing" will be done."  **(Exhibit #A2, pages 1-20)**

**Investigative Report #98-41395**
        **EEOC  15A980402**

**Page 11**

On 04/13/92, Carmen Blanco signed a Department of
Corrections Receipt for Rules, Procedures or Policies
revising the EEO/AA Policy Statement effective 11/91.
**(Exhibit #A4)**

On 10/19/98, I sent Ms. Carmen Blanco a certified letter
requesting she contact me for an interview concerning her
complaint and verifying our telephone conversation on
10/02/98. Ms. Carmen Blanco signed for this letter on
10/21/98 and has not contacted me for an interview.
**(Exhibit #A3, pages 1 & 2)**

On 11/20/98, I reviewed and copied the Attendance and Leave
Reports for Carmen Blanco for the dates of 04/17/98 through
06/29/98.

> These documents reveal that Carmen Blanco worked a
> total of 53.50 hours.  **(Exhibit #A5, pages 1-7)**

On 11/20/98, I conducted a sworn tape-recorded interview
with Correctional Probation Senior Supervisor Grace
Fishter.

> Ms. Grace Fishter reviewed the complaint filed by Ms.
> Carmen Blanco and related she was not aware of any
> discrimination based on Ms. Blanco's national origin
> or retaliation.  **(Exhibit #A6, pages 1-6)**

On 11/20/98, I conducted a sworn tape-recorded interview
with Word Processing Systems Operator Supervisor Karen
McDonald.

> Ms. Karen McDonald reviewed the complaint filed by Ms.
> Carmen Blanco and related she was not aware of any
> discrimination based on Ms. Blanco's national origin
> or retaliation.  **(Exhibit #A7, pages 1-7)**

Investigative Report #98-41395
        EEOC  15A980402

Page 12

Signature: _Philip B Sprent_     _12/28/98_
     Correctional Officer Senior Inspector    Date

Reviewed By: _G. Cary Hill_     _12/28/98_
     Regional Inspector Supervisor     Date

_E. A. Slack_     _1/4/99_
Chief Inspector     Date